# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-00029-H-KS

| | | |
|---|---|---|
| EGLĖ VAITKUVIENĖ, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | CLASS ACTION |
| Plaintiff, | ) ) | DEMAND FOR JURY TRIAL |
| vs. | ) ) | |
| SYNEOS HEALTH, INC., ALISTAIR MACDONALD and GREGORY S. RUSH, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ACTION.........................................................................................1

II.   JURISDICTION AND VENUE ......................................................................................6

III.  FRAUD-BASED CLAIMS ............................................................................................7

    A.    Parties to Fraud-Based Claims..........................................................................7

        1.    Lead Plaintiffs.....................................................................................7

        2.    Section 10(b) Defendants.....................................................................7

    B.    Substantive Allegations ...................................................................................11

        1.    Background of INCR...........................................................................11

        2.    INCR Endeavored to Capture the Growing Commercial (CCO) Market..11

        3.    The Section 10(b) Defendants Promoted the Benefits of the Merger and the Growth Prospects of inVentiv's Commercial (CCO) Segment and the Combined Company .................................................................14

        4.    The Commercial (CCO) Segment Acquired From inVentiv Was Struggling to Win New Business and Keep Existing Business, Which Would Dramatically Slow Commercial Growth in 2018 .........................16

        5.    The Section 10(b) Defendants Assured Investors that a Rebound in New Drug Approvals and inVentiv's Pipeline of Business Would Return the Commercial Segment to Strong Double-Digit Growth in 2018 ...............18

        6.    The Section 10(b) Defendants Began to Express Uncertainty About Growth of the Commercial Business .......................................................20

        7.    Numerous Facts Support Defendants' Knowledge that the Commercial Segment Was Struggling to Win Large Contracts, Which Would Negatively Impact Revenue in 2018 .......................................................23

        8.    The Section 10(b) Individual Defendants Were Motivated to Implement the Merger and Artificially Inflate the Company's Stock Price ...............27

        9.    Executive Departures Provide Further Support that the Section 10(b) Individual Defendants Acted Fraudulently...............................................29

    C.    The Section 10(b) Defendants' Materially False and Misleading Statements, Omissions of Material Facts, and Partial Revelations During the Class Period.................................................................................................32

## TABLE OF CONTENTS

**Page**

1.    When Announcing the Merger, the Section 10(b) Defendants Materially Misrepresented and Omitted Material Facts Concerning the Company's Commercial Business.................................................35

2.    The Section 10(b) Defendants Continued Making False and Misleading Statements and Omitting Material Facts Four Weeks After Announcing the Merger.................................................39

3.    The Section 10(b) Defendants Continued Making Materially False and Misleading Statements and Omitting Material Facts in the Proxy Materials .................................................40

4.    Just Four Days Prior to the July 31, 2017 Merger Vote, the Section 10(b) Defendants Continued Making Materially False and Misleading Statements and Omitting Material Facts.................................................42

D.    Just One Month After Closing the Merger, the Section 10(b) Defendants Began to Reveal the True Prospects of the Commercial Business Acquired from inVentiv, but the Section 10(b) Defendants Continued to Mislead the Market .................................................44

E.    Post-Class Period Developments .................................................56

F.    Loss Causation .................................................63

G.    Presumption of Reliance .................................................67

H.    No Safe Harbor .................................................69

I.    Lead Plaintiffs' Class Action Allegations for Fraud-Based Claims .................................................70

COUNT I .................................................72

FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL SECTION 10(b) DEFENDANTS.................................................72

COUNT II .................................................76

FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS.................................................76

IV.    NON-FRAUD PROXY CLAIMS .................................................78

A.    Overview of Non-Fraud Proxy Claims.................................................78

B.    Parties to Non-Fraud Proxy Claims .................................................79

## TABLE OF CONTENTS

**Page**

    1.    Lead Plaintiffs ................................................................................... 79

    2.    Section 14(a) Defendants ................................................................. 79

C.    The Section 14(a) Defendants Performed Due Diligence Regarding the Merger ........................................................................................................ 82

D.    Shareholders Received Proxy Materials ............................................... 85

E.    The Structure of the Merger .................................................................. 85

F.    The Proxy Materials Solicited the Section 14(a) Class's Votes for the Merger and, Therefore, Were an Essential Link in the Accomplishment of the Merger ............................................................................................... 86

G.    The Proxy Materials Contained Material Misrepresentations and Omissions of Material Facts .................................................................... 87

H.    Before the Truth Was Revealed, the Section 14(a) Class Voted to Approve the Merger ............................................................................................... 88

I.    Loss Causation ....................................................................................... 90

J.    Lead Plaintiffs' Class Action Allegations for Non-Fraud Proxy Claims .............. 94

COUNT III ............................................................................................................... 96

    FOR VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 AGAINST ALL SECTION 14(a) DEFENDANTS ..................................... 96

COUNT IV ............................................................................................................... 98

    FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST ALL SECTION 14(a) INDIVIDUAL DEFENDANTS ..................................... 98

PRAYER FOR RELIEF ......................................................................................... 99

By and through their undersigned counsel, Lead Plaintiffs San Antonio Fire & Police Pension Fund and El Paso Firemen & Policemen's Pension Fund ("Lead Plaintiffs") bring this federal class action against the Section 10(b) Defendants and the Section 14(a) Defendants (as defined below; collectively, "Defendants"), upon personal knowledge as to those allegations concerning Lead Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Defendant Syneos Health, Inc., formerly known as INC Research Holdings, Inc. ("INCR" or "Company"), and other related non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review and analysis of securities analyst reports, news articles, websites, and other publicly available information concerning Defendants and other related non-parties; and (d) interviews with factual sources, including individuals formerly employed by the Company. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    Prior to the Class Period (defined below), Defendant INCR was primarily a contract research organization ("CRO"), meaning that it assisted biopharmaceutical companies in conducting clinical trials. The CRO market, however, had been largely developed for many years and did not offer substantial opportunities for growth. By late 2016, INCR identified a need to expand its services and enhance its opportunities for continued growth.

2.    To that end, INCR sought a merger ("Merger") with inVentiv Health, Inc. ("inVentiv"), which was both a CRO and a contract commercial organization ("CCO"), offering a full suite of commercialization and post-drug approval services for biopharmaceutical customers. inVentiv was the number one CCO in the world, with a robust history of growth. Indeed, inVentiv's

- 1 -

CCO, also known as its "Commercial" segment or business, was its primary growth driver from 2013 to 2016, with revenues rising at a compound annual growth rate ("CAGR") of 15%, compared to CAGR of 6% for CRO revenues.  inVentiv also had strong connections to large biopharmaceutical ("big pharma") customers, which INCR did not have at that time.  Eager to tap into that growth potential, between November 2016 and May 2017, INCR's Chief Executive Officer ("CEO"), Defendant Alistair Macdonald ("Macdonald"), INCR's Chief Financial Officer ("CFO"), Defendant Gregory S. Rush ("Rush"), and the INCR Board of Directors ("Board") met with inVentiv's CEO, Defendant Michael A. Bell ("Bell"), and other inVentiv executives and completed due diligence concerning a potential Merger.

3.      On May 10, 2017, the first day of the Class Period, inVentiv and INCR announced the proposed Merger and began distributing information about the Merger in various Proxy Materials (as defined below) that were filed with the SEC.  This marked the beginning of a public campaign by Defendants to convince INCR's shareholders to approve the Merger.  On an investor call held the same day, Defendants highlighted the benefits of the Merger and assured investors that INCR had performed extensive due diligence on inVentiv, reviewed all aspects of inVentiv's Commercial business, scrutinized its material contracts and business pipeline, and understood its expected financial performance.

4.      Defendants disclosed on the investor call that inVentiv would experience Commercial shortfalls in 2017 due to business cancellations and a lower number of new U.S. Food and Drug Administration ("FDA") drug approvals in 2016.  However, Defendants assured investors that new drug approvals were rebounding strongly in 2017, which Rush called "a huge leading indicator as you're thinking about modeling the Commercial business going forward as to what that market looks like."

- 2 -

5.      Defendants stated that, based on the Commercial business's increase in new drug approvals and strong business pipeline, the combined Company would achieve 9% or double-digit revenue growth in 2018.  As Rush said on the May 10, 2017 call:  "Well, we're #1 in the [Commercial] market.  So we own this market, so that's a good thing. . . . [W]hen you're looking at new drug applications doubling [in 2017] and the pipeline discussions we're having with our customers, *we're confident in that double-digit [revenue growth] number [in 2018]. . . . I wouldn't give that kind of commentary if we didn't feel, at this stage, based on what we see today, that we were confident in it*."  Defendants also stated that the combined Company would achieve immediate accretion to adjusted earnings per share ("EPS") as a result of the Merger and that the Commercial business, in 2018, could return to its historic revenue growth of 15%.  inVentiv's 2018 Commercial performance was of critical importance to investors, who understood 2017 would not see a strong financial performance in Commercial, but sought assurance that the Merger would buoy, not sink, INCR's future growth.  Because inVentiv was privately held, investors' primary access to information about the Commercial business was through Defendants' representations during the Class Period.

6.      As the Class Period continued, Defendants doubled down on their optimistic statements.  On July 27, 2017 – just four days before INCR shareholders voted on the Merger – Rush claimed that "*[w]e're more optimistic today than we were on May 10 on . . . the combined compan[y's] numbers for 2018*," citing the rebound in new drug approvals and "first half results." In fact, Macdonald confirmed that Defendants were still "on the path to returning the company to *double-digit organic revenue growth in 2018*."  Against this backdrop, INCR's shareholders approved the Merger, which was finalized on August 1, 2017.  Defendants' campaign to convince shareholders was a success.

- 3 -

7.      In reality, Defendants knew that continued growth of the Commercial business was dependent on winning large contracts to commercialize drugs developed by pharmaceutical customers. Defendants referred to these contracts as "100-plus" based on the fact that they involved large sales teams of 100 or more sales representatives ("100-plus sales team contracts"). Because these contracts were critical, inVentiv focused on winning them at the expense of pursuing a more diverse pool of different-sized contracts. While this approach drove double-digit Commercial revenue growth for several years (2013-2016), it left inVentiv vulnerable to a sharp financial downturn if it failed to win a sufficient number of 100-plus sales team contracts to sustain such growth in the future.

8.      This is precisely what happened in 2017. Through the end of the Class Period, the Commercial segment *had not earned a single 100-plus sales team contract or gained other new business sufficient to compensate for such failure*. As a result, Defendants knew during the Class Period that the Company's 2018 revenue growth would not be in the double digits despite the rebound in new drug approvals that Defendants misleadingly emphasized as a precursor to such growth.

9.      After closing the Merger and reaping *nearly $30 million* in Merger-related compensation and insider sales proceeds, Defendants began to reveal that the Commercial prospects might not be as rosy as they first claimed. During a conference call on September 6, 2017, just a few days after Rush sold over $7.6 million of INCR stock, an analyst inquired about Defendants' "pretty ambitious targets" for the Company's financial performance following the Merger. In response, Rush said the Commercial segment was a "wild card" and discussed a range of possible growth scenarios in 2018. This uncertainty caused the Company's stock price to decline by over 5%. The very next day, in response to pressure from analysts, Rush assuaged investors and claimed there

were no new developments that would change Defendants' prior statements about 2018 results: "So what we told people in July [2017], in May [2017], there's nothing that -- there's not new news here on that that we're trying to lay out to the market."

10.     Just two months later, on November 9, 2017, Defendants shocked the market with a surprisingly dismal outlook for 2018. Defendants revealed that Commercial revenue growth would be "roughly flat" and therefore Company-wide revenue growth would be in the low or mid-single-digits. Defendants admitted for the first time that the downturn was due to the Company's failure to win any 100-plus sales team contracts in 2017. This meant that, while new drug approvals doubled in 2017, this trend would not come close to delivering the 2018 revenue growth stated by Defendants.

11.     In response to this news, the Company's stock price experienced a massive decline, *dropping over 28%* on November 9, 2017. The stock price continued to fall over the next several trading days, resulting in millions in investor losses. While investors suffered, Macdonald and Rush enjoyed a financial windfall. During the Class Period, they sold a combined $9.4 million of their personal INCR shares at prices that were artificially inflated by their false assurances of growth, and received a combined $21 million in Merger-related compensation, which was more than double their total compensation during the previous year.

12.     After the Class Period, Rush and the Company's General Counsel – two of the main architects of the Merger – abruptly left the Company. Analysts were dismayed, stating that "[t]o say that the executive exodus at [INCR] is concerning risks understatement," and noting that the "integration distractions have also exposed just how volatile the commercial business can be." News of these departures caused additional stock price declines of approximately 6% and 16% on January 4 and February 22, 2018, respectively, resulting in additional investor losses. The Company also

- 5 -

signaled that it was shifting its focus toward Commercial contracts involving smaller sales teams in order to diversify and "build a much more stable trajectory."

13.    To recover the damages that Defendants inflicted on INCR investors, Lead Plaintiffs bring this action on behalf of themselves and (a) all persons or entities that purchased or otherwise acquired shares of INCR common stock between May 10, 2017 and November 8, 2017, inclusive ("Class Period"), and were damaged thereby ("Section 10(b) Class"); and (b) all persons or entities that held shares of INCR common stock as of June 29, 2017 ("Section 14(a) Class").  Lead Plaintiffs bring this action under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC.[1]

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to Sections 10(b), 14(a), 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and Rules 10b-5 and 14a-9, 17 C.F.R. §§240.10b-5 and 240.14a-9, promulgated thereunder by the SEC.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

15.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act, 15 U.S.C. §78aa, because INCR transacts business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.  Defendants issued false and misleading statements from this District through written and oral means, which were widely disseminated to investors, including investors in this District.

---

[1]    This Amended Complaint for Violation of the Federal Securities Laws ("Complaint") sets forth the fraud-based claims first, under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and then separately sets forth the non-fraud claims under Section 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.

16.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     FRAUD-BASED CLAIMS

### A.     Parties to Fraud-Based Claims

#### 1.     Lead Plaintiffs

17.     Lead Plaintiffs San Antonio Fire & Police Pension Fund and El Paso Firemen & Policemen's Pension Fund were appointed to serve as Lead Plaintiffs in this action by Order of this Court dated May 29, 2018 [ECF No. 20].  As set forth in their certifications [ECF No. 14-3], which are incorporated herein, Lead Plaintiffs purchased or otherwise acquired INCR common stock at artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's operating and financial condition were disclosed and the artificial inflation was removed from the price of INCR common stock.

#### 2.     Section 10(b) Defendants

18.     Defendant INCR is a Delaware corporation with its principal place of business located in Raleigh, North Carolina.  Throughout the Class Period, INCR was formally known as "INC Research Holdings, Inc." and INCR's common stock traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "INCR."  After the Class Period, in connection with rebranding after INCR's Merger with inVentiv on August 1, 2017, INCR changed its name to "Syneos Health, Inc." and its NASDAQ ticker symbol to "SYNH," effective January 9, 2018. Notwithstanding these changes, for the sake of consistency, INCR is referred to as "INCR" or the "Company" throughout this document.

19.     Defendant Macdonald has served at all relevant times as the CEO of INCR and a member of the Board of INCR.  He joined the Company in 2002 and has served in various senior leadership roles during that time.  Prior to his current role, Defendant Macdonald served as the Company's President from January 2015 to October 2016 and as Chief Operating Officer from January 2013 to October 2016.  He also served as President of Clinical Development Services from March 2012 to January 2013, Executive Vice President of the Global Oncology Unit from February 2011 to March 2012, Executive Vice President of Strategic Development from October 2009 to February 2011, and Senior Vice President of Biometrics from May 2002 to September 2009.

20.     Defendant Rush served as the Company's Executive Vice President and CFO until his departure from the Company effective February 21, 2018.  He joined INCR from Tekelec Inc., a leading high-tech services provider, where he has served as Senior Vice President and CFO and served as its Chief Accounting Officer from May 2006 to March 2010.  Prior to that, he served as Senior Director of Finance, External Reporting & Acquisitions at Siebel Systems, Inc.  Previously, he was Senior Director, Business Analysis and Financial Reporting for Quintiles Transnational Corp.  He began his career in public accounting, serving numerous high technology companies at Ernst & Young and PricewaterhouseCoopers, where he served as a Senior Manager.  He has more than 20 years of public accounting and global finance experience in both the public and private company environments.  He is a Certified Public Accountant ("CPA") and has both a Bachelor of Science degree in Business Administration and a Masters of Accounting degree from the University of North Carolina at Chapel Hill.

21.     Defendant Bell was appointed Executive Chairman of the Board of INCR on August 1, 2017, and continues to serve in that position.  He also served as President of the Commercial Division of the Company from August 1, 2017 to December 1, 2017.  Prior to the Merger, Defendant

- 8 -

Bell served as CEO and Chairman of inVentiv. Before joining inVentiv, Defendant Bell served as Senior Executive Vice President of John Hancock Financial Services, reporting to the Chairman and CEO.

22.    Defendants Macdonald, Rush, and Bell are collectively referred to herein as the "Section 10(b) Individual Defendants." The Section 10(b) Individual Defendants and INCR are collectively referred to herein as the "Section 10(b) Defendants."

23.    During and prior to the Class Period, the Section 10(b) Individual Defendants, as senior executive officers of INCR, were privy to confidential and proprietary information concerning INCR. Because of their positions with INCR, the Section 10(b) Individual Defendants had access to non-public information about the Company's business operations, financial condition, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. As such, the Section 10(b) Individual Defendants had access to material adverse non-public information concerning the financial condition and prospects of the Company and its Commercial segment, as discussed in detail below. Because of their possession of such information, the Section 10(b) Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.    The Section 10(b) Individual Defendants are liable as direct participants in the wrongs complained of herein. The Section 10(b) Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the

misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Each of the Section 10(b) Individual Defendants had access to the adverse undisclosed information about the Company's business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about INCR and its business, which were issued or adopted by the Company, materially false and misleading.

25.     In addition, the Section 10(b) Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Section 10(b) Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

26.     As senior executive officers and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Section 10(b) Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's securities would be based upon truthful and accurate information. The Section 10(b) Individual Defendants' material misrepresentations and omissions of material facts during the Class Period violated these specific requirements and obligations.

27.     The Section 10(b) Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of the Company's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme deceived the investing public regarding the Company's operating and financial condition and the intrinsic value of INCR common stock, causing Lead Plaintiffs and other members of the Section 10(b) Class to purchase INCR common stock at artificially inflated prices.

### B.     Substantive Allegations

#### 1.     Background of INCR

28.     INCR was founded over 30 years ago as an academic organization dedicated to central nervous system research, and later became a Delaware corporation in August 2010.  Prior to merging with inVentiv in mid-2017, INCR was exclusively a CRO that provided clinical development services across various therapeutic areas in the biopharmaceutical and medical device industries.   In particular, INCR conducted various stages of clinical trials worldwide for pharmaceutical and biotechnology companies.

29.     Prior to the Merger, the Company had relatively limited exposure to the 20 largest big pharma companies ("top 20 big pharma"), with most of its customers being small and mid-sized pharmaceutical companies.

#### 2.     INCR Endeavored to Capture the Growing Commercial (CCO) Market

30.     In 2016, INCR's management and Board identified a need to increase the scale of INCR's operations, expand the scope of its service offerings, and improve its ability to obtain clinical business from existing and prospective customers.  In particular, the Company wanted to gain access to big pharma and the growing commercial (CCO) market.  This was necessary because

INCR's business was limited to a CRO market that had been largely developed for many years, with many established competitors vying for business, and did not offer substantial opportunities for growth.

31.    The Company set its sights on a potential business combination with inVentiv, a biopharmaceutical services provider based in Boston, Massachusetts.  inVentiv was founded in 1997, went public in 1999, and then was taken private again in 2010.  inVentiv's customer base included large, top 20 big pharma companies to which INCR had little exposure.  Indeed, inVentiv helped to develop or commercialize over 80% of all new molecular entities approved by the FDA and 70% of those products granted marketing authorization by the European Medicines Agency from 2013 through 2017.

32.    Critically, while inVentiv possessed a CRO segment like INCR, it also possessed a lucrative CCO segment, which INCR did not.  inVentiv's CCO segment, which comprised 53.6% of its total net revenue in 2016, was the industry's *only* provider of a full suite of commercialization and post-drug approval services for biopharmaceutical customers.  This segment was comprised of four sub-segments:  Selling Solutions, Communications, Consulting, and Medication Adherence. The Selling Solutions sub-segment was the largest contract sales organization in the United States and a top five sales organization in Japan.  Through this sub-segment, inVentiv leased sales and marketing staff, including medical science liaisons, nurse educators, and call centers, to biopharmaceutical firms to help them encourage clinicians to prescribe (and consumers to use) their drugs.  inVentiv's Communications sub-segment included advertising, medical communications, digital marketing and public relations, and branding services.  This sub-segment was the largest independent healthcare communications agency in the world.  inVentiv's Consulting sub-segment provided advisory services related to commercial strategy and planning, pricing and market access,

- 12 -

medical affairs advisory, and risk and program management.  The Medication Adherence sub-segment helped patients stay on their prescribed therapies through tailored direct-to-patient programs.

33.    inVentiv's CCO segment was its strongest growth driver from 2013 to 2016, with revenues growing 15%, compared to 6% growth of CRO revenues.  The CCO segment also provided inVentiv with an important cross-selling opportunity, and enabled it to optimize its clinical trial strategy and design for CRO customers and increase efficiency for clinical trial management.

34.    A Merger with inVentiv, therefore, was viewed as an opportunity for INCR to break into the fast-growing CCO market and become the dominant player in that market.  As Rush would later state when the Merger was announced, inVentiv's CCO was "#1 in the market. So we own this market, so that's a good thing."  The Merger was also said to enable INCR to gain more business from existing and prospective customers, including large biopharmaceutical customers that comprised inVentiv's traditional customer base, and to improve its competitive position in the biopharmaceutical services industry.

35.    In November 2016, Defendants Macdonald and Bell had an initial meeting to discuss the potential benefits of a Merger between their two respective companies.  After more than five months of meetings between representatives of INCR and inVentiv (including Defendants Bell, Macdonald, and Rush) and the completion of due diligence (*see* ¶¶62-66, *infra*), the companies reached agreement on the terms of the Merger, pursuant to which the two companies would merge in an all-stock transaction that valued inVentiv at $4.6 billion and the combined Company at $7.4 billion.  The Merger was expected to be completed in the second half of 2017 subject to, among other things, approval by INCR shareholders, the satisfaction of certain regulatory requirements, and other customary closing conditions.    Legacy INCR shareholders were expected to own

approximately 53% of the combined Company and legacy inVentiv shareholders were expected to own approximately 47% of the combined Company. Defendant Macdonald would serve as CEO and a director of the combined Company, Defendant Rush would serve as CFO of the combined Company, and Defendant Bell would serve as Executive Chairman and manage the Commercial segment of the combined Company.

### 3. The Section 10(b) Defendants Promoted the Benefits of the Merger and the Growth Prospects of inVentiv's Commercial (CCO) Segment and the Combined Company

36. On May 10, 2017, INCR and inVentiv issued a joint press release announcing the Merger. The Section 10(b) Defendants immediately embarked on a public campaign to promote the Merger in order to obtain the necessary vote from at least a majority of the outstanding shares of INCR common stock. The Section 10(b) Defendants also held an earnings call in which they highlighted the benefits of the Merger, including the growth opportunities it would create and INCR's access to inVentiv's "key relationships with large biopharma [customers]," complementing INCR's "small and midsized biopharma [customers]." Macdonald stated that, prior to the Merger, INCR "didn't get invited to all the big dances with Big Pharma," but the Merger "gets us invited to that dance."

37. The Section 10(b) Defendants also confidently stated that, as a result of the Merger, the combined Company would achieve immediate mid-to-high single-digit accretion to adjusted EPS in 2018 and *9% or double-digit growth in 2018*, driven by growth in the Commercial business. They assured investors, in no uncertain terms, of their confidence in those statements. As Defendant Rush stated, "*I wouldn't give that kind of commentary if we didn't feel, at this stage, based on what we see today, that we were confident in it.*" Rush added that this growth projection "may in fact turn out to be conservative, because we have not included any of the many opportunities for revenue synergy in these projections." The Section 10(b) Defendants also led the market to

- 14 -

believe that the CCO acquired from inVentiv would actually grow more than the industry average (*i.e.*, double-digit growth vs. industry-wide growth of 8%) and would be a long term growth story similar to the Company's CRO experience.

38.     On the May 10, 2017 call, the Section 10(b) Defendants also promoted the Merger by emphasizing the "strengths and capabilities" of the combined Company's leadership – highlighting Macdonald, Rush, and Bell as the key leadership figures – and the prior expertise of and data available to such leadership.  Macdonald stated, for example, that "this Merger will be seamless for all of our stakeholders, including our customers, employees and shareholders" given that "[b]oth organizations have extensive integration experience."  Later in the call, Rush emphasized:

> [I]t is important to understand that [INCR] and inVentiv both have a history of value creation through successful integration of past acquisitions. We have done this without negatively impacting customers and while ***continuing to grow and expand our customer base***. At [INCR], we have completed 7 acquisitions since the beginning of 2007 . . . . It is important to note that many of the team involved in leading those successful integrations, including Alistair Macdonald, are still within [INCR] today. . . . inVentiv has completed 25 acquisitions since 2007 . . . . ***Clearly, we know how to integrate and drive value creation***.

Rush added that, based on lessons learned from one of INCR's prior acquisitions, INCR made "sure that we understood [inVentiv's] backlog [of business].  And we did that properly this time."

39.     Defendants' repeated assurances and expressions of confidence in inVentiv's business, its growth trajectory, and its ability to drive revenue growth for the combined Company weighed heavily with investors.  As inVentiv was privately held before the Merger, statements made by the Section 10(b) Defendants were investors' primary exposure to inVentiv's recent operating condition, financial results, and prospects.  Indeed, as Defendant Rush later acknowledged, due to the limited information available publicly, INCR investors were "flying blind" on the Commercial business acquired from inVentiv.

- 15 -

40.     Analysts reacted positively to the news of the Merger on May 10, 2017, particularly because, as the Section 10(b) Defendants represented, inVentiv would offer the combined Company immediate accretion and access to a large stable of existing customers.  For example, on May 10, 2017, Jefferies called the Merger an "accretive merger that significantly improves INCR's competitive position."  On the same day, J.P. Morgan commented:  "We believe the strategic rationale for the merger appears sound, with limited client overlap and a broader offering (particularly in [Functional Service Provider] and Commercial Solutions, which are both fast-growth areas) positioning the new entity well in a quickly consolidating market with significant advantages to scale."

**4.     The Commercial (CCO) Segment Acquired From inVentiv Was Struggling to Win New Business and Keep Existing Business, Which Would Dramatically Slow Commercial Growth in 2018**

41.     Historically, inVentiv was successful at winning large contracts with big pharma companies which hired CCOs like inVentiv to commercialize drugs newly approved by the FDA.

42.     In particular, inVentiv's ability to win highly lucrative 100-plus sales team contracts contributed to its achievement of 15% annual revenue growth in its Commercial business from 2013 to 2016.  As Defendant Rush would later admit at the end of the Class Period, such awards were one of "the best leading indicators of revenue growth."

43.     inVentiv became highly dependent on such contracts to achieve revenue growth and put most of its energy and resources into capturing them rather than pursuing smaller contracts from smaller companies.  This left inVentiv underexposed to such smaller contracts and susceptible to revenue swings because inVentiv's revenue was heavily tied to the ability to win 100-plus sales team contracts in a highly competitive environment.

44.     This became particularly problematic starting in 2016, when inVentiv struggled to win the 100-plus sales team contracts it relied upon for revenue growth.  In 2016, the number of new

FDA-approved drugs plummeted, falling from 45 in 2015 to an unusually low 22 in 2016. And, of the 22 new drugs approved, only four or five resulted in 100-plus sales team contracts put out for bid in 2016, two of which were won by inVentiv. As Defendant Rush explained, there was "usually a one-year lag" between inVentiv's sales and a resulting impact on revenue growth. Therefore, although the Company's Commercial revenue experienced double-digit growth in 2016 due to revenue from prior-year contracts, this growth would not continue in 2017 because inVentiv failed to win 100-plus sales team contracts.

45.     In 2017, while new drug approvals were back up to historical levels – which the Section 10(b) Defendants repeatedly cited as a driver of 2018 revenue growth – only two 100-plus sales team contracts were available for bid. *Unbeknownst to the market, inVentiv and the combined Company won none of these awards*. Rush attributed the inability to win bids for these contracts on the fact that the Company was underbid by competitions who offered to perform the work for less money: "We weren't willing to match the price and our competitors were willing to do that, and they had their own reasons for going to those prices." The loss of these bids meant that Commercial revenue growth was certain to decline in 2018.

46.     During the same time period, inVentiv and the combined Company also struggled to retain *existing* Commercial business, which compounded the failure to add *new* 100-plus sales team contracts critical to the Commercial business. The Company was susceptible to losing existing business because the Commercial contracts of inVentiv and the combined Company often permitted customers to terminate them on just 30 days' notice. Customers increasingly took advantage of these flexible terms in the time leading up to the Merger. In particular, cancellations reached "unprecedented" levels in late 2016, including a large customer that cancelled business when one of its products was removed from the market. The Company disclosed these 2016 cancellations prior

- 17 -

to the Class Period and factored them into their statements regarding 2018 growth. This cancellation trend failed to improve in 2017, when the Company's largest advertising customer reduced a significant amount of its business with the Company due to "across-the-board reductions in their outsourcing spend." However, that 2017 loss was no more than 3% of 2018 Commercial revenue, and the Section 10(b) Defendants failed to disclose the greater cause of the Company's decline in 2018 revenue growth: the inability to win new business, particularly 100-plus sales team contracts.

5. **The Section 10(b) Defendants Assured Investors that a Rebound in New Drug Approvals and inVentiv's Pipeline of Business Would Return the Commercial Segment to Strong Double-Digit Growth in 2018**

47.   At the time the Merger was announced (the start of the Class Period), the Section 10(b) Defendants knew, but failed to disclose, that inVentiv was struggling to win new business and **had yet to win any** 100-plus sales team contracts in 2017. While Defendants acknowledged that the Company's 2017 Commercial business would be hurt by increased cancellations and lower new drug approvals in 2016, they downplayed any lasting impact and instead highlighted the fact that such approvals were rebounding in 2017. For example, Macdonald stated on the May 10, 2017 call announcing the Merger: "And I think when you look at the stats for 2016, the number of approvals through the FDA, obviously, that was a low point of -- I think the lowest point since 2007. We see a return to the -- to really high levels of drugs being approved through the FDA [in 2017.]" More specifically, Rush added:

> 2016 was a near record low in new drug approvals. And as we look at where we're at today in '17, they're already effectively, through last Friday, at the same level they were for all of '16. We've looked at -- I think there's over 70 new drug applications this year. Not all of those will get approved, but we think they're on pace to double. *That is a huge leading indicator as you're thinking about modeling the commercial business going forward as to what that market looks like.*

48.   The Section 10(b) Defendants further emphasized that the rebound in 2017 new drug approvals and inVentiv's pipeline of business would result in strong Commercial revenue growth in

2018.  In other words, the Section 10(b) Defendants signaled that inVentiv was actually gaining or poised to gain Commercial business resulting from those trends, and that business would quickly pay off in 2018.  As Rush stated on the May 10, 2017 call:

> With respect to inVentiv, they too experienced an admirably high level of cancellations within the commercial segment at the end of 2016 and are coming off one of the lowest years of new drug approvals by the FDA, with only 22 drugs approved last year. Despite these challenges, FDA approvals are on track to more than double in 2017, with 20 approvals already year-to-date. ***This trend, coupled with inVentiv's pipeline, sets the foundation for a strong growth in 2018 and beyond.***

49.     Additionally, Rush asserted on the May 10, 2017 call that "when you're looking at new drug applications doubling [in 2017] and the pipeline discussions we're having with our customers, ***we're confident in that double-digit [revenue growth] number [in 2018].***"  Rush expressed unwavering confidence about this growth trend based on information available to Defendants, stating:  "***I wouldn't give that kind of commentary if we didn't feel, at this stage, based on what we see today, that we were confident in it.***"

50.     In the months following the Merger, the Section 10(b) Defendants confirmed that they were even more confident in the Company's 2018 growth prospects.  On July 27, 2017, for example, Rush doubled down on previous assurances of 2018 growth:  "***We're more optimistic today than we were on May 10 on . . . the combined compan[y's] numbers for 2018***."  Rush reiterated that this growth was linked to the strong rebound in new drug approvals as well as "our first half results":

> [N]ew drug approvals are pretty strong so far this year, which is a precursor to the commercial [business].  We got to go close that business in the second half of this year in the commercial business for sure, but at least the leading indicator is good for that business. ***So we're more optimistic today than we were in May given our first half results***.

He also noted that "[w]e believe very much in transparency[,] [s]o we want to give you as much information as we do."

51.     During the same call on July 27, 2017, Rush reiterated that higher drug approvals in 2017 would drive growth in 2018: "And so one of the things that we're optimistic about for 2018 is the fact that we're already above the approvals through June for the full year. . . . So that's a pretty strong growth.  And a lot of people are predicting 40 to 50 approvals this year which if we go back to that level that should, in theory, give us an opportunity to return to *strong growth in commercial in 2018*."  Moreover, Macdonald continued to express optimism that the Section 10(b) Defendants were "on the path to returning the company to *double-digit organic revenue growth in 2018*."

52.     On July 31, 2017, INCR held a special shareholder meeting in which INCR shareholders voted on and approved the proposed Merger.  The Merger was completed the following day, August 1, 2017, when inVentiv merged with and into INCR, which survived as the combined Company.

53.     As a result of the Merger, Macdonald and Rush earned over $21 million combined in Merger-related compensation, representing more than double Macdonald's total 2016 compensation and more than triple Rush's total 2016 compensation.  In addition to this compensation, Macdonald and Rush sold shares of their personal INCR stock for proceeds totaling over $1.2 million and $8.1 million during the Class Period, respectively (*see* ¶¶71-78, *infra*, for further discussion on the Merger-related compensation and insider sales).  Significantly, most of Rush's insider sales (over $7.6 million) came during a two-day period from August 30 to September 1, 2017.  This was just a few days before Rush would abruptly change his bullish tone on the Commercial segment on September 6, 2017 (*see* ¶54, *infra*).

    **6.     The Section 10(b) Defendants Began to Express Uncertainty
            About Growth of the Commercial Business**

54.     After raising the Company's 2018 revenue growth target, closing the Merger, and reaping *nearly $30 million* in insider sales proceeds and Merger-related compensation, the Section

10(b) Defendants began to reveal that the Company's Commercial business prospects were not as rosy as they had assured the market.  On September 6, 2017, at the Wells Fargo Securities Healthcare Conference, an analyst questioned Rush about the "pretty ambitious targets" the Section 10(b) Defendants had set for the deal after it closed, which were above industry growth.  While Rush did not back away from those targets, he described the Commercial business as a "wild card" and discussed different Commercial revenue growth scenarios that might occur in 2018.  The uncertainty created by these statements surprised the market, causing INCR's stock price to decline over 5%.

55.    At the Robert W. Baird Global Healthcare Conference the very next day (September 7, 2017), analysts immediately questioned Rush on his "wild card" statement and how, if at all, 2018 may be specifically impacted.  In the face of pointed questions, Rush sought to assuage the market's reaction and concerns.  He acknowledged that investors "didn't like the use of the word wild card in yesterday's presentation" and stated that his CEO (Macdonald) "banned" him from "ever using that word again."  Rush then attempted to refashion his comments, emphasizing that a "wild card" is the most valuable card in a poker game.

56.    And, most significantly, while continuing to acknowledge revenue variability in Commercial, Rush reassured investors that there were no new developments that would change the Company's growth rate for 2018.  One analyst asked point-blank whether "the CCO orders coming in [are] slower this year than they have in the past" and whether "there [is] any scenario where you think you could actually see a revenue decline in the CCO next year."  In response, Rush concealed material facts regarding the Company's failure to win any 100-plus sales team contracts and the resulting revenue growth decline in 2018 and instead stated:  "Nothing has come to my mind . . . . So what we told people in July [2017], in May [2017], there's nothing that -- there's not new news here

- 21 -

on that that we're trying to lay out to the market." Defendants succeeded in assuaging investors and prevented INCR's stock price from a steeper decline.

57.    Just two months later, on November 9, 2017, the Section 10(b) Defendants stunned investors by revealing a drastic reversal in the Company's 2018 growth.  In stark contrast to the double-digit revenue growth they said would occur in 2018, the Section 10(b) Defendants now said the Company would experience "roughly flat" Commercial revenue growth in 2018.  This was far below the Commercial business's 15% average annual revenue growth from 2013 to 2016, and also well below industry-wide CCO revenue growth of 8%.  Defendants also announced that this would be a drag on *total* Company-wide revenue growth in 2018, dropping from double-digit growth to mid-single-digit growth.   This surprising downtrend was a far cry from the Section 10(b) Defendants' rosy Class Period statements concerning the purported immediate benefits of the Merger.

58.    Defendants further disclosed that this deceleration was driven by "the lack of the wins of the 100-plus sales teams."  While Defendants had repeatedly assured the market that rising new drug approvals in 2017 would lead to double-digit revenue growth in 2018, they now admitted that the "best leading indicator" of revenue growth for the Commercial segment was the award of 100-plus sales team contracts, which the Company was completely unsuccessful in obtaining in 2017.

59.    The revelations on November 9, 2017 caused INCR's stock price to plummet *over 28%* in a single trading day, as artificial inflation caused or maintained by the Section 10(b) Defendants' material misrepresentations or omissions of material facts dissipated from the stock price. As one analyst observed:  "With [INCR] shares down >28% today, investors were clearly disappointed with INCR's 2018 outlook, which embeds significantly lower top-line growth expectations relative to the bullish tone set by management at the time of the inVentiv merger

announcement (when it expected a sharp rebound to [double-digit] growth in 2018)." The stock price continued to fall over the next several trading days, resulting in millions in investor losses.

60.    The fallout continued in the months following Class Period. Two top executives who helped orchestrate the Merger – Rush and Christopher L. Gaenzle ("Gaenzle"), INCR's Chief Administrative Officer, General Counsel, and Secretary – each unexpectedly departed from the Company. This caused INCR stock price declines of approximately 6% and 16% on January 4, 2018 and February 22, 2018, respectively, resulting in additional investor losses. Around the same time, Macdonald signaled that the Company was changing its Commercial strategy to address the growth deceleration, shifting focus to contracts with smaller sales teams rather than depending on 100-plus sales team contracts in order to diversify and "build a much more stable trajectory." *See* ¶163, *infra*.

### 7.    Numerous Facts Support Defendants' Knowledge that the Commercial Segment Was Struggling to Win Large Contracts, Which Would Negatively Impact Revenue in 2018

61.    Numerous facts support the Section 10(b) Individual Defendants' knowledge of the materially false and misleading nature of their public statements and omissions during the Class Period.

62.    As detailed in INCR's Preliminary Proxy Statement filed with the SEC on Schedule 14A on June 9, 2017 ("Preliminary Proxy") and INCR's Definitive Proxy Statement filed with the SEC on Schedule 14A on June 30, 2017 ("Definitive Proxy") (collectively, "Merger Proxy"), the Section 10(b) Individual Defendants conducted due diligence into every aspect of inVentiv's business and financial performance, with a particular focus on inVentiv's Commercial business.

63.    On November 17, 2016, Macdonald and Bell held an initial meeting in Boston, Massachusetts to discuss the potential benefits of a transaction between INCR and inVentiv. Thereafter, Macdonald, Rush, Bell, and Gaenzle, among other INCR and inVentiv executives and

- 23 -

the INCR Board, met on several occasions to continue discussing a potential Merger between the

two companies:

- On January 23, 2017, Macdonald updated the INCR Board on discussions with inVentiv management, including the complementary nature of inVentiv's relationships with large biopharmaceutical companies to INCR's relationships with small and mid-sized pharmaceutical companies as well as inVentiv's CCO capabilities.

- On February 3, 2017, Macdonald, Rush, Bell and other members of INCR and inVentiv management met in New York City to receive more information about inVentiv's CCO offerings.

- On March 28, 2017, at a meeting with the INCR Board and members of INCR management, Bell gave a presentation on inVentiv's CCO business and its leadership and culture. Bell also responded to questions from the INCR Board at this meeting.

- On April 5, 2017, the INCR Board held a meeting with Macdonald, Rush, and others discussing, among other things, the terms of a potential transaction with inVentiv, the impact of such a transaction on the scale of INCR's operations and expanding the scope of its service offerings, and a timeline for negotiations with inVentiv and due diligence reviews.

- On April 10, 2017, INCR and inVentiv provided one another with access to virtual data rooms to facilitate due diligence review efforts that would continue until execution of a merger agreement.

- On April 17, 2017, the INCR Board held a meeting with Macdonald, Rush, and others. At the meeting, Macdonald, Rush, and Gaenzle provided a status update on the transaction process with inVentiv and preliminary due diligence findings, including findings relating to inVentiv's CCO business.

- On April 20-21, 2017, INCR's and inVentiv's respective management teams and legal and financial advisors met in New York, New York for management presentations concerning the businesses of the respective parties.

- On April 25, 2017, the INCR Board held a meeting with Macdonald and Gaenzle and others during which, among other things, Macdonald and Gaenzle updated the Board on the management presentations made during the previous week as well as the status of due diligence reviews and Merger negotiations.

- On April 29, 2017, the INCR Board held a meeting with Macdonald, Gaenzle, Rush and others. At the meeting, Macdonald, Gaenzle, and Rush

reviewed the results of financial due diligence then conducted to date, including in respect of inVentiv's financial projections, backlog, and relationships with key customers. In addition, Centerview provided the Board with preliminary financial perspectives regarding inVentiv and INCR. Members of the Board **requested additional information relating to inVentiv's CCO unit** which would be provided by INCR management at a subsequent meeting to be held on May 2, 2017.

- On May 2, 2017, the INCR Board held a meeting with Macdonald, Gaenzle, Rush, and others. Among other things, INCR management reviewed with the Board management's assessments of inVentiv's CCO segment and provided additional information concerning inVentiv's backlog. Macdonald also reviewed with the Board the underlying rationale for a Merger, including the ability to expand the scale and scope of INCR's offerings and acquire inVentiv's CCO business.

64.    At these meetings and in the course of their due diligence the Section 10(b) Defendants and the INCR Board reviewed information about inVentiv, including detailed information about inVentiv's CCO business and "relationships with key customers." Indeed, through this due diligence process, the Section 10(b) Defendants had unbridled access to all of inVentiv's "financial, operating and other data and information," including "non-public financial forecasts regarding inVentiv . . . that were prepared by inVentiv's management and not for public disclosure." That access included each of inVentiv's "material contracts" that were undisclosed to the public.

65.    Moreover, the Merger Proxy explicitly confirmed that the Board had developed an "understanding of the respective businesses, operations, financial condition, earnings, strategy and prospects of [INCR] and inVentiv, taking into account the due diligence review of inVentiv performed by [INCR] management and [INCR]'s legal advisors, as well as [INCR]'s and inVentiv's respective historical and projected financial performance." Indeed, the Section 10(b) Individual Defendants analyzed inVentiv's data in such depth that INCR's "management made certain downward adjustments to inVentiv's projected net service revenue and associated earnings for the fiscal years 2017–2019." In other words, the Section 10(b) Defendants had scrutinized inVentiv's

finances to such a degree that they believed that their understanding of those finances was superior to the understanding of inVentiv's own management.

66.     Defendant Rush, the Company's CFO and a CPA by trade, also confirmed that, based on lessons learned from a prior acquisition gone bad, INCR made "sure that we understood [inVentiv's] backlog [of business]. And we did that properly this time." Defendant Rush added that "we did a really comprehensive analysis looking at the customer overlap" between INCR and inVentiv and "we did not see any reason for a revenue dissynergy." Similarly, Defendant Bell highlighted the Company's "expansive data assets" and "proprietary data": "In combining CRO and CCO capabilities, we'll have expansive data assets to drive insights and improve execution. . . . Many in our industry have data, but what we offer is a differentiated approach to insights. We generate proprietary data every day, from which we garner insights and drive actionable improvements for our customers."

67.     In addition to conducting their due diligence, the Section 10(b) Individual Defendants repeatedly made statements to investors about the progress and success of the Commercial business, including statements that the Commercial business would lead to double-digit growth in 2018 (*see, e.g.*, ¶¶49, 51, *supra*). In so doing, they demonstrated their knowledge of the Commercial business's prospects and growth for 2018.

68.     On May 10, 2017, for example, Defendant Rush stated that "when you're looking at new drug applications doubling and the pipeline discussions we're having with our customers, we're confident in that double-digit [revenue growth] number" and "*I wouldn't give that kind of commentary if we didn't feel, at this stage, based on what we see today, that we were confident in it.*"

69.     Relying on that "proprietary data," Defendant Rush stated on July 27, 2017 that "[w]e're more optimistic today than we were on May 10 on . . . the combined compan[y's] numbers for 2018" and "the leading indicator is good for [the Commercial] business[,] [s]o *we're more optimistic today than we were in May given our first half results*." He also noted that "[w]e believe very much in transparency[,] [s]o we want to give you as much information as we do."

70.     During two healthcare conferences on September 6 and 7, 2017, the Section 10(b) Defendants once again confirmed that they had in-depth knowledge of CCO metrics. Defendant Rush, for example, reaffirmed the Company's prior statements concerning 2018 results and elaborated that such statements took into account "all the conversations with our customers, and all of the discussions with our employees," "the numbers," and "new drug approvals." Based on that information, he emphasized that:

- "*Nothing has come to my mind since [the Company's conference call on July 27, 2017] that would change*" the Section 10(b) Defendants' statements regarding Commercial growth in 2018; and

- "[W]hat we told people in July, in May, there's nothing that - - *there's not new news here* on that that we're trying to lay out to the market."

### 8.     The Section 10(b) Individual Defendants Were Motivated to Implement the Merger and Artificially Inflate the Company's Stock Price

71.     Additionally, the Section 10(b) Individual Defendants were motivated to present the Merger and Commercial business in the best possible light. Defendants Rush and Macdonald personally profited by receiving compensation connected to the Merger and by selling large amounts of common stock at artificially inflated prices.

72.     According to the Merger Proxy, "[INCR]'s directors and executive officers have interests in the merger that are different from, or in addition to, the interests of [INCR] stockholders generally." Specifically, *Defendant Macdonald stood to receive $11,416,629 in cash and equity*

- 27 -

*while Defendant Rush stood to receive $9,818,872 in cash and equity – all of which was "based on or otherwise relate[d] to the merger*." The compensation Defendant Macdonald stood to gain from consummation of the Merger was more than *two times* (261%) his total 2016 compensation of $4,372,758. Similarly, the compensation Defendant Rush stood to gain from consummation of the Merger was more than *three times* (342%) his total 2016 compensation of $2,872,253.00.

73.    This exorbitant compensation depended on the Section 10(b) Individual Defendants' ability to convince INCR's shareholders to vote on July 31, 2017 in favor of the Merger. To that end, the Section 10(b) Defendants made materially false and misleading statements or omissions of material facts from May 10, 2017 through July 31, 2017 in order to obtain the necessary shareholder votes to approve the Merger.

74.    Defendants Macdonald and Rush also profited through their fraud by selling significant portions of their holdings at artificially-inflated prices for more than *$9 million in collective proceeds*. Indeed, on May 4, 2017, shares of INCR common stock were trading at $40.65 per share – the lowest price date in 2017. After the Section 10(b) Individual Defendants announced the Merger on May 10, 2017 and began their campaign of false and misleading statements and omissions, the price of common stock rose steadily, reaching a 2017-high closing price of $60.65 per share on June 19, 2017.

75.    Both Macdonald and Rush's sales were suspiciously well-timed to enable them to capitalize on this artificial inflation. Their sales occurred after the Merger announcement when the stock was trading near its 2017-high and before Defendants' disclosures concerning the true prospects of the Commercial business on November 9, 2017. Moreover, since these revelations and the resulting stock price decline, neither Macdonald nor Rush has sold any additional shares.

76.    Specifically, over a period of less than three months during the Class Period, Defendant Macdonald sold 21,731 shares of INCR common stock – representing approximately 18% of his total holdings – for total gross proceeds of over $1.2 million:

| | Shares | % of Total Holdings | Price | Proceeds |
|---|---|---|---|---|
| 06.30.17 | 9,467 | | $58.36 | $552,494 |
| 07.03.07 | 1,088 | | $58.55 | $63,702 |
| 08.17.17 | 8,828 | | $55.65 | $491,278 |
| 09.18.17 | 2,348 | | $54.60 | $128,201 |
| Totals | 21,731 | 18.1% | $56.86 (avg) | $1,235,675 |

77.    Additionally, during the Class Period, Defendant Rush sold 139,862 shares of INCR common stock – representing approximately 64% of his total holdings – yielding total gross proceeds of over $8.1 million:

| | Shares | % of Total Holdings | Price | Proceeds |
|---|---|---|---|---|
| 08.30.17 | 35,503 | | $58.27 | $2,068,760 |
| 08.30.17 | 5,917 | | $58.22 | $344,488 |
| 09.01.17 | 1,834 | | $58.68 | $107,619 |
| 09.01.17 | 35,503 | | $59.21 | $2,102,133 |
| 09.01.17 | 11,834 | | $58.45 | $691,697 |
| 09.01.17 | 16,202 | | $59.54 | $964,667 |
| 09.01.17 | 19,300 | | $58.60 | $1,130,980 |
| 09.01.17 | 4,066 | | $58.39 | $237,414 |
| 09.18.17 | 9,703 | | $54.48 | $528,619 |
| Totals | 139,682 | 64.0% | $58.53 | $8,176,377 |

78.    These sales were particularly well-timed in that the vast majority ($7.6 million) occurred over a three-day period from August 30 to September 1, 2017 – just five days before he called inVentiv's Commercial business a "wild card" and expressed uncertainty about its growth (*see* ¶54, *supra*).

**9.    Executive Departures Provide Further Support that the Section 10(b) Individual Defendants Acted Fraudulently**

79.    After the Section 10(b) Defendants stunned the market in November 2017 by revealing the truth about the Commercial business and the Company overall (*see* ¶¶133-139, *infra*) –

- 29 -

and after Defendants Macdonald and Rush had reaped millions of dollars in personal compensation – the Company suffered executive departures that further substantiate that the Section 10(b) Individual Defendants acted with scienter.

80.     On December 7, 2017, the Company disclosed on a Form 8-K filed with the SEC that Defendant Bell, the former Chairman and CEO of inVentiv, had ceased to be President of the Commercial segment and an executive officer of the Company on December 1, 2017, after serving in that role for only four months following the closing of the Merger.  Bell would temporarily remain in the Commercial segment in a non-executive employee role during a four month transition period, and continue to serve as Chairman of the Board.

81.     On January 3, 2018, less than one month after announcing Bell's departure from the Commercial segment, the Company issued an unexpected press release announcing that Rush was stepping down as CFO, but would remain in that role through April 30, 2018.  This announcement came just seven months after the Section 10(b) Defendants highlighted the strength of the Company's leadership structure, including Rush as CFO, as a key selling point the proposed Merger.

82.     On the same day, the Company filed a Form 8-K, attaching a Letter Agreement with Defendant Rush.  The Letter Agreement outlined the terms of Rush's departure, providing, in pertinent part, that: "[U]ntil [April 30, 2018] you will continue to serve in your current role and will execute [INCR]'s Form 10-K in February 2018, including any customary certifications . . . ."

83.     Defendant Rush, however, did not remain with the Company until April 30, 2018. On February 21, 2018, the Company filed a Form 8-K stating as follows:

> As previously announced on January 3, 2018, Gregory S. Rush, Executive Vice President and Chief Financial Officer of Syneos Health, Inc., a Delaware corporation (the "Company"), will step down as Chief Financial Officer of the Company and cease to be an executive officer. ***Such action will be effective as of February 21, 2018, and Mr. Rush will be placed on paid leave for the remainder of his previously announced term of service, which runs through April 30, 2018***.

84.     This sudden change in management was striking, given that, less than one year earlier, Defendant Macdonald had positively highlighted "[t]he leadership of the new company" and the Merger Proxy had emphasized "the Board's belief that the combined company would benefit from the skill sets and capabilities of each company's management team."

85.     Exacerbating those suspicious circumstances, the February 21, 2018 Form 8-K also disclosed the sudden, unexplained departure of the Company's General Counsel, Gaenzle:

> On February 14, 2018, Christopher L. Gaenzle, Chief Administrative Officer, General Counsel and Secretary of the Company, tendered his resignation notice from the Company (with his final day of employment being April 15, 2018). Mr. Gaenzle was placed on paid leave (during such 60 day notice period) as of February 19, 2018, at which time he ceased to function in such roles and ceased to be an executive officer of the Company.

86.     According to the Merger Proxy, Gaenzle had been a key participant in implementing the Merger. Specifically, he participated in the numerous Merger-related due diligence meetings with inVentiv's management (*see* ¶¶62-66, *supra*), and he earned $6,425,722 in compensation "based on or otherwise relate[d] to the merger." This was more than *double* (229%) Gaenzle's total 2016 compensation of $2,805,401. In addition, Gaenzle sold 54,156 shares of INCR common stock during the Class Period, yielding total gross proceeds of over $3.1 million. Hence, like the Section 10(b) Defendants, Gaenzle was highly motivated to complete the Merger for personal reasons, and it was suspicious that he inexplicably departed shortly after the Merger concluded and the Section 10(b) Defendants' fraud was revealed.

87.     Analysts expressed concerns over the leadership shakeup. On January 3, 2018, Jefferies observed that "CFO Rush's departure comes only 5 months after the close of INCR's merger with inVentiv. The departure also comes 1 month after the exit of Michael Bell, former President, Commercial Solutions, and former inVentiv CEO. . . . The C-suite turnover comes as INCR continues to work through a large integration and an underperforming Commercial segment."

Jefferies voiced heightened concern on February 21, 2018: "To say that the executive exodus at [INCR] is concerning risks understatement. . . . What is happening at this company that three Top 5 executives [Bell, Rush, and Gaenzle] have left in the last 19 months?" On the same day, William Blair observed: "From our perspective, the timing of the departures is troubling. . . . . the fact that both the CFO and general counsel are leaving provides added evidence that the company remains in the midst of integration turbulence with more changes likely on the way." Wells Fargo issued a report on the same day stating that "[d]espite the company's characterizations, we believe neither of these [departures of Rush and Gaenzle] look good. What [INCR] needs is predictability and consistency, and these announcements help neither, in our view."

88.    Just one week later, on February 28, 2018, the Company filed its Form 10-K for fiscal year 2017. Despite Defendant Rush's publicly disclosed agreement to "execute [INCR]'s Form 10-K in February 2018, including any customary certifications," ***Defendant Rush did not sign the Form 10-K***.

89.    Those multiple successive executive departures – which occurred during the fallout from the revelations of the Section 10(b) Defendants' material misrepresentations and omissions of material facts – were highly suspicious and further support the Section 10(b) Individual Defendants' scienter.

C.    **The Section 10(b) Defendants' Materially False and Misleading Statements, Omissions of Material Facts, and Partial Revelations During the Class Period**

90.    Throughout the Class Period, the Section 10(b) Defendants made specific and positive statements concerning the Company's Commercial business, including statements about the importance of increasing drug approvals in 2017 and Commercial growth in 2018. The Section 10(b) Defendants, however, did not provide a full picture of the true circumstances at the Company. When the Section 10(b) Defendants spoke, they were under a duty to disclose the full truth about the

Company and its Commercial business that would have made such statements not misleading.

Specifically, the Section 10(b) Defendants were under a duty to disclose that:

- the Commercial business critically depended on the number of 100-plus sales team contracts it was able to win, irrespective of the total number of new drug approvals for the year;

- through the end of the Class Period, no more than two such contracts had been available for bidding in 2017, and the Commercial business had yet to win any such contracts;

- the Commercial business was struggling to win new 100-plus sales team contracts because the Company could not compete on price;

- given the failure to win any 100-plus sales team contracts, the Commercial business would see decreased revenues into 2018, despite the increased 2017 new drug approvals that the Section 10(b) Defendants repeatedly highlighted as the best predictor of the Commercial business's future performance;

- in 2018, the Commercial business was not expected to achieve double-digit revenue growth or return to its historic CAGR of 15% for net revenues or 22% for adjusted EBITDA experienced from 2013 to 2016, and the combined Company was not expected to achieve 9% or double-digit revenue growth;

- the Commercial business was not on track to beat industry-wide growth of 8% and would create a drag on revenue growth of the combined Company in 2018; and

- the number of new drug approvals was not a leading indicator of growth of the Commercial business or the combined Company in 2018.

91.    By failing to fully reveal this information and, instead, omitting and concealing it from investors, the Section 10(b) Defendants violated their duty to disclose the full truth, and they artificially increased or maintained the Company's stock price.  This information was material because it would have altered the total mix of information about the Company that was available to reasonable investors during the Class Period.  The materiality of this information was further demonstrated upon revelation of the Section 10(b) Defendants' false and misleading statements or omissions of material fact, causing INCR's stock price to decline when investors learned the truth about the Commercial business and its 2018 growth.

92.     Further, the Section 10(b) Defendants violated Item 303 of Regulation S-K ("Item 303"), 17 C.F.R. §229.303, based on their failure to disclose certain material information related to the Commercial business.  Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(a)(3)(ii).

93.     The SEC has explained, "[o]ne of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties."  Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 8350, 68 Fed. Reg. 75,056, 75,061 (Dec. 19, 2003).  Thus, SEC guidance requires management to make two assessments where a trend or uncertainty is known:

> 1.  Is the known trend . . . or uncertainty likely to come to fruition? If management determines that it is *not reasonably likely to occur*, no disclosure is required.

> 2.  If management cannot make that determination, it must evaluate objectively the *consequences of the known trend* . . . or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is *not reasonably likely to occur*.

*See* Certain Investment Company Disclosures, Securities Act Release No. 6835, 54 Fed. Reg. 22,427, 22,430 (May 24, 1989) ("1989 SEC Release").

94.     The SEC has made clear for decades that, in addition to the identification of such "known trends or uncertainties," Item 303 specifically requires disclosure of the expected *impact* that any such trends or uncertainties are expected to have on a company's prospective financial performance.  The SEC has stated that "Item 303 *require[s] disclosure of forward-looking*

*information*," including, at a minimum, disclosure of the "*reasonably likely material effects on operating results*."  1989 SEC Release at 22,428-29.

95.     Here, the Section 10(b) Defendants violated Item 303 by failing to disclose a known uncertainty with respect to the aforementioned matters and the impact of those trends, including expected revenue declines for the Commercial business in 2018.

### 1.     When Announcing the Merger, the Section 10(b) Defendants Materially Misrepresented and Omitted Material Facts Concerning the Company's Commercial Business

96.     On May 10, 2017 – before market open – INCR issued a press release ("May 10, 2017 Press Release") announcing the Merger and also disseminated a presentation ("May 10, 2017 Investor Presentation") providing additional information about the purported benefits of the Merger. Through the May 10, 2017 Press Release, the Section 10(b) Defendants stated:

> The transaction is projected to be accretive to [INCR]'s adjusted earnings per share in the first 12 months following close, mid to high single-digit accretive in 2018 and accretive by more than 20 percent in 2019 and beyond.

97.     Through the May 10, 2017 Investor Presentation, moreover, the Section 10(b) Defendants set forth, in pertinent part, the following material information about the proposed Merger:

- Adjusted EPS – Mid-to-high single-digit accretion in 2018;

- Commercial Business is Well-Positioned for Growth;

  - new drug approvals have been on a steady increase over the past decade;

  - 2016 Decline (~50%) only 3rd down year since 2007 and well in excess of historical average decline of (26%);

  - approximately 70 compounds scheduled for potential approval this year; and

  - decline in new drug approvals during 2016 expected to reverse during 2017.

- Commercial business impacted by a large customer cancellation (product removed from market) in Q4 and near-decade low (22) new drug approvals in 2016 – *New product approval pipeline (20 YTD) provides significant new business opportunity in late 2017 and beyond.*

98. The May 10, 2017 Investor Presentation also included a slide titled, "inVentiv Health Financial Overview," which stated: "*Pipeline and expected new product approvals support return to historical growth in 2018+ [for inVentiv]*." The same slide identified the following historical growth of inVentiv's Commercial business: 15% net revenue growth (CAGR) and 22% adjusted EBITDA growth (CAGR) from 2013-2016. In other words, the May 10, 2017 Investor Presentation stated that, in 2018, the Commercial business would return to 15% net revenue growth (CAGR) and 22% adjusted EBITDA growth (CAGR).

99. Also before the market opened on May 10, 2017, the Section 10(b) Defendants conducted a conference call with investors ("May 10, 2017 Investor Conference Call").[2] Macdonald and Rush participated in the call and stated, in pertinent part:

**Defendant Macdonald**:

We expect mid- to high-single-digit accretion to [INCR]'s adjusted EPS in 2018, an accretion of more than 20% in 2019 and beyond.

\*  \*  \*

*[W]hen we're looking at what feeds that, the CCO model, you're looking at product launches, new drugs coming through*. And I think when you look at the stats for 2016, the number of approvals through the FDA, obviously, that was a low point of-- I think the lowest point since 2007. We see a return to the -- to really high levels of drugs being approved through the FDA. I think we're at 20 already this year. So in 5 months, you've got as many drugs approved as you had in the whole of the 12 months last year.

\*  \*  \*

---

[2] Later in the day on May 10, 2017, the Section 10(b) Defendants filed a Form 8-K attaching the May 10, 2017 Press Release and May 10, 2017 Investor Presentation. On May 11, 2017, the Section 10(b) Defendants filed Schedule 14A forms attaching an amended version of the May 10, 2017 Investor Presentation and a transcript of the May 10, 2017 Investor Conference Call.

**Defendant Rush**:

Looking at revenue, *we expect the combined company to grow revenue at 9% per year. We believe this may in fact turn out to be conservative*, because we have not included any of the many opportunities for revenue synergy in these projections.

*     *     *

Our modeling projects adjusted EBITDA to grow in the mid-teens, driven by inVentiv's margin expansion and realizing the achievable cost synergies that we have identified. This does not reflect additional potential cost synergies and margin enhancement opportunities that I will discuss shortly. The transaction is expected to be accretive to [INCR]'s adjusted EPS in 2018 at mid- to high single digits and to be accretive by more than 20% in 2019 and beyond*.*

*     *     *

With regard to '17, inVentiv, as we said in our prepared remarks and you see it in the deck, at the end of '16, they had a massive cancellation on the commercial side, and it was due solely to the drug company's decision to pull the drug from the market. So effectively, that's keeping their commercial business down a little bit this year, plus I think there's a slide in the deck that I think will tell a good story, Slide 32, that talks about how 2016 was a near record low in new drug approvals. And as we look at where we're at today in '17, they're already effectively, through last Friday, at the same level they were for all of '16. *We've looked at -- I think there's over 70 new drug applications this year. Not all of those will get approved, but we think they're on pace to double. That is a huge leading indicator as you're thinking about modeling the commercial business going forward as to what that market looks like.* We looked at the discussions in the pipeline, and went to a customer and said, the commercial business is not like the CRO. You're going to have to sort of think of it differently. It's not a backlog-driven business. Its 2 best indicators is what's the sales pipeline?  Think of a software company. A software company has 0 backlog when they start the year, and they build their forecast and their analysts figure out what the revenue's going to be based on 2 things: where's the market going; and two, where's that particular company's spot in the market? *Well, we're #1 in the market. So we own this market, so that's a good thing. And secondly, where's the market going? And when you're looking at new drug applications doubling and the pipeline discussions we're having with our customers, we're confident in that double-digit number*, particularly when you look at the CRO backlog that supports double-digit that is a more of an in-house you've won it type of backlog. So I think you've worked with me for a while. *I wouldn't give that kind of commentary if we didn't feel, at this stage, based on what we see today, that we were confident in it.*

- 37 -

100.    The statements described above made by the Section 10(b) Defendants in the May 10, 2017 Press Release, May 10, 2017 Investor Presentation, and May 10, 2017 Investor Conference Call were materially false and misleading and omitted material facts for the following reasons:

(a)    the Commercial business critically depended on the number of 100-plus sales team contracts it was able to win, irrespective of the total number of new drug approvals for the year (*see* ¶¶41-45, 57-58, *supra*);

(b)    as of May 10, 2017, no more than two such contracts had been available for bidding in 2017, and the Commercial business had yet to win any such contracts (*see* ¶¶44-45, *supra*);

(c)    given the failure to win any 100-plus sales team contracts, the Commercial business would see decreased revenues into 2018, despite the increased 2017 drug approvals that the Section 10(b) Defendants repeatedly highlighted as the best predictor of the Commercial business's future performance (*see* ¶¶57-58, *supra*);

(d)    the Section 10(b) Defendants' assertions that, in 2018, the Commercial business could achieve double-digit revenue growth or return to its historic CAGR of 15% for net revenues or 22% for adjusted EBITDA experienced from 2013 to 2016, and the combined Company could achieve 9% or double-digit revenue growth, were unreasonable when made (*see* ¶¶44-45, 57-58, *supra*);

(e)    the Commercial business was not on track to beat industry-wide growth of 8% and would create a drag on revenue growth of the combined Company in 2018 (*see id.*); and

(f)    thus, the number of new drug approvals was not "a huge leading indicator" for "modeling the commercial business going forward" (*see id.*).

101.    Following those false and misleading statements and omissions, INCR's stock price rose 21% from a May 9, 2017 closing price of $43.65 per share to a May 10, 2017 closing price of $52.80 per share, on unusually high trading volume.  On May 11, 2017, the stock price rose another 2% on unusually high trading volume, closing at $53.90 per share.

102.    Meanwhile, analysts took note of the Company's focus on new drug approvals as the central metric for projecting the Commercial business's success into 2018.  As KeyBank Capital Markets stated on June 4, 2017:  "inVentiv's commercial services (CCO) are particularly relevant now . . . . the FDA is on pace to approve 50 new drugs in 2017 – more than double from last year."

### 2.    The Section 10(b) Defendants Continued Making False and Misleading Statements and Omitting Material Facts Four Weeks After Announcing the Merger

103.    On June 7, 2017, while the market was still open, Macdonald spoke at the Jefferies Global Healthcare Conference.  He stated that the Merger "gives us high-single-digit accretion in 2018 *straight off the bat*, and then 20%-plus in 2019 and beyond."

104.    On the same day, the Section 10(b) Defendants also released a presentation that was nearly identical to that issued on May 10, 2017, and reiterated each statement set forth above in ¶¶96-98.

105.    The statements described above made by the Section 10(b) Defendants on June 7, 2017 were materially false and misleading and omitted material facts for the following reasons:

(a)    the Commercial business critically depended on the number of 100-plus sales team contracts it was able to win, irrespective of the total number of new drug approvals for the year (*see* ¶¶41-45, 57-58, *supra*);

(b)    since speaking on May 10, 2017 about the Commercial business's prospects for 2018, the Section 10(b) Defendants had four weeks of additional data on the number of 100-plus sales team contracts available for bidding, knew that no more than two such contracts had been

available for bidding in 2017, and knew that the Company had yet to win any such contracts (*see* ¶¶44-45, *supra*);

(c)    given the failure to win any 100-plus sales team contracts, the Commercial business would see decreased revenues into 2018, despite the increased 2017 drug approvals that the Section 10(b) Defendants repeatedly highlighted as the best predictor of the Commercial business's future performance (*see* ¶¶57-58, *supra*);

(d)    the Section 10(b) Defendants' assertions that, in 2018, the Commercial business could achieve double-digit revenue growth or return to its historic CAGR of 15% for net revenues or 22% for adjusted EBITDA experienced from 2013 to 2016, and the combined Company could achieve 9% or double-digit revenue growth, were unreasonable when made (*see* ¶¶44-45, 57-58, *supra*); and

(e)    the Commercial business was not on track to beat industry-wide growth of 8% and would create a drag on revenue growth of the combined Company in 2018 (*see id.*).

3.    **The Section 10(b) Defendants Continued Making Materially False and Misleading Statements and Omitting Material Facts in the Proxy Materials**

106.    The Section 10(b) Defendants' Proxy Materials (as defined in ¶¶229-234, *infra*) continued plugging the Merger as positioning the Company to grow significantly in 2018:

> The transaction is projected to be accretive to [INCR]'s adjusted earnings per share in the first 12 months following the closing of the merger, ***mid to high single-digit accretive in 2018*** and accretive by more than 20 percent in 2019 and beyond.

107.    Additionally, the Proxy Materials provided an "[a]djusted inVentiv forecast[ ]" of net service revenue growth from $2.101 billion in 2017 to $2.344 billion in 2018 – representing year over year growth of 11.5% and adjusted EBITDA growth from $380 million in 2017 to $441 million in 2018 – representing year over year growth of 16%.

108.    On July 19, 2017, moreover, the Section 10(b) Defendants filed a Schedule 14A ("July 19, 2017 Schedule 14A") – which constituted "definitive additional materials" that were part of the Proxy Materials and which was incorporated therein by reference.  Through that filing, Defendants reiterated the adjusted inVentiv forecast of adjusted EBITDA growth from $380 million in 2017 to $441 million in 2018 – representing year over year growth of 16%.

109.    The statements described above made by the Section 10(b) Defendants in the Proxy Materials were materially false and misleading and omitted material facts for the following reasons:

(a)    the Commercial business critically depended on the number of 100-plus sales team contracts it was able to win, irrespective of the total number of new drug approvals for the year (*see* ¶¶41-45, 57-58, *supra*);

(b)    since speaking on May 10, 2017 about the Commercial business's prospects for 2018, the Section 10(b) Defendants had over six weeks of additional data on the number of 100-plus sales team contracts available for bidding, knew that no more than two such contracts had been available for bidding in 2017, and knew that the Company had yet to win any such contracts (*see* ¶¶44-45, *supra*);

(c)    given the failure to win any 100-plus sales team contracts, the Commercial business would see decreased revenues into 2018, despite the increased 2017 drug approvals that the Section 10(b) Defendants repeatedly highlighted as the best predictor of the Commercial business's future performance (*see* ¶¶57-58, *supra*);

(d)    the Section 10(b) Defendants' assertions that, in 2018, the Commercial business could achieve double-digit revenue growth or return to its historic CAGR of 15% for net revenues or 22% for adjusted EBITDA experienced from 2013 to 2016, and the combined Company

- 41 -

could achieve 9% or double-digit revenue growth, were unreasonable when made (*see* ¶¶44-45, 57-58, *supra*); and

> (e)    the Commercial business was not on track to beat industry-wide growth of 8% and would create a drag on revenue growth of the combined Company in 2018 (*see id.*)

### 4.    Just Four Days Prior to the July 31, 2017 Merger Vote, the Section 10(b) Defendants Continued Making Materially False and Misleading Statements and Omitting Material Facts

110.    On July 27, 2017, the Company held a conference call to discuss INCR's financial results for the second quarter of 2017, as well as the Merger, which was scheduled for an approval on July 31, 2017. Macdonald and Rush participated on the call. On this call, the Section 10(b) Defendants continued to mislead the market regarding the Commercial business. Instead of revealing the Company's dependence on winning – but inability to win – any 100-plus sales team contracts in 2017, Defendant Rush highlighted the Company's success in generating business:

> *We're more optimistic today than we were on May 10* on both [INCR]'s standalone and the combined compan[y's] numbers for 2018. We both are building good backlog for that in the CRO and *new drug approvals are pretty strong* so far this year, which is a precursor to the commercial. We got to go close that business in the second half of this year in the commercial business for sure, but at least *the leading indicator is good for that business. So we're more optimistic today than we were in May given our first half results.*

111.    Rush also gave the misleading assurance that the Section 10(b) Defendants were being completely transparent about the Company: "So we believe very much in transparency. So we want to give you as much information as we do."

112.    When specifically asked about the Commercial business, Rush failed to identify 100-plus sales team contracts as a relevant factor; instead, he identified the number of new drug approvals as signaling growth for Commercial in 2018:

> [W]hen we were on announce the merger we articulated that our forecast, *our guidance expectations* the numbers that were included in our proxy for inVentiv, they were all contemplated a low teen to mid-teen decline for the commercial

business in '17 compared to '16 and that was primarily due to 2 things: one, they had a large cancellation at the end of '16; and secondly, they're coming off the year which was -- in which FDA approvals of new drugs had been cut in half, I think it went from something like 45 in 2015 to 22 I think is the number I have in my head for '16. And that really hurts their ability to grow revenue particularly on selling solutions piece. ***And so one of the things that we're optimistic about for 2018 is the fact that we're already above the approvals through June for the full year.*** So we're already again on that same slide, we talk about -- there's already 24 year-to-date approvals and that compares to 22 last year. So that's a pretty strong growth. And a lot of people are predicting 40 to 50 approvals this year which if we go back to that level that should, in theory, ***give us an opportunity to return to strong growth in commercial in 2018.***

113.    Macdonald then confirmed that the Section 10(b) Defendants were cautiously optimistic that the Company was "on the path to returning the company to ***double-digit organic revenue growth in 2018***."

114.    The Section 10(b) Defendants' presentation – as provided in conjunction with the July 27, 2017 conference call – similarly contained the false and misleading statement that "[g]rowth in FDA's new product approval pipeline (24 YTD) provides new business opportunity in late 2017 and beyond for commercial . . . already exceeding the 22 approvals for full-year 2016."

115.    The statements described above made by the Section 10(b) Defendants on July 27, 2017 were materially false and misleading and omitted material facts for the following reasons:

(a)    the Commercial business critically depended on the number of 100-plus sales team contracts it was able to win, irrespective of the total number of new drug approvals for the year (*see* ¶¶41-45, 57-58, *supra*);

(b)    since speaking on May 10, 2017 about the Commercial business's prospects for 2018, the Section 10(b) Defendants had over 10 weeks of additional data on the number of 100-plus sales team contracts available for bidding, and knew that the Company had yet to win any such contracts (*see* ¶¶44-45, *supra*);

(c)    given the failure to win any 100-plus sales team contracts, the Commercial business would see decreased revenues into 2018, despite the increased 2017 drug approvals that the Section 10(b) Defendants repeatedly highlighted as the best predictor of the Commercial business's future performance (*see* ¶¶57-58, *supra*);

(d)    the Section 10(b) Defendants' assertions that, in 2018, the Commercial business could achieve double-digit revenue growth or return to its historic CAGR of 15% for net revenues and 22% for adjusted EBITDA from 2013 to 2016, and that the combined Company could achieve double-digit revenue growth, were unreasonable when made (*see* ¶¶44-45, 57-58, *supra*);

(e)    the Commercial business was not on track to beat industry-wide growth of 8% and would create a drag on revenue growth of the combined Company in 2018 (*see id.*); and

(f)    thus, the fact that "new drug approvals are pretty strong so far this year" was not "a precursor to the commercial" (*see id.*).

116.    On July 31, 2017, INCR's shareholders voted overwhelmingly in favor of the Merger, which closed as of August 1, 2017.  As a result, Rush and Macdonald realized a combined $21 million in Merger-related compensation.

117.    During the one-month period between the closing of the Merger on August 1, 2017 and September 1, 2017, Rush and Macdonald sold personal shares of their INCR common stock for total gross proceeds of over $7.6 million and nearly $500,000, respectively.

**D.    Just One Month After Closing the Merger, the Section 10(b) Defendants Began to Reveal the True Prospects of the Commercial Business Acquired from inVentiv, but the Section 10(b) Defendants Continued to Mislead the Market**

118.    Defendants could only conceal the truth for so long as the Company's Commercial business failed to improve during the Class Period as the Company continued to struggle to gain new business in 2017 necessary to achieve the Section 10(b) Defendants' statements regarding 2018

growth.  The Company's problems were ultimately revealed in a series of partial disclosures causing declines in the Company's stock price.  The declines would have been swifter and steeper, but Defendants failed to fully disclose the nature and extent of such problems.  Instead, Defendants downplayed the negative news and continued to mislead the market with misrepresentations regarding the state of the Company's Commercial business.  By continuing to mislead the market in this manner, Defendants kept the Company's stock price artificially inflated throughout the remainder of the Class Period.  This section details the partial revelations of truth regarding Defendants' fraud, the resulting INCR stock price declines, and Defendants' continued misrepresentations and omissions that kept the Company's stock price artificially inflated even as the truth began to leak out.

119.   Before the market closed on September 6, 2017, Rush and Bell spoke about the Company at the Wells Fargo Securities Health Care Conference.  On the call, Defendant Rush changed his message by describing the Commercial business as a "wild card" and discussing different Commercial revenue growth scenarios that might occur in 2018:

> So, on the CRO side, we feel really confident at the high single digits growth because of that backlog building. ***On commercial, that's the wild card and that's the piece of the business that we have to make sure that we continue to sell on***. If that business were to grow at a high single, low double-digit growth, that makes the single digits – high single digits growth a layup. If it were to be flat again to down, then that's something laid on our ability to hit that. And we've got four months left to close the year, so we'll see.

120.   Following the partial revelation that the Commercial business was a "wild card," the Company's stock price fell 5.39% from a September 5, 2017 closing price of $58.40 per share to a September 6, 2017 closing price of $55.25 per share, on unusually high trading volume.

121.   The stock price decline would have been even greater, but during the September 6, 2017 conference, the Section 10(b) Defendants failed to disclose the Commercial segment's failure to obtain new business, or the fact that the segment would not be able to achieve 2018 growth.  In

addition, Rush continued to mislead the market about the prospects of the Commercial segment, stating that "we believe, over time, that [outsourcing] curve will follow that of the CRO industry and move up the penetration rate, and will be high single-digit – double-digit growth industry" despite being "more lumpy, more risky in the short run." Rush also stated that, based on the acquisition of inVentiv's "high concentration of customers in the top 20 pharma," representing approximately 70% of inVentiv's revenue, "we have a good balance [of customers] that really is reflective of how the market is purchasing."

122.    Also at the September 6, 2017 conference, an analyst asked "how worried we should be about unforeseen disruption in the next few quarters?" Bell downplayed any concerns, stating that "we're very comfortable that there will be bumps as there is in any merger, but relative to anything that has happened [in prior mergers completed by INCR and inVentiv], we think it's going to be relatively small."

123.    The following day, before the market closed on September 7, 2017, Rush and Bell spoke about the Company at the Robert W. Baird Global Healthcare Conference. Analysts immediately questioned Defendant Rush about his "wild card" statement made the previous day and how 2018 might be impacted in particular. In response to pointed questions, Rush sought to assuage the market's reaction and analysts' concerns. Rush acknowledged that investors "didn't like the use of the word wild card in yesterday's presentation" and stated that his CEO (Macdonald) "banned" him from "ever using that word again." Rush then attempted to refashion his comments, emphasizing that a "wild card" is the most valuable card in a poker game.

124.    Although Rush continued to acknowledge the lower visibility and revenue variability in Commercial, Rush reassured investors that there were no new developments that would change the Company's growth rate for 2018. One analyst asked whether the Commercial business was

earning new business in 2017 at a rate comparable to the rate in previous years, and whether the Commercial business could see a revenue decline in 2018. In response, Rush concealed material facts regarding the failure to win 100-plus sales team contracts and the resulting revenue growth decline in 2018, and instead stated as follows:

**Analyst:**

[A]re any of the CCO orders -- are the CCO orders coming in slower this year than they have in the past . . . [and] . . . is there any scenario where you think you could actually see a revenue decline in the CCO next year, based on what's happened so far this year with the 31 new drugs and other comments you've made?

**Defendant Rush**:

Yes. ***So one of the questions was: is the pattern different?  Not substantially***. That's one. In terms of linearity. I don't know off the top of my head and don't have their sales by month last year versus this year, so I can't answer that. My gut is is things are thereabouts. As we said on July 27 earnings call, those companies believe that they were roughly on track to hitting the numbers in the proxy for 2017. ***Nothing has come to my mind since then that would change that answer.*** Roughly, I think we said within a few percentage points, that's $100 million, $150 million of the original number in that range. I think there's nothing that's changed that. ***So what we told people in July, in May, there's nothing that -- there's not new news here on that that we're trying to lay out to the market***.

125.     Moreover, during the September 7, 2017 conference call, the Section 10(b) Defendants continued to make positive statements about the Commercial business's progress and prospects: *e.g.*, "[w]e are very excited about long-term aspects of the commercial business; very excited about that." And they continued to base those positive statements on the number of new drug approvals in 2017 over 2016. Rush stated:

[A]ll the conversations with our customers, and all of the discussions with our employees have led us to believe that we are - - we believe in the long-term prospects of this deal more so today than we did on May 10. Full stop. . . . You've got the best commercial business out there, hands down. The numbers tell you that. We have the best commercial business out there. We're going to take market share.

*     *     *

*Long-term, this was playing out exactly the way we thought.  More and more drugs are getting approved.  We're at 31 drug approvals this year compared to 22 last year.*  Our conversations with small to mid pharma, very excited.  More excited than we thought they were going to be.  Big pharma, continuing when we had those discussions; they see the value.

126.     Additionally, Rush specifically discussed which metrics were the best available predictors for the Commercial business's performance, yet he never mentioned the status of obtaining 100-plus sales team contracts:

I think when you look at the CCO business, we want to be careful that we don't give a metric that doesn't always have a perfect correlation, using the example you just give.  *I think that new drug approvals is a metric that has some correlation.*  If you look back at inVentiv sales business in 2014, 2015, and 2016, you got to go back to the year before because it's usually a one-year lag, but you had 40 drug approvals. So 45 ranging in that -- in the years 2013, 2014, and 2015.  The year after that, you had 15% to 20% growth in revenue. *So it seems to be a pretty strong correlation.*  Next year, 2016, you go from 45 down to 21, 22 drug approvals.  2017 follows with mid-teen decline in the revenue. There was a correlation there.  The way the correlation can be strongest is when you start going through the following diagram.  Okay? When that drug -- the drug that is going to be approved, is it a bigger market drug or is it a very small market?  Because if it's a small drug that doesn't have much of a market, they don't need many salespeople, the opportunity that they're willing to spend is smaller, but it's bigger.  That's the first question.  Does that company have a propensity to outsource or not?  Some of them are, like, no, hell no.  I'm not outsourcing, I'm keeping it in.  And others are, like, yes, I'll listen.  And others are, yes, I already do it.  Where they are on that spectrum, if it's ones that's are willing to consider it or doing it, that's a good [buy].  Are they a Quintiles, UDG, or inVentiv customer?  Do we have to pry them away or are they already in our customer history?  So, you can break that correlation pretty quickly as you go down that list.  And so, it's too simple of a metric, but it's the best one that we've been able to give you to date.  That's why I say stay tuned, because we're going to try to give you the same information.  I think we were leading edge.  I think you would acknowledge that on backlog coverage, and I think most people have adopted that as the best metric.  *Hopefully we will be viewed the same weight on the -- over time on this CCO business, that we are giving the best metrics.*

127.     As discussed below, the fact that the Section 10(b) Defendants continued to point to drug approvals as the best metric for growth was materially misleading because the Section 10(b) Defendants knew, but did not discuss, that 100-plus sales team contracts were vital components of the Commercial business, that fewer such contracts were available for bidding in 2017 than in 2016,

- 48 -

and that the Company had won zero such contracts in 2017. Furthermore, the Section 10(b) Defendants knew but failed to disclose that the absence of those large contracts would negatively impact the Company's financial results in 2018, despite the increase in new drug approvals.

128. Bell similarly concealed the key metrics regarding 100-plus sales team contracts; instead, he conveyed that developments in the Commercial business were positive and in line with the Section 10(b) Defendants' hopes:

> So the world has changed fairly dramatically, **and it is coming in the direction that we hoped it would in terms of commercialization**. We have field resources. We have marketing capabilities, med ed, PR, expert opinion leaders, behavioral scientists, consultants, adherence, organizations. We have the only full suite of commercialization assets, and our portfolio mirrors what actually happens in commercialization and pharma. **So we have seen a noticeable change with people's receptivity to outsourcing in commercial**.

129. When an analyst specifically asked Bell to identify metrics that were important to the Commercial business's growth and prospects, Bell demurred:

> **Analyst**:
>
> I think the question is, one of the things Wall Street really needs is -- are there any metrics that we can track or look at where you can say if we see X number of drugs approved, growth will be Y at some point in the future? I just don't know -- I don't – I've covered the group for over 20 years. I still don't know how to really forecast the revenue growth in a -- for lack of a better term, a CCO model. And I think a lot of other folks are struggling with that.
>
> **Defendant Bell**:
>
> I will let Greg speak to the metrics because I've been instructed to never talk about them. Happy to do that.

130. As noted above, *see* ¶126, Rush responded that the best metric was the number of new drug approvals for 2017. He avoided any mention of the drop in 100-plus sales team contracts – a metric that the Section 10(b) Defendants knew was central to the Commercial business's performance and growth.

131.   The statements described above made by the Section 10(b) Defendants on September 6, 2017 and September 7, 2017 were materially false and misleading and omitted material facts for the following reasons:

(a)   the Commercial business critically depended on the number of 100-plus sales team contracts it was able to win, irrespective of the total number of new drug approvals for the year (*see* ¶¶41-45, 57-58, *supra*);

(b)   since speaking on May 10, 2017 about the Commercial business's prospects for 2018, the Section 10(b) Defendants had 17 weeks of additional data on the number of 100-plus sales team contracts available for bidding, knew that no more than two such contracts had been available for bidding in 2017, and knew that the Company had yet to win any available contracts (*see* ¶¶44-45, *supra*);

(c)   given the failure to win any 100-plus sales team contracts, the Commercial business would see decreased revenues into 2018, despite the increased 2017 drug approvals that the Section 10(b) Defendants repeatedly highlighted as the best predictor of the Commercial business's future performance (*see* ¶¶57-58, *supra*);

(d)   the Section 10(b) Defendants' assertions that, in 2018, the Commercial business could still achieve double-digit revenue growth or return to its historic CAGR of 15% for net revenues and 22% for adjusted EBITDA from 2013 to 2016, and the combined Company could still achieve double-digit revenue growth, were unreasonable when made (*see* ¶¶44-45, 57-58, *supra*);

(e)   the Commercial business was not on track to beat industry-wide growth of 8% and would create a drag on revenue growth of the combined Company in 2018 (*see id.*);

(f)     thus, the number of new drug approvals was not "the best [metric for the Commercial business]" nor even a reasonable predictor of Commercial growth, in contrast to the number of 100-plus sales team contracts (*see id.*);

(g)     the Company's business did not have a "good balance" based on the acquisition of inVentiv; rather, that business highly volatile due to an overdependence on big pharma customers and contracts (*see* ¶¶41-45, 57-58, *supra*); and

(h)     the combined Company was indeed experiencing "disruption" after the Merger closed, caused by significant problems within the Commercial segment acquired from inVentiv that reduced growth (*see* ¶¶44-45, 57-58, *supra*).

132.    Based on the Section 10(b) Defendants' statements, the market continued to believe that new drug approvals were the central metric for projecting the Commercial business's success into 2018:

**Credit Suisse, October 11, 2017**:

However, looking ahead into 2018, the Commercial services segment should rebound 11%, driven primarily by strengthening CCO fundamentals, demonstrated by rebounding [New Drug Approval]s YTD, the most meaningful leading indicator for commercial services demand, though slightly offset by residual headwinds related to 2016 cancellations, which should roll off by mid-2018.

133.    The truth continued to leak out on November 9, 2017. On that day, the Section 10(b) Defendants issued a press release announcing disappointing financial results for the third quarter of 2017 and guidance for the fourth quarter of 2017. According to the press release, the Company's performance was hurt by problems in the Commercial segment acquired in the Merger, despite a "strong" performance by the Clinical segment. The Section 10(b) Defendants disclosed the following declines in key financial metrics:

- Year-over-year decreases in combined net service revenue of $48.7 million (6.0%, falling to $766.6 million) and $93.8 million (3.9%, falling to $2.33 billion) for the three and nine months ended September 30, 2017,

respectively, driven by year-over-year decreases in Commercial net service revenue of $62.3 million (21.1%, falling to $233.2 million) and $134.4 million (15.1%, falling to $752.9 million) for the three and nine months ended September 30, 2017, respectively;

- Year-over-year decreases in combined adjusted EBITDA of $14.2 million (9.3%) and $14.9 million (3.4%) for the three and nine months ended September 30, 2017, respectively; and

- A year-over-year decrease in combined adjusted EBITDA margin, falling from 18.8% in the third quarter of 2016 to 18.1% in the third quarter of 2017.

134. On the same day, November 9, 2017, the Company held a conference call with securities analysts to discuss the Company's financial results and guidance. Macdonald and Rush participated in the call on behalf of the Company. In his opening remarks, Macdonald revealed significant "growth challenges" affecting the Commercial segment.

135. In his opening remarks, Rush stunned investors and analysts by reducing the Company's 2018 revenue growth projection from double digits down to mid-single digits, partly driven by "roughly flat" revenue growth in the Commercial segment, in sharp contrast to the Section 10(b) Defendants' bullish Class Period statements regarding 2018 growth:

> Although we are not providing 2018 guidance until our fourth quarter call, I do want to give some color for 2018. As a reminder, these views are preliminary and are subject to continued strong new awards, normal levels of cancellations and a return to normal levels of steady delays versus the high rate we experienced in 2017. Based on existing accounting standards for revenue, we are cautiously optimistic that ***our consolidated net service revenue may grow in the mid-single digits***, which takes into account the following expectations within each of our segments. For our Clinical segment, we continue to build our backlog for 2018 and, accordingly, we believe that we have line of sight to achieve mid-single-digits growth in 2018 for the segment with potential upside to the high single digits. ***For our Commercial business***, while we don't have the same levels of visibility as our Clinical segment, we are cautiously optimistic that ***our revenue will be roughly flat with our 2017 revenue levels*** with a potential path to low single-digit growth.

136. Following their opening remarks, Macdonald and Rush responded to several questions from securities analysts regarding the Company's surprisingly poor results and guidance. In response to one question, Rush admitted that investors had been "somewhat flying blind on the

commercial," alluding the limited information the Section 10(b) Defendants and inVentiv had made available about the Commercial segment in the past.

137.    Rush then explained that, contrary to earlier statements, the Commercial segment's ability to win contracts involving 100-plus sales team contracts (a.k.a. "big sales teams" or "100-plus sales teams") was one of "the best leading indicators of revenue growth," and then revealed, for the first time, that the Commercial segment had captured little of this business, winning zero of two bids for such contracts in 2017, which hurt the Company's revenue growth in 2018:

> John, one of the things that we're going to try to do, and I'm not going to make a commitment that we'll be able to do it is, obviously, one of the things that we're getting a handle on is *what are the best leading indicators of revenue growth*? . . . *You're -- obviously, our investors and you're somewhat flying blind on the Commercial.* One of the things that I would tell you that we're -- we saw this year, even though new drug approvals are up and probably going to be in the low 40s, the mix of those drugs that are approved are smaller compounds and not producing some of the big sales teams that we saw even in '16. So I may have that wrong, so use this, what I'm about to say as directional. But I think last year, we had 4 -- there was 4 or 5 100-plus sales teams that went out to bid to the industry. So there's only 4 or 5 proposals last year whereas in the years before, it was much greater than that. Two were actually awarded to us last year, and we lost 3. So we had a 40% hit rate last year. *I believe this year, there's only been 2 that have even gone out to bid to the sector and both of those were awarded to others based on price. We weren't willing to match the price and our competitors were willing to do that, and they had their own reasons for going to those prices.* But -- so you only had 2 versus 5, and we're 0 for 2. *And so that's one of the reasons why we also tempered our expectation for '18.* We had expected Commercial to have double-digit growth next year in our original proxy filing. But they -- that's not going to happen right now because we haven't won those big 100-plus selling teams this year that we would have expected to.

138.    Later in the call, Rush stated that the Company's downturn in 2018 growth was "almost solely within Commercial," driven in part by the Section 10(b) Defendants' new revelation that Commercial's inability to win new business involving 100-plus sales team contracts (*i.e.*, "the lack of the wins of the 100-plus sales teams"):

**Timothy Cameron Evans**:

- 53 -

Wells Fargo Securities, LLC, Research Division - VP and Senior Equity Analyst:

I was hoping to take a big step back here and look at the forest instead of the trees. When you closed this deal or when you announced the deal, excuse me, you sounded like you had a very high amount of confidence in, say, the CAGR numbers that you gave for 2017 through 2020, the 9% top line, the 14% EBITDA. *And from what you're telling us today, I think is going to kind of shake our faith in those numbers.* What has -- what are the 2 or 3 things that have really changed since that point in time through today?

**Defendant Rush**:

Yes. I'll take the first one and let Alistair address. I think Clinical -- nothing has changed in terms of bookings. They've come in where we thought they were going to be our backlog is built -- building exactly where we thought it would be. And again, those numbers were in May, so you -- in fairness, 7 months have passed and all of our competitors have modified their numbers with new information. But Clinical, I would say not much, other than we've tried to be prudent in giving 2018 guide of delays. Long term, we still believe high single digits is where this company will be over the long term. That has not changed. And you -- when we gave that 9%, it wasn't by year. We didn't say every year it was going to be 9%. We articulated that Commercial in particular has a higher beta, and the variability in that will be -- will not be straight up and to the right. *In fairness, 2018 is not going to be as strong as we would've thought initially, and that's all on the Commercial side.* I think that we had expected Commercial to be -- to finish this year, quite honestly, above $1 billion in revenue. Right now this guy would say, it's going to be below $1 billion, but we expected it to finish this year a little higher than it did. And next year, for it to be -- low double-digit growth. And *the lack of the wins of the 100-plus sales teams* and the $30 million hit that we're taking in advertising, that's 2 points on the growth rate right there or 2 to 3 points on Commercial and a solid 1 point on the total company growth. That 1 customer alone. So we still said mid -- in a mid-single digits. *You can articulate that to be 4%, 5%, 6% is what we think the whole company, but the downturn from the 9% is almost solely within Commercial.*

139.     Rush also disclosed that the poor Commercial results would impact, not only revenue growth, but also the Company's EBITDA margins, stating that "[o]ur biggest headwind for EBITDA margins for the total company is in the Commercial business" and that "we will be facing a headwind in EBITDA margin expansion in 2018."

140.     The price of INCR's common stock plummeted in response to the Section 10(b) Defendants' revelations on November 9, 2017. After closing at $57.50 per share on November 8,

- 54 -

2017, the stock closed at $41.15 per share on November 9, 2017, a one-day decline of over 28% on unusually high trading volume of nearly 4 million shares.

141.   In the wake of the November 9, 2017 revelations, several analysts issued reports discussing the Company's disappointing financial results and guidance, driven by problems in the Commercial segment.  For example, on November 9, 2017, J.P. Morgan observed the contrast between these revelations and the "bullish tone" set by the Section 10(b) Defendants when the Merger was announced, and noted the Company's precipitous one-day stock price decline of over 28% in response to such revelations, at the time of J.P. Morgan's report:

> Digging deeper into the guidance shortfall ... With [INCR] shares down >28% today, investors were clearly disappointed with INCR's 2018 outlook, which *embeds significantly lower top-line growth expectations relative to the bullish tone set by management at the time of the inVentiv merger announcement (when it expected a sharp rebound to [double-digit] growth in 2018)*. . . . Management also noted that YTD wins in Commercial have been weak (INCR won two of five bids for 100+ reps last year, while this year has seen only two such bids emerge, with INCR losing both based on competitors charging a lower price).

142.   On the same day, November 9, 2017, Jefferies issued a report observing that the Company's guidance for the fourth quarter of 2017 was "well below consensus expectations": guidance of just $738-$768 million versus consensus estimates of $808.7 million.

143.   On the following day, November 10, 2017, William Blair issued a report including commentary on the Section 10(b) Defendants' "worrisome" guidance driven by challenges in the Commercial business:

> Management provided guidance for the fourth quarter of 2017 that came in lower than we had anticipated.  The guidance implies that clinical revenues will be flat and commercial revenues will be down 21% year-over-year.  We view this as worrisome given the challenges that inVentiv's commercial business has faced so far this year. In aggregate, the revenue guidance is $55 million below our target, using the midpoint and excluding the impact of $12 million in purchase accounting.  The fourth-quarter earnings guidance also fell well below our estimates; we suspected that earnings guidance would come in lighter given some of the moving parts as the merger integration begins, but EPS guidance of between $0.52 and $0.60 fell well below our estimate of $0.74 and the consensus estimate of $0.72 for the quarter.

144.    On November 13, 2017, Credit Suisse issued a report cutting its earnings estimates and stock price target for the Company, noting that the Company's stock price had "deteriorated 36% since INCR's first post-Merger earnings release (vs. -0.5% S&P) [on November 9, 2017], on disappointing prelim. pro forma guidance that pointed to more modest +[mid-single digits] topline growth and de minimis EBITDA margin leverage on sustained headwinds in both CRO and CCO segments" including "weaker large (100+ rep) contributions."

145.    Following the over 28% single-day drop on November 9, 2017, INCR's stock price continued to fall over the next three trading days, ultimately closing at $34.35 per share on November 14, 2017, on unusually high trading volume averaging approximately 2.4 million shares per trading day.  The total stock price decline over this four-day period was over 40%, or $23.15 per share.

### E.    Post-Class Period Developments

146.    The fallout from the Commercial problems revealed by the Section 10(b) Defendants continued after the Class Period.  Among other developments, Rush and Gaenzle – two key figures at INCR who drove the Merger – each departed from the Company within four months of the revelations.

147.    On December 7, 2017, the Company filed an SEC Form 8-K disclosing that Bell, the former Chairman and CEO of inVentiv, had "ceased" to be President of the Commercial segment and an executive officer of the Company on December 1, 2017, after serving in that role for only four months.  Pursuant to a Letter Agreement with the Company, Bell agreed to temporarily remain in the Commercial segment in a non-executive employee role during a four month transition period, and continue to serve as Chairman of the Board.

148.    Less than a month after the announcement of Bell's departure from the Commercial segment, the Company issued a press release after the market closed on January 3, 2018 announcing

that Rush was stepping down from the Company but would remain as the Company's CFO until April 30, 2018. On this news, the Company's stock price fell 5.7%, from a close of $43.80 per share on January 3, 2018 to a close of $41.30 per share on January 4, 2018, on higher-than average trading volume of nearly 2 million shares.

149.    In response, Jefferies issued a report on January 3, 2018 regarding the exits of Rush and Bell, linking this to "recent stock and results volatility" and "an underperforming Commercial segment":

> We can't say we are surprised by the news of CFO Rush's pending resignation. During our December meeting, Mr. Rush acknowledged the pressure created by recent stock and results volatility. . . . CFO Rush's departure comes only 5 months after the close of INCR's merger with inVentiv. The departure also comes 1 month after the exit of Michael Bell, former President, Commercial Solutions, and former inVentiv CEO. Mr. Bell continues to serve as Chairman of the Board. ***The C-suite turnover comes as INCR continues to work through a large integration and an underperforming Commercial segment***.

150.    A report issued by Credit Suisse on the same day, January 3, 2018, also linked the Rush and Bell departures to the Company's "turmoil" following disappointing 2018 guidance:

> INCR announced the departure of CFO Greg Rush . . . . The announcement also comes on the heels of the step down/transition of Mike Bell, then President of Commercial Solutions and formerly the CEO of inVentiv Health prior to its merger with INCR. The news comes as less of a surprise given recent turmoil following a fairly disappointing preliminary pro forma 2018 guidance that was well below investor expectations. In conjunction, we are lowering our target price to $52 from $54, on less clarity into 2018 given the ongoing management shifts that provide little confidence during an already important integration period.

151.    At the J.P. Morgan Healthcare Conference on January 9, 2018, Macdonald acknowledged "pressure on the commercial side in terms of net service revenue" and identified the need to move into the "small to mid market" as key to a turnaround. He also emphasized that "we know we've got to build a lot of work in this area to create our pipeline of work that will carry over into the commercial sector." He elaborated that:

We've had some pressure on the commercial side in terms of net service revenue. But I think we've got a lot of activities that will help us turn that around. So penetration, our opportunity into the small to mid market is key to that. We have, if you look at this donut in the bottom corner here, 66% of this work is [from] the top 20 [customers]. Now they're the people that commercialize. We're seeing this big shift now to small to mid[-sized customers] commercializing their own work. Our relationships traditionally with the small to mid[-sized customers] make this a fertile hunting ground for us. These are the organizations who we believe will go end to end in our platform. These are the people who we want to carry along that journey.

152.    Hence, after investors had lost millions of dollars at the end of the Class Period, Macdonald finally began elaborating on the Company's inability to garner the large contracts in the Commercial business, calling 2017 a "down year" tied to the inability to land 100-plus sales team contracts and cancellations.  Rush, moreover, stressed a push toward diversifying the Company's customer base into smaller and mid-sized customers in order to "reduce the volatility" within the Commercial business:

Can I add just a couple of things on that? And I think it's very important. One of the strategies of this merger was to take the commercial offering into the small to mid. And the positive news *-- the negative side of what you pointed out is that there was only 2 of the large 100-plus thing -- sales teams and we [didn't land] either one.* The positive side of that is if you have that in your backlog and one of those were to cancel, it can result in a little bit higher volatility. *One of the things that we've been able to do over the last year is bring in a broad mix of small to mids such that the impact of any one cancellation is not very significant. So that helps reduce the volatility in the space, plus it's given us much more diversified customer base.* In addition, if you look at the -- where a lot of the new drugs are being approved, they're in the small to mid[-sized] customers. They may or may not need a large sales team. And so what you want to be able to do is be the leader that can show that you have those capabilities to do the novel drugs. That's been an area where we've been take advantage of this 2017 "down year" to build those capabilities out. If we get one of those in 2018, again, those can represent 5% growth in 1 year and so that can sort of be a fuel to the growth factor. But obviously, that needs to come later. But the good news is we're diversifying our customer base.

153.    More surprising news about the Company's executive departures was released after the market closed on February 21, 2018.  The Company filed an SEC Form 8-K disclosing that Rush would "step down as [CFO] and cease to be an executive officer" on that day (February 21, 2018) rather than his previously announced departure date of April 30, 2018.  The Company also revealed

that Gaenzle, its Chief Administrative Officer, General Counsel, and Secretary, had tendered his resignation notice on February 14, 2018 and "was placed on paid leave" as of February 19, 2018. No reasons were given for Rush's accelerated departure or Gaenzle's sudden resignation. On this news, the Company's stock price fell 16%, from a close of $37.75 per share on February 21, 2018 to a close of $31.70 per share on February 22, 2018, on unusually high trading volume of 3.2 million shares.

154.    In reaction to this latest shakeup at the Company, Jefferies issued a report on February 21, 2018 stating in part:

> ***To say that the executive exodus at Syneos is concerning risks understatement.*** The instability at the top during the [i]nVentiv integration raises the chances of missteps, a risk the market has substantially discounted in the stock. The timing of the announcement and the repeat of prior mistakes we think are highly likely to put additional pressure on [INCR] on Thursday. . . . We are concerned about the management changes – not only the specific handling of the CFO transition, but also the string of executive level departures. The stock is <15x our '18 and likely lower on Thursday. . . . ***What is happening at this company that three Top 5 executives have left in the last 19 months?***

155.    Another analyst reacting to this news, William Blair, issued a report on February 21, 2018 titled "Two Management Departures Suggest Turbulence Has Not Yet Ended," stating in part:

> ***From our perspective, the timing of the departures is troubling.*** In particular, the CFO change coming one week before the release of fourth-quarter results, 2018 guidance, and the publishing of the 10-K all create a greater degree of risk, in our opinion. Both the interim CFO and, eventually, the permanent CFO will have the opportunity to reset financial expectations lower after a large reset last year. And the fact that both the CFO and general counsel are leaving provides added evidence that the company remains in the midst of integration turbulence with more changes likely on the way. . . . We see good prospects for cost and revenue synergies as a result [of the merger]. But putting these two companies together has clearly been more challenging than first expected by management. And those integration distractions have also exposed just how volatile the commercial business can be in the wake of internal or external shocks.

156.    Wells Fargo Securities also issued a report on February 21, 2018 regarding the surprising accelerated departure of Rush and sudden departure of Gaenzle, stating in part that

"[d]espite the company's characterizations, we believe neither of these items look good. What [INCR] needs is predictability and consistency, and these announcements help neither, in our view. We expect significant stock volatility into next week's print."

157.    On February 28, 2018, the Company filed its Form 10-K – as well as a press release on Form 8-K – announcing the results for the fourth quarter of 2017, the results for fiscal year 2017, and guidance for fiscal year 2018:

- adjusted net service revenue decreased 5.6% for the fourth quarter 2017 and 4.3% for fiscal year 2017 (compared to fourth quarter and fiscal year 2016);

- the Commercial business's adjusted net service revenue decreased 20.4% for the fourth quarter 2017 and 16.4% for fiscal year 2017 (compared to fourth quarter and fiscal year 2016); and

- net service revenue for 2018 would grow 4.3% to 7.7% compared to 2017

158.    On the same day, the Company held an investor conference call, and Macdonald confirmed that the Company had been forced to move away from its previous reliance on large contracts in the Commercial business:

**Tycho W. Peterson - *JPMorgan Chase & Co, Research Division - Senior Analyst***:

One thing it would be helpful to hear is if there's any comments you can make on the pricing side for Commercial and then also on your initiative to improve visibility. I mean, obviously, the overall market seems like it's a little bit better in here due to big wins. But curious on your own internal efforts to improve visibility for that business as well.

**Defendant Macdonald**:

So we need to make sure that we have a diversified backlog. And the move, I think, away from kind of the big blockbusters to the specialty products actually helps us do that because there are a lot more deals. You saw the 46 approvals in 2017 versus 22 In '16. And a lot of those were smaller products, which enables you to diversify that backlog as you win smaller but more relationships.

Additionally, Macdonald confirmed that there were metrics – other than new drug approvals, standing alone – that could signal the Commercial business's performance:

In the Commercial segment, we continue to believe that this underpenetrated market has significant long-term growth opportunities. We see further signs of improvement in the macro environment, including the rapid pace of new drug approvals, which continued in the fourth quarter, resulting in 46 FDA approvals in 2017 and the expectation of continued strong approvals over the next 3 to 4 years. Both overall proposal volume and new business wins have increased and our selling solutions pipeline is approximately 30% larger than at the same point in 2017. As always, there is work to do to convert this increased pipeline into revenue-generating opportunities.

159.    On March 13, 2018, at the Barclays Global Healthcare Conference, Macdonald continued emphasizing metrics (RFPs and sales pipeline) that were vital to the Commercial business but that Defendants had not disclosed during the Class Period:

The market, though, if you see 2016, it's an anomaly to the downside in the number of approvals. We've seen that return to 46 in U.S. in 2017. Specialty drugs driving a much broader marketplace, and we're starting to see that start to flow through in the RFPs and the sales pipeline that we're seeing. We talked about on our earnings call on the 28th, our pipeline on the commercial side is about 30% higher than it was a year ago. So that's a good indicator that, that work is starting to flow through the pipe.

160.    On May 9, 2018, the Company filed a Form 10-Q, as well as a press release on Form 8-K, announcing the results of the first quarter of 2018.  Blaming problems that had existed in 2017 but that had not been disclosed to investors at that time (*e.g.*, "lower new business awards in 2017"), the Company reported a severe decline in the Commercial business:

Combined Company adjusted service revenue under ASC 605 decreased by $24.4 million, or 3.1%, to $761.5 million from $785.9 million in the first quarter of 2017. The decrease was primarily due to project cancellations and customer downsizing within the Company's selling solutions and communications service offerings in 2017, partially offset by growth in the Company's Clinical Solutions segment and a foreign currency exchange rate benefit of $10.9 million.

*          *          *

The Combined Company Commercial Solutions segment generated $230.6 million of adjusted service revenue under ASC 605 in the first quarter of 2018*, a decrease of $36.1 million, or 13.5%*, compared to $266.8 million in the first quarter of 2017. This decrease was primarily due to project cancellations and customer downsizing within the Company's selling solutions and communications service offerings, along with *lower new business awards in 2017 that reduced 2018 revenue*. Despite these

factors, adjusted service revenue from the Company's Commercial Solutions segment was consistent with the fourth quarter of 2017.

161. Additionally, the Company began providing a Commercial business book-to-bill metric (*i.e.*, the ratio of business received by the Company to the amount billed by the Company for a particular period, a leading indicator of demand), which had not been provided during the Class Period: "Commercial Solutions segment net awards of $322.4 million, representing a book-to-bill ratio of 1.40x."

162. During a conference call on the same day, Jason M. Meggs, who was named Interim CFO of the Company following Rush's departure, further emphasized that the Commercial business had struggled with new business in 2017 despite the high number of new drug applications:

> The decline in adjusted service revenue was driven by a *14% decline in our Commercial segment*, which fell from $266.8 million in 2017 to $230.6 million in 2018. This is primarily due to the impact of cancellations and customer downsizing during 2017, along with *lower new business wins in 2017*. . . . Despite the 2017 headwinds, our Commercial revenue was relatively flat sequentially compared to the fourth quarter.

163. On June 12, 2018, Macdonald spoke at the William Blair Growth Stock Conference, providing further details about the Company's failure to win large contracts in 2017 and its need to adjust away from those contracts:

> *Now, the shift to specialty is very important in this commercial space. It used to be powered by large primary care product sales teams, 500 reps, 200 reps. Those field teams don't exist as much anymore. Our backlog is now made up of smaller, more stable, specialty products that help us diversify that backlog, enable us to build a much more stable trajectory*. You can see we've been flat for last three quarters. We expect that to return to sequential growth as we go through the end of 2018. It's powered by the chart on the right, neutral approvals. In 2016, you see the big drop-off correlates pretty well with the drop-off in revenue in the commercial space in 2017. That market came back in 2017 in terms of new approvals and it's continuing into 2018. The projection is for the next five years that it will be about 40 to 50 drugs a year approved by the FDA and that helps to power obviously the number of drugs that [ph] will go into . . . commercialization across the market.

164.   On June 13, 2018, Macdonald reiterated those points at the Goldman Sachs Global Healthcare Conference:

> What we are seeing is a shift in that customer base, though, in the contracts that are there. I think gone are the days of the 500,000-person salesforce that's driving primary care products, and we are happy about that. Don't get me wrong, we'd love to win a 1,000-head sales team, but it creates a bit of a time bomb in your backlog and if it ever c[anc]els, you have a huge impact, which is what happened to inVentiv at the end of 2016. ***What we are seeing now is a move to specialty. Smaller teams***, blended teams between nurse-educated MSLs and traditional sales reps. But also with remuneration specialists in the call centers, so it's a much more holistic approach. ***And that's perfect for us***, because we are the organization that has all those pieces under one roof. ***So I think what we'll see longer term in commercial is a growth of smaller, but more, sales teams focused on more specialty products around the market***.

165.   During the Class Period, the Section 10(b) Defendants knew but did not disclose those material facts – *i.e.*, that large sales team contracts were dropping in 2017, despite increased drug approvals.

### F.     Loss Causation

166.   During the Class Period, as detailed herein, the Section 10(b) Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of INCR's common stock, or otherwise maintained the artificially inflated price of INCR's common stock, and operated as a fraud or deceit on Class Period purchasers of INCR's common stock. When the Section 10(b) Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the price of INCR's common stock fell as the prior artificial inflation came out. The truth began to emerge, and/or the risk caused by the Section 10(b) Defendants' fraud materialized, through a series of revelations that cast doubt on the veracity of the Section 10(b) Defendants' Class Period statements. As a result of their purchases of INCR's common stock during the Class Period, Lead Plaintiffs and the other members of the Section 10(b) Class suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

167. On September 6, 2017, the Company surprised investors by revealing that the Commercial business was a "wild card," backtracking from confident previous assertions regarding Commercial's 2018 growth prospects, as detailed further in ¶119 above. As a result, the stock price fell 5.39% from a September 5, 2017 closing price of $58.40 per share to a September 6, 2017 closing price of $55.25 per share, on unusually high trading volume.

168. The following day, on September 7, 2017, the Company expressed additional uncertainty about the "visibility" and short-term prospects of the Commercial business while continuing to buoy the stock price by reaffirming 2018 growth, as detailed further in ¶¶123-130 above.

169. On November 9, 2017, the Company revealed dramatically slower revenue growth in 2018 due to problems in the Company's Commercial business, as detailed further in ¶¶133-145 above. As a result, the Company's common stock price fell over 28% on unusually high trading volume of nearly 4 million shares. The stock continued to fall the following three trading days, ultimately closing at $34.35 per share on November 14, 2017, on unusually high trading volume averaging approximately 2.4 million shares per trading day. The total stock price decline over this four-day period was over 40%, or $23.15 per share.

170. After the market closed on January 3, 2018, the Company announced that Defendant Rush was stepping down from his position as CFO, as detailed further in ¶¶148-150 above. On this news, the Company's stock price fell approximately 6% from a close of $43.80 per share on January 3, 2018 to a close of $41.30 per share on January 4, 2018, on unusually heavy trading volume.

171. After the market closed on February 21, 2018, the Company announced that Defendant Rush was leaving the Company earlier than previously announced and that another high-level executive, Gaenzle (Chief Administrative Officer, General Counsel, and Secretary), was also

leaving the Company, as detailed further in ¶¶153-156 above.  This caused the Company's stock price to plummet 16%, falling from a close of $37.75 per share on February 21, 2018 to a close of $31.70 per share on February 22, 2018, on unusually heavy trading volume.

172.    As a result of their purchases of INCR common stock during the Class Period, Lead Plaintiffs and the other members of the Section 10(b) Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  By failing to disclose to investors the adverse facts detailed herein, the Section 10(b) Defendants presented a misleading picture of INCR's business and prospects.  The Section 10(b) Defendants' false and misleading statements had the intended effect and caused INCR common stock to trade at artificially inflated levels throughout the Class Period.

173.    When the truth about the Company began to be disclosed in a series of partial revelations beginning on September 6, 2017, the price of INCR's common stock declined.  These declines removed the inflation from the price of INCR's common stock, causing real economic loss to investors who had purchased INCR's common stock during the Class Period.

174.    The declines in the price of INCR's common stock after the revelations came to light was a direct result of the nature and extent of the Section 10(b) Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in INCR common stock negate any inference that the losses suffered by Lead Plaintiffs and the other members of the Section 10(b) Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Section 10(b) Defendants' fraudulent conduct.  This is evidenced by the chart below, which demonstrates the

clear divergence of the Company's common stock price from the Company's benchmark indices and the stock prices of its peer companies,[3] as the revelations of the truth became known to the market:



175.   The economic losses, *i.e.*, damages, suffered by Lead Plaintiffs and the other members of the Section 10(b) Class were a direct result of the Section 10(b) Defendants' fraudulent

---

[3]   The indices reflected in this chart, NASDAQ Healthcare Index and NASDAQ Composite Index, were cited as benchmarks for INCR's common stock performance in INCR's Form 10-K, filed with the SEC on February 28, 2018.  The "peer group" reflected in this chart is comprised of the following companies that INCR identified as its peer group in its Proxy Statement filed with the SEC on Schedule 14A on April 13, 2018:  Agilent Technologies, Inc.; ICON Public Limited Company; PerkinElmer, Inc.; Bio-Rad Laboratories, Inc.; Illumina, Inc.; Perrigo Company plc; Cerner Corporation; IQVIA Holdings Inc.; PRA Health Sciences, Inc.; Charles River Laboratories International, Inc.; Laboratory Corporation of America Holdings; Quest Diagnostics Incorporated; Endo International plc; Mettler-Toledo International Inc.; VWR Corporation; Envision Healthcare Corporation; PAREXEL International Corporation; and Waters Corporation.

scheme to artificially inflate the price of INCR common stock and the subsequent significant decline in the value of INCR common stock when the Section 10(b) Defendants' prior misrepresentations and fraudulent conduct were revealed.

### G.     Presumption of Reliance

176.     A class-wide presumption of reliance is appropriate with respect to the claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on the Section 10(b) Defendants' material omissions.  Because this action involves the Section 10(b) Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that the Section 10(b) Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Section 10(b) Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

177.     A class-wide presumption of reliance is also appropriate with respect to the claims in this action under the fraud-on-the-market doctrine.  As a result of the Section 10(b) Defendants' materially false and misleading statements, the Company's publicly traded securities traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.  Lead Plaintiffs and other members of the Section 10(b) Class purchased or otherwise acquired the Company's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to INCR, and have been damaged thereby.

178.     At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)    As a regulated issuer, INCR regularly made public filings with the SEC and related press releases, and was eligible to file Form S-3s with the SEC during the Class Period;

(b)    INCR regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)    INCR was followed by several securities analysts employed by major brokerage firms, such as JP Morgan, Jefferies, William Blair, and Credit Suisse, among others, who wrote research reports concerning INCR that were distributed to the brokerage firms' sales forces, entered the public marketplace, and were publicly available; and

(d)    The Company's common stock met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market.

179.    As a result of the foregoing, the market for the Company's securities promptly digested current information regarding INCR from all publicly available sources and reflected such information in the prices of the Company's securities.

180.    Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices.

181.    At the times they purchased or otherwise acquired the Company's securities, Lead Plaintiffs and other members of the Section 10(b) Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

182.    As a result of the above circumstances, the presumption of reliance applies.

183.    In sum, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    the Section 10(b) Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiffs and other members of the Section 10(b) Class purchased or otherwise acquired the Company's securities between the time the Section 10(b) Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

**H.    No Safe Harbor**

184.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from INCR's filings.

185.    The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as

the very risks they sought to warn of began to materialize. Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless. Given the scope and magnitude of the Section 10(b) Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield the Section 10(b) Defendants from liability. The risk warnings were false and misleading because they did not disclose that the Section 10(b) Defendants were actually embroiled in the very circumstances about which they purportedly warned, and the Section 10(b) Defendants had actual knowledge of material adverse facts undermining such disclosures.

186. Moreover, to the extent that any statements pleaded herein are forward-looking, the Section 10(b) Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of INCR who knew it was false or misleading when made.

I. **Lead Plaintiffs' Class Action Allegations for Fraud-Based Claims**

187. Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons or entities that purchased or otherwise acquired shares of INCR common stock between May 10, 2017 and November 8, 2017, inclusive. Excluded from this Section 10(b) Class are the Section 10(b) Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Section 10(b) Defendants have or had a controlling interest.

188. Because INCR has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ, members of the Section 10(b) Class are so numerous that joinder of all members is impracticable. According to the Company's Form 10-Q for

- 70 -

the third quarter of 2017, the Company had more than 104 million shares outstanding as of November 2, 2017. While the exact number of Section 10(b) Class members can only be determined by appropriate discovery, Lead Plaintiffs believe that Section 10(b) Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

189.    Lead Plaintiffs' claims are typical of the claims of the members of the Section 10(b) Class because Lead Plaintiffs and all of the Section 10(b) Class members sustained damages arising out of the Section 10(b) Defendants' wrongful conduct complained of herein.

190.    Lead Plaintiffs will fairly and adequately protect the interests of the Section 10(b) Class members and has retained counsel experienced and competent in class actions and securities litigation. Lead Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Section 10(b) Class that Lead Plaintiffs seek to represent.

191.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Section 10(b) Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Section 10(b) Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

192.    Questions of law and fact common to the members of the Section 10(b) Class predominate over any questions that may affect only individual members in that the Section 10(b) Defendants have acted on grounds generally applicable to the entire Section 10(b) Class. Among the questions of law and fact common to the Section 10(b) Class are:

(a)     whether the Section 10(b) Defendants violated the federal securities laws as alleged herein;

(b)      whether the Section 10(b) Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)      whether the Section 10(b) Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)      whether the Section 10(b) Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)      whether the Section 10(b) Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(f)      whether the market prices of the Company's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Section 10(b) Class have sustained damages as a result of the decline in value of the Company's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL SECTION 10(b) DEFENDANTS

193.    Lead Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against all Section 10(b) Defendants.

194.    During the Class Period, INCR and the Section 10(b) Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, Lead Plaintiffs, and other Section 10(b) Class members, as alleged herein; (b) artificially inflate and/or maintain the market price of the Company's publicly traded securities; and (c) cause Lead Plaintiffs and other members of the Section 10(b)

- 72 -

Class to purchase the Company's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, INCR and the Section 10(b) Individual Defendants, and each of them, took the actions set forth herein.

195.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Section 10(b) Individual Defendants are also sued as controlling persons of INCR, as alleged below.

196.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

197.    INCR and the Section 10(b) Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the

mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

198.    These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's financial and operational strength, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

199.    The Section 10(b) Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (a) the Section 10(b) Individual Defendants were high-level executives at the Company during the Class Period; (b) the Section 10(b) Individual Defendants, by virtue of their responsibilities and activities as senior executive officers were privy to, and participated in, the creation, development, and reporting of the Company's financial condition and results; (c) the Section 10(b) Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) the Section 10(b) Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

200.    Each of the Defendants had actual knowledge of the material misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Section 10(b) Individual Defendants and the misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, the Section 10(b) Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

201.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and other members of the Section 10(b) Class acquired the Company's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

202.     At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Section 10(b) Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiffs and other members of the Section 10(b) Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Section 10(b) Class would not have purchased or otherwise acquired their INCR publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

203.     By virtue of the foregoing, INCR and the Section 10(b) Individual Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

204.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Section 10(b) Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines, discussed above, when the artificial inflation was removed from the Company's stock.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

205.     Lead Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against the Section 10(b) Individual Defendants.

206.     The Section 10(b) Individual Defendants acted as controlling persons of INCR within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Section 10(b) Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. The Section 10(b) Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

207. In addition, the Section 10(b) Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

208. As set forth above, INCR and the Section 10(b) Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Section 10(b) Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Section 10(b) Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Section 10(b) Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

IV.    NON-FRAUD PROXY CLAIMS

    A.    Overview of Non-Fraud Proxy Claims

    209.    The claims set forth below in Counts III and IV allege violations of Section 14(a) of the Exchange Act, Rule 14a-9 promulgated thereunder, and Section 20(a) of the Exchange Act ("Proxy Claims"). Lead Plaintiffs bring these claims individually and on behalf of the Section 14(a) Class (as defined below, *see* ¶262). For the purposes of the Proxy Claims, Lead Plaintiffs repeat and reallege parties, jurisdiction, and factual allegations from ¶¶14-16, 18-21, 28-33, 41-46, 96-99, 106-108, 119-120, 133-140, 148, 151, 157-164, 184.

    210.    On May 10, 2017, INCR and inVentiv agreed to the Merger. The Merger, however, required the approval of INCR's shareholders. Accordingly, the Section 14(a) Defendants (as defined below, *see* ¶¶214-224) used the Proxy Materials (as defined below, *see* ¶¶229-234) to solicit the votes of INCR's shareholders to approve the Merger on July 31, 2017.

    211.    The Proxy Claims are based on the Section 14(a) Defendants' dissemination of material misrepresentations and omissions of material facts in the Proxy Materials used to obtain shareholder approval of the Merger. As detailed below, the Proxy Materials – including the material misrepresentations and omissions of material facts – were an essential link in the accomplishment of the Merger. Moreover, the Proxy Materials' material misrepresentations and omissions of material facts – and/or the Merger accomplished pursuant to those Proxy Materials – caused injury to INCR's shareholders, including Lead Plaintiffs and other members of the Section 14(a) Class.

    212.    The Proxy Claims are based solely on strict liability and/or negligence, not on knowing or reckless conduct. Lead Plaintiffs expressly disclaim any allegations of fraud, scienter, or recklessness in these non-fraud Proxy Claims.

B.    **Parties to Non-Fraud Proxy Claims**

1.    **Lead Plaintiffs**

213.    Lead Plaintiffs San Antonio Fire & Police Pension Fund and El Paso Firemen & Policemen's Pension Fund owned shares of INCR common stock on June 29, 2017, as set forth in their certifications [ECF No. 14-3] incorporated herein, and therefore Lead Plaintiffs were entitled to vote at the Company's Special Meeting of Stockholders held on July 31, 2017 to approve the proposed Merger.    Lead Plaintiffs were damaged as a result of the Section 14(a) Defendants' violations of Section 14(a) of the Exchange Act Rule 14a-9 promulgated thereunder.

2.    **Section 14(a) Defendants**

214.    Defendants INCR, Macdonald, Rush, Bell, and the following additional Defendants (who served on the Board of INCR) signed, permitted the use of their names in, and/or controlled the content and dissemination of the Proxy Materials, which contained materially false and misleading statements and omitted material facts, were used to solicit shareholders' votes, and were used to recommend that shareholders vote in favor of the Merger.    These Defendants are named in this Section for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

215.    Defendant Robert Breckon ("Breckon") served as a director of INCR from September 2010 until the consummation of the Merger on August 1, 2017.    Breckon signed INCR's Form 10-K for the period ending December 31, 2016, which was incorporated by reference into the Proxy Materials.    Breckon participated in the Merger discussions and negotiations and, as a member of the Board, solicited shareholders' votes and recommended that shareholders vote in favor of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

216.    Defendant David F. Burgstahler ("Burgstahler") served as a director of INCR from August 2010 until the consummation of the Merger on August 1, 2017.    Burgstahler signed INCR's

- 79 -

Form 10-K for the period ending December 31, 2016, which was incorporated by reference into the Proxy Materials. Burgstahler participated in the Merger discussions and negotiations and, as a member of the Board, solicited shareholders' votes and recommended that shareholders vote in favor of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

217. Defendant Linda S. Harty ("Harty") has served as a director of INCR since March 2017 and upon consummation of the Merger on August 1, 2017 was retained as a director of the combined company and appointed the Lead Independent Director. Harty participated in the Merger discussions and negotiations and, as a member of the Board solicited shareholders' votes and recommended that shareholders vote in favor of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

218. Defendant Richard N. Kender ("Kender") served as a director of INCR from December 2014 until the consummation of the Merger on August 1, 2017. Kender signed INCR's Form 10-K for the period ending December 31, 2016, which was incorporated by reference into the Proxy Materials. Kender participated in the Merger discussions and negotiations and, as a member of the Board, solicited shareholders' votes and recommended that shareholders vote in favor of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

219. Defendant William E. Klitgaard ("Klitgaard") has served as a director of INCR since March 2017 and upon consummation of the Merger on August 1, 2017, was retained as a director of the combined company. Klitgaard participated in the Merger discussions and negotiations and, as a member of the Board, solicited shareholders' votes and recommended that shareholders vote in favor

of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

220.   Defendant Kenneth F. Meyers ("Meyers") has served as a director of INCR since October 2016 and, upon consummation of the Merger on August 1, 2017, was retained as a director of the combined company.  Meyers signed INCR's Form 10-K for the period ending December 31, 2016, which was incorporated by reference into the Proxy Materials.  Meyers participated in the Merger discussions and negotiations and, as a member of the Board, solicited shareholders' votes and recommended that shareholders vote in favor of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

221.   Matthew E. Monaghan ("Monaghan") has served as a director of INCR since October 2016 and upon consummation of the Merger on August 1, 2017, was retained as a director of the combined company.  Monaghan signed INCR's Form 10-K for the period ending December 31, 2016, which was incorporated by reference into the Proxy Materials.  Monaghan participated in the Merger discussions and negotiations and, as a member of the Board, solicited shareholders' votes and recommended that shareholders vote in favor of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

222.   David Y. Norton ("Norton") served as a director of INCR from February 2015 until the consummation of the Merger on August 1, 2017.  Norton was the Chairman of the INCR Board from May 31, 2016 to August 1, 2017.  Norton signed the Notice of Special Meeting of Stockholders included in the Proxy Materials and INCR's Form 10-K for the period ending December 31, 2016, which was incorporated by reference into the Proxy Materials.  Norton participated in the Merger discussions and negotiations and, as a member of the Board, solicited shareholders' votes and

recommended that shareholders vote in favor of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

223.    Eric P. Pâques ("Pâques") served as a director of INCR from February 2017 until the consummation of the Merger on August 1, 2017.  Pâques signed INCR's Form 10-K for the period ending December 31, 2016, which was incorporated by reference into the Proxy Materials.  Pâques participated in the Merger discussions and negotiations and, as a member of the Board, solicited shareholders' votes and recommended that shareholders vote in favor of the Merger as stated in the Proxy Materials, which contained materially false and misleading statements and omitted material facts.

224.    Defendants Macdonald, Rush, Breckon, Burgstahler, Harty, Kender, Klitgaard, Meyers, Monaghan, Norton, and Pâques are collectively referred to herein as the "Section 14(a) Individual Defendants."  The Section 14(a) Individual Defendants, Bell, and INCR are collectively referred to herein as the "Section 14(a) Defendants."

**C.    The Section 14(a) Defendants Performed Due Diligence Regarding the Merger**

225.    On November 17, 2016, Defendants Macdonald and Bell held an initial meeting in Boston, Massachusetts to discuss the potential benefits of a transaction between INCR and inVentiv. Thereafter, Macdonald, Rush, and Bell, among other INCR and inVentiv executives and the INCR Board, met on several occasions to continue discussing a potential Merger between the two companies:

- On January 23, 2017, Macdonald updated the INCR Board on discussions with inVentiv management, including the complementary nature of inVentiv's relationships with large biopharmaceutical companies to INCR's relationships with small and mid-sized pharmaceutical companies as well as inVentiv's CCO capabilities.

- On February 3, 2017, Macdonald, Rush, Bell and other members of INCR and inVentiv management met in New York City to receive more information about inVentiv's CCO offerings.

- On March 28, 2017, at a meeting with the INCR Board and members of INCR management, Bell gave a presentation on inVentiv's CCO business and its leadership and culture. Bell also responded to questions from the INCR Board at this meeting.

- On April 5, 2017, the INCR Board held a meeting with Macdonald, Rush, and others discussing, among other things, the terms of a potential transaction with inVentiv, the impact of such a transaction on the scale of INCR's operations and expanding the scope of its service offerings, and a timeline for negotiations with inVentiv and due diligence reviews.

- On April 10, 2017, INCR and inVentiv provided one another with access to virtual data rooms to facilitate due diligence review efforts that would continue until execution of a merger agreement.

- On April 17, 2017, the INCR Board held a meeting with Macdonald, Rush, and others. At the meeting, Macdonald, Rush, and Gaenzle provided a status update on the transaction process with inVentiv and preliminary due diligence findings, including findings relating to inVentiv's CCO business.

- On April 20-21, 2017, INCR's and inVentiv's respective management teams and legal and financial advisors met in New York, New York for management presentations concerning the businesses of the respective parties.

- On April 25, 2017, the INCR Board held a meeting with Macdonald and Gaenzle and others during which, among other things, Macdonald and Gaenzle updated the Board on the management presentations made during the previous week as well as the status of due diligence reviews and Merger negotiations.

- On April 29, 2017, the INCR Board held a meeting with Macdonald, Gaenzle, Rush and others. At the meeting, Macdonald, Gaenzle and Rush reviewed the results of financial due diligence then conducted to date, including in respect of inVentiv's financial projections, backlog and relationships with key customers. In addition, Centerview provided the Board with preliminary financial perspectives regarding inVentiv and INCR. Members of the Board requested additional information relating to inVentiv's CCO unit which would be provided by INCR management at a subsequent meeting to be held on May 2, 2017.

- On May 2, 2017, the INCR Board held a meeting with Macdonald, Gaenzle, Rush, and others. Among other things, INCR management reviewed with the

Board management's assessments of inVentiv's CCO segment and provided additional information concerning inVentiv's backlog. Macdonald also reviewed with the Board the underlying rationale for a Merger, including the ability to expand the scale and scope of INCR's offerings and acquire inVentiv's CCO business.

226. At these meetings and in the course of their due diligence, the Section 14(a) Defendants reviewed information about inVentiv, including detailed information about inVentiv's CCO business and "relationships with key customers." Indeed, through this this due diligence process, the Section 14(a) Defendants had unbridled access to all of inVentiv's "financial, operating and other data and information," including "non-public financial forecasts regarding inVentiv . . . that were prepared by inVentiv's management and not for public disclosure." That access included each of inVentiv's "material contracts" that were undisclosed to the public.

227. Moreover, the Proxy Materials explicitly confirmed that the Board had developed an "understanding of the respective businesses, operations, financial condition, earnings, strategy and prospects of [INCR] and inVentiv, taking into account the due diligence review of inVentiv performed by [INCR] management and [INCR]'s legal advisors, as well as [INCR]'s and inVentiv's respective historical and projected financial performance." Indeed, the Section 14(a) Individual Defendants analyzed inVentiv's data in such depth that INCR's "management made certain downward adjustments to inVentiv's projected net service revenue and associated earnings for the fiscal years 2017–2019." In other words, the Section 14(a) Defendants had scrutinized inVentiv's finances to such a degree that they believed that their understanding of those finances was superior to the understanding of inVentiv's own management.

228. Because of this due diligence, it was unreasonable for the Section 14(a) Defendants to issue materially false and misleading statements and omissions of material facts in the Proxy Materials, as detailed below.

### D.   Shareholders Received Proxy Materials

229.   On May 10, 2017, INCR made an SEC filing labeled "Form DEFA14A – Additional definitive proxy soliciting materials and Rule 14(a)(12) material."  That filing included the May 10, 2017 Press Release and May 10, 2017 Investor Presentation, among other documents.

230.   On May 11, 2017, INCR filed a Schedule 14A attaching an amended version of the May 10, 2017 Investor Presentation and a separate Schedule 14A attaching a transcript of the May 10, 2017 Investor Conference Call.

231.   On June 9, 2017, INCR filed with the SEC the Preliminary Proxy, which incorporated by reference various documents including, but not limited to, the following:  (a) INCR's Annual Proxy Statement on Schedule 14A, filed with the SEC on April 13, 2017 and additional materials thereto filed with the SEC on May 10, 2017; and (b) INCR's Form 8-Ks filed with the SEC on May 10, 2017 and May 11, 2017.

232.   On June 30, 2017, INCR filed with the SEC the Definitive Proxy, which incorporated by reference the same documents as the Preliminary Proxy.

233.   On July 19, 2017, INCR filed with the SEC a Schedule 14A – which constituted "definitive additional materials" for the Definitive Proxy and which was incorporated therein by reference.

234.   The Preliminary Proxy and Definitive Proxy are collectively defined herein as the "Merger Proxy."  The Merger Proxy, all documents incorporated therein by reference, and all materials filed under Section 14(a) in connection with the Merger Proxy are defined herein as the "Proxy Materials."

### E.   The Structure of the Merger

235.   As explained in the Proxy Materials, inVentiv would merge into INCR, with INCR being the surviving corporation and inVentiv's common stock being cancelled and ceasing to exist.

In consideration for obtaining inVentiv, INCR would issue 49,989,839 new shares of INCR common stock and provide that stock to inVentiv's shareholders.  Because those 49,989,839 shares would be newly-issued, the Merger would not require INCR's pre-Merger shareholders to give up any of their own shares.

236.    Prior to the Merger, there were approximately 54,156,876 total outstanding shares of INCR common stock, as owned by INCR's shareholders.  Following the Merger, those preexisting shares would represent approximately 53% of the outstanding fully diluted shares of INCR's common stock.  The 49,989,839 newly-issued INCR shares, as given to inVentiv's former shareholders, would represent approximately 47% of the outstanding fully diluted shares of INCR's common stock.  To implement the Merger, therefore, INCR would not pay any consideration in the form of cash, but INCR's pre-Merger shareholders would drop from owning 100% of the outstanding shares to owning 53% of the outstanding shares.

**F.    The Proxy Materials Solicited the Section 14(a) Class's Votes for the Merger and, Therefore, Were an Essential Link in the Accomplishment of the Merger**

237.    The Proxy Materials solicited the vote of all individuals who were INCR stockholders as of June 29, 2017 (*i.e.*, the record date for the vote).  Specifically, the Proxy Materials stated that:

- they were "furnished to [INCR] stockholders as part of the solicitation of proxies by the Board for use at the special meeting to be held on July 31, 2017";

- "[a]t the special meeting, holders of shares of [INCR] common stock will be asked to consider and vote upon . . . [t]he merger proposal . . . [and] [t]he stock issuance proposal" . . . .;

- "[t]he Board unanimously recommends that you vote 'FOR' each of the above proposals"; and

- "[INCR] stockholders must approve the merger proposal and the stock issuance proposal in order for the merger to occur[, and] [i]f [INCR] stockholders fail to approve the merger proposal or the stock issuance proposal, the merger will not occur."

238.    The Proxy Materials also emphasized the materiality of the information contained therein, stating that investors "*should rely only on the information contained in this proxy statement*, including the annexes attached hereto or the information incorporated by reference herein, to vote your shares of [INCR] common stock at the special meeting of [INCR]'s stockholders."

239.    Accordingly, the Proxy Materials were an essential link in the accomplishment of the Merger.  The Merger required shareholder approval, which, in turn, required the Proxy Materials. Indeed, because inVentiv was a private company at the time of the Merger, the Proxy Materials were the *definitive source* for the members of the Section 14(a) Class to obtain and consider up-to-date information regarding inVentiv's financial health.  As described below, however, the Proxy Materials contained materially false and misleading statements and omissions of material facts.

**G.    The Proxy Materials Contained Material Misrepresentations and Omissions of Material Facts**

240.    Through the Proxy Materials – which include, but are not limited to – the May 10, 2017 Press Release, May 10, 2017 Investor Presentation, May 10, 2017 Investor Conference Call, Merger Proxy, and July 19, 2017 Schedule 14A – the Section 14(a) Defendants made every statement (and omission) set forth above in ¶¶96-99, 106-108.

241.    The statements described above made by the Section 14(a) Defendants in the Proxy Materials were materially false and misleading and omitted material facts for the following reasons:

(a)    the Commercial business critically depended on the number of 100-plus sales team contracts it was able to win, irrespective of the total number of new drug approvals for the year;

(b)    as of May 10, 2017, May 11, 2017, June 9, 2017, June 30, 2017, July 19, 2017, and July 31, 2017, no more than two such contracts had been available for bidding in 2017, and the Commercial business had yet to win any such contracts;

(c)      given the failure to win any 100-plus sales team contracts, the Commercial business would see decreased revenues into 2018, despite the increased 2017 drug approvals that the Section 14(a) Defendants repeatedly highlighted as the best predictor of the Commercial business's future performance;

(d)      the Section 14(a) Defendants' assertions that, in 2018, the Commercial business could achieve double-digit revenue growth or return to its historic CAGR of 15% for net revenues and 22% for adjusted EBITDA from 2013 to 2016, and that the combined Company could achieve 9% or double-digit revenue growth, were unreasonable when made;

(e)      the Commercial business was not on track to beat industry-wide growth of 8% and would create a drag on revenue growth of the combined Company in 2018; and

(f)      thus, the number of new drug approvals was not "a huge leading indicator" for "modeling the commercial business going forward" in 2018.

242.    The Section 14(a) Defendants were strictly liable and/or negligent when making those materially false and misleading statements and/or omissions of material facts in the Proxy Materials.

## H.    Before the Truth Was Revealed, the Section 14(a) Class Voted to Approve the Merger

243.    On July 31, 2017, pursuant to the Proxy Materials, INCR held its Special Meeting of Stockholders to vote on whether to approve the Merger.

244.    When voting, the Section 14(a) Class was not fully informed of the Section 14(a) Defendants' materially false and misleading statements and/or omissions of material facts in the Proxy Materials.  Disclosure of the Section 14(a) Defendants' materially false and misleading statements and/or omissions of material facts in the Proxy Materials would have altered the total mix of information available to INCR shareholders voting to approve the Merger.  Based on the Proxy

Materials, nearly 99% of INCR's voting shares voted to approve the Merger.  On August 1, 2017, the Merger was completed.

245.    The Proxy Materials artificially inflated or otherwise maintained the Company's artificially inflated stock price until such time, as described below in ¶¶250-261, the Company began to reveal inVentiv's true operational and/or financial condition and the Section 14(a) Defendants' materially false and misleading statements and/or omissions of material facts in the Proxy Materials related thereto in a series of disclosures on September 6, 2017, November 9, 2017, January 3, 2018, and February 21, 2018.

246.    During the Class Period, the Section 14(a) Defendants' materially false and misleading statements and/or omissions of material facts in the Proxy Materials, and/or the Merger effectuated by the Proxy Materials, directly and proximately caused the economic losses suffered by Lead Plaintiffs and the Section 14(a) Class.

247.    The Section 14(a) Defendants are strictly liable, and/or they failed to exercise due care to ensure that the Proxy Materials did not include materially false and misleading statements and/or omissions of material facts, the result of which was to artificially inflate or otherwise maintain the Company's artificially inflated stock price.  The Proxy Materials were an essential link to the approval of the Merger.

248.    Following the Merger, when inVentiv's true operational and/or financial condition and Defendants' materially false and misleading statements and/or omissions of material facts in the Proxy Materials related thereto were revealed, the value of INCR's stock price declined precipitously.  The timing and magnitude of the INCR's stock price declines negates any inference that the losses suffered by Lead Plaintiffs and the Section 14(a) Class were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to the

Section 14(a) Defendants' strictly liable and/or negligent conduct, the Section 14(a) Defendants' materially false and misleading statements and/or omissions of material facts in the Proxy Materials, and/or the Merger effectuated by the Proxy Materials.

249.    The artificial inflation in INCR's stock price caused or maintained by the Proxy Materials, and/or by the Merger effectuated by the Proxy Materials, was removed with the disclosures, as described below in ¶¶250-261.  As a result, INCR's stock price suffered a series of declines, including a single-day decline of more than 28% from its close of $57.50 per share on November 8, 2017 to a close of $41.15 per share on November 9, 2017, on unusually high trading volume of almost four million shares, resulting in substantial losses to Lead Plaintiffs and the Section 14(a) Class.

### I.    Loss Causation

250.    The Section 14(a) Defendants' material misrepresentations and omissions of material facts – and/or the Merger effectuated by the Proxy Materials containing those material misrepresentations and omissions of material facts – directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Section 14(a) Class.

251.    The Section 14(a) Defendants were strictly liable, and/or they failed to exercise due care to ensure that the Proxy Materials did not omit material facts necessary to make the statements therein not materially false and misleading.  The Proxy Materials were an essential link to the approval of the Merger.

252.    When the Section 14(a) Defendants' prior misrepresentations were revealed and became apparent to the market, the price of INCR's common stock fell as the prior artificial inflation came out.  The truth began to emerge, and/or the risk caused by the Section 14(a) Defendants' false and misleading statements and omissions materialized, through a series of revelations that cast doubt on the veracity of the Proxy Materials.  As a result, Lead Plaintiffs and the other members of the

Section 14(a) Class suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

253.    On September 6, 2017, the Company surprised investors by revealing that the Commercial business was a "wild card," backtracking from confident previous assertions regarding Commercial's 2018 growth prospects.  As a result, the stock price fell over 5% from a September 5, 2017 closing price of $58.40 per share to a September 6, 2017 closing price of $55.25 per share, on unusually high trading volume.

254.    The following day, on September 7, 2017, the Company expressed additional uncertainty about the "visibility" and short-term prospects of the Commercial business while continuing to buoy the stock price by reaffirming 2018 growth.

255.    On November 9, 2017, the Company revealed dramatically slower revenue growth in 2018 due to problems in the Company's Commercial business.  As a result, the Company's common stock price fell over 28% on unusually high trading volume of nearly 4 million shares.  The stock continued to fall the following three trading days, ultimately closing at $34.35 per share on November 14, 2017, on unusually high trading volume averaging approximately 2.4 million shares per trading day.  The total stock price decline over this four-day period was over 40%, or $23.15 per share.

256.    After the market closed on January 3, 2018, the Company announced that Defendant Rush was stepping down from his position as CFO.  On this news, the Company's stock price fell approximately 6% from a close of $43.80 per share on January 3, 2018 to a close of $41.30 per share on January 4, 2018, on unusually heavy trading volume.

257.    After the market closed on February 21, 2018, the Company announced that Defendant Rush was leaving the Company earlier than previously announced and that another high-

level executive, Gaenzle (Chief Administrative Officer, General Counsel, and Secretary), was also leaving the Company. This caused the Company's stock price to plummet 16%, falling from a close of $37.75 per share on February 21, 2018 to a close of $31.70 per share on February 22, 2018, on unusually heavy trading volume.

258.    As a result of the Section 14(a) Defendants' strictly liable and/or negligent conduct, the material misrepresentations and omissions in the Proxy Materials, and/or the Merger effectuated by the Proxy Materials containing those material misrepresentations and omissions, Lead Plaintiffs and the other members of the Section 14(a) Class suffered economic loss, *i.e.*, damages, under the federal securities laws. By failing to disclose to investors the material adverse facts detailed herein, the Section 14(a) Defendants, through the Proxy Materials, presented a misleading picture of INCR's business and prospects, and those Proxy Materials were an essential link to the approval of the Merger.

259.    Following the Section 14(a) Class's approval of the Merger, when the truth about the Company – and its Commercial business that was newly-acquired through the Merger – began to be disclosed in a series of partial revelations beginning on September 6, 2017, the price of INCR's common stock declined. These declines removed the inflation from the price of INCR's common stock, causing real economic loss to the Section 14(a) Class.

260.    The declines in the price of INCR's common stock after the revelations came to light were a direct result of the nature and extent of the Proxy Materials' material misrepresentations and omissions and/or of the Merger effectuated by the Proxy Materials containing those material misrepresentations and omissions. The timing and magnitude of the price declines in INCR common stock negate any inference that the losses suffered by Lead Plaintiffs and the other members of the Section 14(a) Class were caused by changed market conditions, macroeconomic or industry factors,

or Company-specific facts unrelated to the Proxy Materials' material misrepresentations and omissions and/or of the Merger effectuated by the Proxy Materials containing those material misrepresentations and omissions.  This is evidenced by the chart below, which demonstrates the clear divergence of the Company's common stock price from the Company's benchmark indices and the stock prices of its peer companies,[4] as the revelations of the truth became known to the market:

---

[4]    The indices reflected in this chart, NASDAQ Healthcare Index and NASDAQ Composite Index, were cited as benchmarks for INCR's common stock performance in INCR's Form 10-K, filed with the SEC on February 28, 2018.  The "peer group" reflected in this chart is comprised of the following companies that INCR identified as its peer group in its Proxy Statement filed with the SEC on Schedule 14A on April 13, 2018:  Agilent Technologies, Inc.; ICON Public Limited Company; PerkinElmer, Inc.; Bio-Rad Laboratories, Inc.; Illumina, Inc.; Perrigo Company plc; Cerner Corporation; IQVIA Holdings Inc.; PRA Health Sciences, Inc.; Charles River Laboratories International, Inc.; Laboratory Corporation of America Holdings; Quest Diagnostics Incorporated; Endo International plc; Mettler-Toledo International Inc.; VWR Corporation; Envision Healthcare Corporation; PAREXEL International Corporation; and Waters Corporation.



261.    The economic losses, *i.e.*, damages, suffered by Lead Plaintiffs and the other members of the Section 14(a) Class were a direct result of the Proxy Materials' material misrepresentations and omissions and/or a direct result of the Merger effectuated by the Proxy Materials containing those material misrepresentations and of the subsequent significant decline in the value of INCR common stock when the Proxy Materials' material misrepresentations and omissions were revealed.

**J.      Lead Plaintiffs' Class Action Allegations for Non-Fraud Proxy Claims**

262.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons or entities that held shares of INCR common stock on June 29, 2017 ("Section 14(a) Class"). Excluded from this

Section 14(a) Class are the Section 14(a) Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Section 14(a) Defendants have or had a controlling interest.

263. Because INCR has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ, members of the Section 14(a) Class are so numerous that joinder of all members is impracticable. According to the Company's Proxy Materials, the Company had more than 54 million shares outstanding as of June 29, 2017. While the exact number of Section 14(a) Class members can only be determined by appropriate discovery, Lead Plaintiffs believe that Section 14(a) Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

264. Lead Plaintiffs' claims are typical of the claims of the members of the Section 14(a) Class because Lead Plaintiffs and all of the Section 14(a) Class members sustained damages arising out of the Section 14(a) Defendants' wrongful conduct complained of herein.

265. Lead Plaintiffs will fairly and adequately protect the interests of the Section 14(a) Class members and have retained counsel experienced and competent in class actions and securities litigation. Lead Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Section 14(a) Class that Lead Plaintiffs seek to represent.

266. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Section 14(a) Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Section 14(a)

Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

267. Questions of law and fact common to the members of the Section 14(a) Class predominate over any questions that may affect only individual members in that the Section 14(a) Defendants have acted on grounds generally applicable to the entire Section 14(a) Class. Among the questions of law and fact common to the Section 14(a) Class are:

(a)    whether the Section 14(a) Defendants violated the federal securities laws as alleged herein;

(b)    whether the Section 14(a) Defendants' publicly disseminated Proxy Materials omitted and/or misrepresented material facts;

(c)    whether the Section 14(a) Defendants failed to convey material facts in the Proxy Materials or to correct material facts previously disseminated in the Proxy Materials;

(d)    whether the Section 14(a) Defendants are strictly liable for and/or acted negligently in omitting and/or misrepresenting material facts in the Proxy Materials;

(e)    whether the market prices of the Company's securities were artificially inflated due to material nondisclosures and/or misrepresentations in the Proxy Materials; and

(f)    whether the members of the Section 14(a) Class have sustained damages as a result of the decline in value of the Company's stock when the truth was revealed and/or the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT III

### FOR VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14A-9 AGAINST ALL SECTION 14(a) DEFENDANTS

268. Lead Plaintiffs repeat and reallege each and every allegation in ¶¶209-267 above as if fully set forth herein.

269.    The Proxy Materials constitute a "proxy solicitation" within the meaning of Section 14(a) of the Exchange Act.

270.    For the purposes of this Count, Lead Plaintiffs assert strict liability and/or negligence claims and expressly exclude and disclaim any allegations of fraud or intentional or reckless misconduct.

271.    The Proxy Materials contained untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9.

272.    Each of the Section 14(a) Defendants was strictly liable for and/or negligent in preparing, reviewing, and disseminating the materially false and misleading Proxy Materials.

273.    The Section 14(a) Defendants did not update the Proxy Materials, when material information arose after dissemination of these documents, but before the shareholder vote on July 31, 2017.

274.    The Proxy Materials were an essential link in the consummation of the Merger. INCR shareholders approved the Merger on the basis of the Proxy Materials.

275.    As a direct and proximate result of the dissemination of the materially false and misleading Proxy Materials, Lead Plaintiffs and other members of the Class were deprived of their right to a fully informed shareholder vote.

276.    As a direct and proximate result of the dissemination of the materially false and misleading Proxy Materials – and/or of the Merger effectuated by the materially false and misleading Proxy Materials – Lead Plaintiffs and other members of the Class suffered damage and actual economic losses in an amount to be determined at trial.

277.    The omissions and false and misleading statements in the Proxy Materials were material in that disclosure of those omitted facts would have been viewed by a reasonable investor as having significantly altered the total mix of information made available, and the omitted facts would have assumed actual significance in the Section 14(a) Class's deliberations regarding the Merger.

278.    This claim is brought within the applicable statute of limitations.

279.    By reason of the foregoing, the Section 14(a) Defendants are liable for violations of Section 14(a) of the Exchange Act 15 U.S.C. §79n(a), and Rule 14a-9, 17 C.F.R. §240.14a-9.

## COUNT IV

### FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST ALL SECTION 14(a) INDIVIDUAL DEFENDANTS

280.    Lead Plaintiffs repeat and reallege each and every allegation in ¶¶209-267 above as if fully set forth herein.

281.    The Section 14(a) Individual Defendants acted as controlling persons of INCR within the meaning of Section 20(a) of the Exchange Act.

282.    By virtue of their position of control and authority as officers and/or directors of INCR, the Section 14(a) Individual Defendants had the power and authority to cause INCR to engage in the conduct complained of herein.  The Section 14(a) Individual Defendants were able to and did control, directly and indirectly, the decision-making of INCR, including the content and dissemination of the Proxy Materials which contained material omissions and/or materially false and misleading statements.

283.    The Section 14(a) Individual Defendants were provided with or had unlimited access to copies of the Proxy Materials prior to and/or shortly after they were issued and had the ability to prevent their issuance or cause them to be corrected.

284.    By reason of such conduct, the Section 14(a) Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on their own behalf and on behalf of the Section 10(b) Class and the Section 14(a) Class, pray for relief and judgment, as follows:

A.    Declaring that this action is a proper class action and certifying Lead Plaintiffs as representatives of the Section 10(b) Class and the Section 14(a) Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Class Counsel for the proposed Section 10(b) Class and the Section 14(a) Class;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other Section 10(b) Class members against all Section 10(b) Defendants, jointly and severally, for all damages sustained as a result of the Section 10(b) Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding compensatory damages in favor of Lead Plaintiffs and other Section 14(a) Class members against all Section 14(a) Defendants, jointly and severally, for all damages sustained as a result of the Section 14(a) Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Lead Plaintiffs, the Section 10(b) Class, and the Section 14(a) Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.    Awarding rescission or a rescissionary measure of damages; and

E.    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

285.    Lead Plaintiffs hereby demand a trial by jury.

DATED:  July 30, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP


_/s/ Jack Reise_

JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com

_Lead Counsel for Lead Plaintiffs_

McDANIEL & ANDERSON, L.L.P.
L. BRUCE McDANIEL (NC State Bar No. 5025)
Lafayette Square
4942 Windy Hill Drive
Raleigh, NC  27609
Telephone:  919/872-3000
919/790-9273 (fax)
mcdas@mcdas.com

_Local Civil Rule 83.1(d) Counsel for Lead
Plaintiffs_

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on July 30, 2018.

                                        */s/ Jack Reise*

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        JACK REISE
                                        STEPHEN R. ASTLEY
                                        ELIZABETH A. SHONSON
                                        120 East Palmetto Park Road, Suite 500
                                        Boca Raton, FL  33432
                                        Telephone:  561/750-3000
                                        561/750-3364 (fax)
                                        jreise@rgrdlaw.com
                                        sastley@rgrdlaw.com
                                        eshonson@rgrdlaw.com

                                        *Lead Counsel for Lead Plaintiffs*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>EGLĖ VAITKUVIENĖ,</td><td>)</td><td></td></tr>
<tr><td><i>Plaintiff(s)</i></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.  5:18-CV-00029-H-KS</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>SYNEOS HEALTH, INC., ALISTAIR</td><td>)</td><td></td></tr>
<tr><td>MACDONALD and GREGORY S. RUSH,</td><td>)</td><td></td></tr>
<tr><td><i>Defendant(s)</i></td><td>)</td><td></td></tr>
</table>

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

Michael A. Bell
34 1/2 Beacon Street
Unit 6N
Boston, MA 02108

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

ROBBINS GELLER RUDMAN & DOWD LLP
Jack Reise
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

### Eastern District of North Carolina

| | | |
|---|---|---|
| EGLĖ VAITKUVIENĖ,<br>*Plaintiff(s)*<br>v.<br>SYNEOS HEALTH, INC., ALISTAIR MACDONALD and GREGORY S. RUSH,<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.  5:18-CV-00029-H-KS |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

      Robert Breckon
      Teacher's Private Capital
      5650 Yonge Street
      Toronto, Ontario M2M 4H5
      Canada

     A lawsuit has been filed against you.

     Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

      ROBBINS GELLER RUDMAN & DOWD LLP
      Jack Reise
      120 East Palmetto Park Road
      Suite 500
      Boca Raton, FL  33432

     If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

                                         _____
                                       *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Eastern District of North Carolina

| | |
|---|---|
| EGLĖ VAITKUVIENĖ,<br>*Plaintiff(s)*<br><br>v.<br><br>SYNEOS HEALTH, INC., ALISTAIR<br>MACDONALD and GREGORY S. RUSH,<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 5:18-CV-00029-H-KS |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*
David F. Burgstahler
200 Sage Avenue
Lawrence, NY  11559

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
ROBBINS GELLER RUDMAN & DOWD LLP
Jack Reise
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                      *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

|  |  |  |
|---|---|---|
| EGLĖ VAITKUVIENĖ, | ) ) ) ) ) | |
| *Plaintiff(s)* | ) | |
| v. | ) ) | Civil Action No. 5:18-CV-00029-H-KS |
| SYNEOS HEALTH, INC., ALISTAIR MACDONALD and GREGORY S. RUSH, | ) ) ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Linda S. Harty
> 1761 Roxbury Road
> Columbus, OH  43212

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> ROBBINS GELLER RUDMAN & DOWD LLP
> Jack Reise
> 120 East Palmetto Park Road
> Suite 500
> Boca Raton, FL  33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of North Carolina

|  |  |
|---|---|
| EGLĖ VAITKUVIENĖ,<br>_____<br>*Plaintiff(s)*<br><br>v.<br><br>SYNEOS HEALTH, INC., ALISTAIR<br>MACDONALD and GREGORY S. RUSH,<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.  5:18-CV-00029-H-KS |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*
　　　　　　　　　　Richard N. Kender
　　　　　　　　　　1336 Bay Avenue
　　　　　　　　　　Mantoloking, NJ  08738

　　　　A lawsuit has been filed against you.

　　　　Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
　　　　　　　　　　ROBBINS GELLER RUDMAN & DOWD LLP
　　　　　　　　　　Jack Reise
　　　　　　　　　　120 East Palmetto Park Road
　　　　　　　　　　Suite 500
　　　　　　　　　　Boca Raton, FL  33432

　　　　If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____
　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

|  |  |  |
|---|---|---|
| EGLĖ VAITKUVIENĖ, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiff(s)* | | |
| v. | | Civil Action No. 5:18-CV-00029-H-KS |
| SYNEOS HEALTH, INC., ALISTAIR MACDONALD and GREGORY S. RUSH, | | |
| *Defendant(s)* | | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

William E. Klitgaard
15 Zaitz Farm Road
Princeton Junction, NJ  08550

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

ROBBINS GELLER RUDMAN & DOWD LLP
Jack Reise
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

|  |  |
|---|---|
| EGLĖ VAITKUVIENĖ, _____ *Plaintiff(s)* v. SYNEOS HEALTH, INC., ALISTAIR MACDONALD and GREGORY S. RUSH, _____ *Defendant(s)* | Civil Action No.  5:18-CV-00029-H-KS |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

Kenneth F. Meyers
216 Wagner Road
Northfield, IL  60093

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

ROBBINS GELLER RUDMAN & DOWD LLP
Jack Reise
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

| | )  |
|---|---|
| | ) |
| | ) |
| EGLĖ VAITKUVIENĖ, | ) |
| *Plaintiff(s)* | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| | ) |
| SYNEOS HEALTH, INC., ALISTAIR | ) |
| MACDONALD and GREGORY S. RUSH, | ) |
| *Defendant(s)* | ) |

Civil Action No.  5:18-CV-00029-H-KS

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Matthew E. Monaghan
3400 Shaker Boulevard
Chagrin Falls, OH  44022

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

ROBBINS GELLER RUDMAN & DOWD LLP
Jack Reise
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*



_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of North Carolina

| | | |
|---|---|---|
| EGLĖ VAITKUVIENĖ, | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No.  5:18-CV-00029-H-KS |
| SYNEOS HEALTH, INC., ALISTAIR MACDONALD and GREGORY S. RUSH, | ) | |
| *Defendant(s)* | ) | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*
David Y. Norton
8 Greenholm Street
Apartment C
Princeton, NJ  08540

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

ROBBINS GELLER RUDMAN & DOWD LLP
Jack Reise
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of North Carolina

|  |  |  |
|---|---|---|
| EGLĖ VAITKUVIENĖ,<br>*Plaintiff(s)*<br>v.<br>SYNEOS HEALTH, INC., ALISTAIR<br>MACDONALD and GREGORY S. RUSH,<br>*Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.  5:18-CV-00029-H-KS |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

Eric P. Pâques
Ronheider Berg 255
52076 Aachen
Germany

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

ROBBINS GELLER RUDMAN & DOWD LLP
Jack Reise
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  5:18-CV-00029-H-KS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

**Yolanda Sherman**

| | |
|---|---|
| **From:** | Notice_NCED@nced.uscourts.gov |
| **Sent:** | Monday, July 30, 2018 11:51 PM |
| **To:** | Notice_NCED@nced.uscourts.gov |
| **Subject:** | Activity in Case 5:18-cv-00029-H-KS Vaitkueviene v. Syneos Health Inc. et al Amended Complaint |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### EASTERN DISTRICT OF NORTH CAROLINA

### Notice of Electronic Filing

The following transaction was entered by Reise, Jack on 7/30/2018 at 11:50 PM EDT and filed on 7/30/2018

| | |
|---|---|
| **Case Name:** | Vaitkueviene v. Syneos Health Inc. et al |
| **Case Number:** | 5:18-cv-00029-H-KS |
| **Filer:** | El Paso Firemen & Policemen's Pension Fund |
| | San Antonio Fire & Police Pension Fund |
| **Document Number:** | 35 |

**Docket Text:**
**AMENDED COMPLAINT** *for Violation of the Federal Securities Laws* **against Alistair MacDonald, Gregory S Rush, Syneos Health Inc., Michael A. Bell, Robert Breckon, David F. Burgstahler, Linda S. Harty, Richard N. Kender, William E. Klitgaard, Kenneth F. Meyers, Matthew E. Monaghan, David Y. Norton, Eric P. Paques, filed by El Paso Firemen & Policemen's Pension Fund, San Antonio Fire & Police Pension Fund. (Attachments: # (1) Proposed Summons Michael A. Bell, # (2) Proposed Summons Robert Breckon, # (3) Proposed Summons David F. Burgstahler, # (4) Proposed Summons Linda S. Harty, # (5) Proposed Summons Richard N. Kender, # (6) Proposed Summons William E. Klitgaard, # (7) Proposed Summons Kenneth F. Meyers, # (8) Proposed Summons Matthew E. Monaghan, # (9) Proposed Summons David Y. Norton, # (10) Proposed Summons Eric P. Paques) (Reise, Jack)**

**5:18-cv-00029-H-KS Notice has been electronically mailed to:**

Andrew T. Rees    arees@rgrdlaw.com

Constantine P. Economides    ceconomides@rgrdlaw.com, evanyi@rgrdlaw.com

1

Elizabeth A. Shonson    eshonson@rgrdlaw.com, e_file_fl@rgrdlaw.com, e_file_sd@rgrdlaw.com, evanyi@rgrdlaw.com

Jack Reise    jreise@rgrdlaw.com, e_file_fl@rgrdlaw.com, e_file_sd@rgrdlaw.com

L. Bruce McDaniel    mcdas@mcdas.com, e_file_fl@rgrdlaw.com, jreise@rgrdlaw.com, kbwatt@mcdas.com

Lee M. Whitman    lwhitman@wyrick.com, eleslie@wyrick.com, mramsey@wyrick.com

Sabrina E. Tirabassi    stirabassi@rgrdlaw.com, 3872386420@filings.docketbird.com, evanyi@rgrdlaw.com

Samuel Ranchor Harris , III    ranchorharris@gmail.com

Stephen R. Astley    sastley@rgrdlaw.com, e_file_fl@rgrdlaw.com, e_file_sd@rgrdlaw.com

**5:18-cv-00029-H-KS Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-0
] [6edcd1415ce82c32183664bc204e5dbf9fb76a079826806220b02221e28396dc4fa
69ea38a9aeb832bcc144a35667efff4b87b4972074946ea3fca72ec464154]]
**Document description:**Proposed Summons Michael A. Bell
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-1
] [0ac1221ed2a417828a65da3f367011cee37a51d5d1d6d9616115f3a1efe27ddb1d0
70a6644df0df75d8dcabc2d90d3ad42acbd2e47e5d706328355de6c7ed50e]]
**Document description:**Proposed Summons Robert Breckon
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-2
] [79ae4f32c54861a5dfd4d53ea8728a078e4b5d58faac3808ee849ccbb5f217e8b8c
804d4b4f7742953f8b448f71cda641d2b3b149618e9063c569a6951de9fba]]
**Document description:**Proposed Summons David F. Burgstahler
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-3
] [3b28a5662f9e6824d7f339237e62d3885d2cb1bf81335df5fe9695427d70533e71d
717c2dce7a29885ccd9c5668fce4aa39081e3dffd07f00bc33839a093ce6b]]
**Document description:**Proposed Summons Linda S. Harty
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-4
] [94c1d065d43cd7eccb1cd9e93b2dbd8f83ac0c1ba5b2377d9d643d618fc81944f5a
6b3a76ffaf3bb872f9b8e4eb1c9ef3a27315559a3bf8762b9aa00f7d9a3d9]]
**Document description:**Proposed Summons Richard N. Kender

**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-5
] [ac0f4a929a9ff0c417ef43aafba1449a687e91de3d8f3c06c77812eea5d9711062f
83c4d6748ff832e8a5129d8252b9eba21c434fda781e76c8b2442a488c98b]]
**Document description:**Proposed Summons William E. Klitgaard
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-6
] [6375966e43179f898c0dae66695caf85b1d4efa7fa0113624bfeec175fe05a2246d
63f30a3d5455b09bdf34ce84cb1a69f3848c03bd8bd43566740435285aa24]]
**Document description:**Proposed Summons Kenneth F. Meyers
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-7
] [62617aca81310cf47f7d3798bbf16c8d02d735b7d4af42e011eefe0b354cc768a6c
45d91b438c6529e2e48c772f13316cb95302d188b4e4f5502a9612e846304]]
**Document description:**Proposed Summons Matthew E. Monaghan
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-8
] [630287189ac103248543696b769ceda03ee413aa2384f28e01b087ecddacd3dcc56
9c2a4aad7ad4327059d013319033079b4710a2d13ee77462c5a0a80704305]]
**Document description:**Proposed Summons David Y. Norton
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-9
] [46d1c4c0a7d96b2e787a70913155d5bbfe1bf2ab376b6ac33c9e6c84e7fdde409d1
fac9f0b367c62f2c241aa6be0d0bcf15a962bd808bb83198ba4869555e3d5]]
**Document description:**Proposed Summons Eric P. Paques
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1114528487 [Date=7/30/2018] [FileNumber=5598069-1
0] [71dc2b3f56ecbf90f0adade3f227af8f3bab6a54424eb73f236ee9b93e9f8330b1
d0254030987574a2c5f568933a540db75fd079cefabc07b4c07a0ba32824d5]]