UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-00029 (H)(KS)

| | |
|---|---|
| EGLĖ VAITKUVIENĖ, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>        v.<br><br>SYNEOS HEALTH, INC., ALISTAIR MACDONALD, GREGORY S. RUSH, MICHAEL A. BELL, ROBERT BRECKON, DAVID F. BURGSTAHLER, LINDA S. HARTY, RICHARD N. KENDER, WILLIAM E. KLITGAARD, KENNETH F. MEYERS, MATTHEW E. MONAGHAN, DAVID Y. NORTON, and ERIC P. PÂQUES,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

September 20, 2018

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................1

ALLEGATIONS OF THE AMENDED COMPLAINT ..........................................5

    A.    The Parties ........................................................................ 5

    B.    May 10, 2017 Announcement of the Merger......................................... 6

    C.    July 27, 2017 INCR Second Quarter 2017 Earnings Announcement.................. 10

    D.    The July 31, 2017 Stockholder Vote and the Proxy Materials ............................ 11

    E.    September 6 and 7, 2017 Healthcare Conferences Following the Merger ........... 13

    F.    November 9, 2017 Third Quarter 2017 Results Announcement ......................... 15

    G.    This Action................................................................................. 17

ARGUMENT .........................................................................................18

I.    PLAINTIFFS PLEAD NO ACTIONABLE MISSTATEMENT OR OMISSION WITH THE PARTICULARITY REQUIRED BY THE PSLRA......................................18

    A.    The Heightened Pleading Requirements of the PSLRA and Rule 9(b). ...............18

    B.    The Amended Complaint Challenges Only Inactionable Forecasts. .....................20

        1.    INCR's Projections Are Not Actionable Factual Statements. .................. 20

        2.    The Challenged Statements Are Forward-Looking and Protected by the PSLRA's Safe Harbor. ......................................... 22

    C.    INCR Had No Duty to Disclose Any Additional, Supposedly Omitted Facts. .........................................................25

        1.    INCR Omitted No Material Facts. ........................................... 26

            a.    New Drug Approvals ................................................. 27

            b.    "100-Plus" Sales Contracts ........................................... 28

            c.    Timing of inVentiv Revenues ...................................... 30

        2.    Regulation S-K Did Not Require Any Disclosure. ................................ 30

D. Defendants' Optimism About the Merger Was Not Fraud. .................................31

E. Plaintiffs Fail to Plead Each Defendant's
Liability for the Challenged Statements. ............................................................32

II. THE AMENDED COMPLAINT ALLEGES NO FACTS ESTABLISHING
A COGENT AND COMPELLING INFERENCE OF SCIENTER. ...............................33

A. Plaintiffs Allege No Legally Cognizable Motive
for Defendants to Commit Fraud. ........................................................................35

1. Motive Cannot Be Inferred from Pre-Arranged Stock Sales. ................... 35

2. The Volume and Timing of the Stock Sales During the
Class Were Not "Unusual" or "Suspicious." ............................................ 37

3. Defendants' Merger-Related Compensation
Gives Rise to No Inference of Scienter..................................................... 39

B. Plaintiffs Fail to Plead Strong Circumstantial Evidence of Fraud. ........................40

C. The Competing Inferences Give Rise to No Strong Inference of Scienter............43

III. THE AMENDED COMPLAINT FAILS TO ALLEGE LOSS CAUSATION.................44

CONCLUSION....................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito* v. *IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)............................................................................................38

*Adams* v. *Standard Knitting Mills, Inc.*,
  623 F.2d 422 (6th Cir. 1980) ......................................................................................34

*Advanced Internet Techs., Inc.* v. *Dell, Inc.*,
  No. 5:07-CV-426, 2009 WL 10688048 (E.D.N.C. Sept. 25, 2009) .........................19

*In re Alamosa Holdings, Inc. Sec. Litig.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) .......................................................................22

*Ash* v. *PowerSecure Int'l, Inc.*,
  No. 4:14-CV-92-D, 2015 WL 5444741 (E.D.N.C. Sept. 15, 2015) ............................... *passim*

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988)....................................................................................................26

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008)......................................................................35

*Bermudez* v. *INC Research Holdings, Inc.*,
  No. 1:17-cv-09457-PGG..............................................................................................17

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005).........................................................................41

*Carlson* v. *Triangle Capital Corp.*,
  No. 5:18-CV-332-FL, 2018 WL 3546232 (E.D.N.C. July 23, 2018)........................19

*Carlucci* v. *Han*,
  886 F. Supp. 2d 497 (E.D. Va. 2012) .........................................................................31

*Cent. Laborers' Pension Fund* v. *Integrated Elec. Servs. Inc.*,
  497 F.3d 546 (5th Cir. 2007) ......................................................................................35

*City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008).........................................................................38

*Cozzarelli* v. *Inspire Pharmaceuticals Inc.*,
  549 F.3d 618 (4th Cir. 2008) ...............................................................5, 19, 33, 39

*In re Criimi Mae, Inc. Sec. Litig.*,
  94 F. Supp. 2d 652 (D. Md. 2000) ...........................................................................................40

*In re Cryomedical Sciences, Inc. Sec. Litig.*,
  884 F.Supp. 1001 (D. Md. 1995) .............................................................................................29

*Dalberth* v. *Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014).....................................................................................................26

*Dura Pharms., Inc.* v. *Broudo*,
  544 U.S. 336 (2005).................................................................................................................18

*In re e.spire Comm., Inc. Sec. Litig.*,
  127 F. Supp. 2d 734 (D. Md. 2001) .........................................................................................40

*Elam* v. *Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ...................................................................................................35

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006).......................................................................................37

*In re Exxon Mobil Corp. Sec. Litig.*,
  387 F. Supp. 2d 407 (D.N.J. 2005) ..........................................................................................39

*Ferro* v. *Blankenship*,
  No. EP-95-CA-004-DB, 1995 WL 18236650 (W.D. Tex. Mar. 17, 1995) .............................19

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ..........................................................................22, 34, 37, 38

*Fishbaum* v. *Liz Claiborne, Inc.*,
  No. 98-9396, 1999 WL 568023 (2d Cir. 1999) .......................................................................35

*In re Focus Media Holding Ltd. Litig.*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010).......................................................................................30

*In re Gilat Satellite Networks, Ltd.*,
  No. CV-02-1510 (CPS), 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005)..................................22

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009).......................................................................................36

*In re Glenayre Techs., Inc. Sec. Litig.*,
  No. 96 CIV. 8252 (HB), 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) ...................................38

*Hayes* v. *Crown Cent. Petroleum Corp.*,
  78 F. App'x 857 (4th Cir. 2003) ....................................................................................... *passim*

*Hess* v. *American Physicans Capital, Inc.*,
  No. 5:04-CV-31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005) ...........................................23

*Hillson Partners Ltd. P'ship* v. *Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994) ........................................................................................ *passim*

*Iron Workers Local 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ....................................................................................41

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
  564 U.S. 135 (2011).........................................................................................................32, 33

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2001)...................................................................................................40

*Kapps* v. *Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) .................................................................................................31

*Kas* v. *First Union Corp.*,
  857 F. Supp. 481 (E.D. Va. 1994) .........................................................................................26

*Katyle* v. *Penn Nat. Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) .................................................................................................44

*KBC Asset Mgmt. NV* v. *3D Sys. Corp.*,
  No. 0:15-CV-02393-MGL, 2016 WL 3981236 (D.S.C. July 25, 2016)..................................36

*Knurr* v. *Orbital ATK Inc.*,
  276 F. Supp. 3d 527 (E.D. Va. 2017) ....................................................................................34

*Kwalbrun* v. *Glenayre Techs., Inc.*,
  201 F.3d 431 (2d Cir. 1999) ..................................................................................................38

*In re Lab. Corp. of Am. Holdings Sec. Litig.*,
  No. 1:03-CV-591, 2006 WL 1367428 (M.D.N.C. May 18, 2006) .............................25, 29, 36

*Lerner* v. *Nw. Biotherapeutics*,
  273 F. Supp. 3d 573 (D. Md. 2017) .................................................................................27, 42

*Longman* v. *Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) .................................................................................................20

*Maguire Fin'l, L.P.* v. *PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ........................................................................................1, 40, 42

*Marcus* v. *Frome*,
  275 F. Supp. 2d 496 (S.D.N.Y. 2003)....................................................................................41

*Marsh Grp.* v. *Prime Retail, Inc.*,
46 Fed. App'x 140 (4th Cir. 2002) ...................................................................21, 23

*Matrix Capital Mgmt. Fund, LP* v. *BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ...............................................................................43

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)...............................................................................................26

*In re Maximus, Inc. Sec. Litig.*,
No. 117-CV-0884, 2018 WL 4076359 (E.D. Va. Aug. 27, 2018)....................32, 45

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) .............................................................................36

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................................35

*In re Neustar Sec. Litig.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) ...............................................................23, 25

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000)..................................................................................40

*In re NYSE Specialists Sec. Litig.*,
503 F.3d 89 (2d Cir. 2007)....................................................................................18

*Oran* v. *Stafford*,
226 F.3d 275 (3d Cir. 2000)..................................................................................31

*Ottmann* v. *Hanger Orthopedic Grp., Inc.*,
353 F.3d 338 (4th Cir. 2003) ...........................................................34, 35, 39, 43

*In re PEC Solutions, Inc. Sec. Litig.*,
418 F.3d 379 (4th Cir. 2005) ...............................................................................36

*Phillips* v. *Triad Guar. Inc.*,
No. 1:09-CV-71, 2015 WL 1457980 (M.D.N.C. Mar. 30, 2015) ..........................42

*Pipefitters Local No. 636 Defined Ben. Plan* v. *Tekelec*,
No. 5:11-CV-4-D, 2013 WL 1192004 (E.D.N.C. Mar. 22, 2013)................35,40, 42

*Pipefitters Local No. 636 Defined Ben. Plan* v. *Tekelec*,
No. 5:11-CV-4-D, 2012 WL -44-1029256 (E.D.N.C. Mar. 26, 2012) .................43

*Plymouth Cty. Ret. Ass'n* v. *Primo Water Corp.*,
966 F. Supp. 2d 525 (M.D.N.C. 2013) ..........................................................23, 25, 31

Case 5:18-cv-00029-H-KS   Document 55   Filed 09/20/18   Page 7 of 55

*Police Retirement Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ...........................................................................23

*In re PXRE Grp. Ltd. Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................................41

*Raab* v. *Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ...............................................................2, 20, 21, 26

*Ressler* v. *Liz Claiborne, Inc.*,
75 F. Supp. 2d 43 (E.D.N.Y. 1998) ....................................................................42

*Ret. Ass'n of Colo.* v. *Deloitte & Touche LLP*,
551 F.3d 305 (4th Cir. 2009) .............................................................................33

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004) ...................................................................33

*Shah* v. *GenVec, Inc.*,
No. 8:12-cv-341-DKC, 2013 WL 5348133 (D. Md. Sept. 20, 2013)....................30

*Shields* v. *Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)........................................................................20, 42

*Singer* v. *Reali*,
883 F.3d 425 (4th Cir. 2018) .............................................................................26

*Smallwood* v. *Pearl Brewing Co.*,
489 F.2d 579 (5th Cir. 1974) .............................................................................19

*In re Sofamor Danek Grp., Inc.*,
123 F.3d 394 (6th Cir. 1997) .............................................................................27

*In re Stone Energy Corp. Sec. Litig.*,
No. 05-2088, 2009 WL 528415 (W.D. La. Feb. 27, 2009).....................................6

*Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta, Inc.*,
552 U.S. 148 (2008)...........................................................................................44

*Svezzese* v. *Duratek, Inc.*,
No. MJG-01-CV-1830, 2002 WL 1012967 (D. Md. Apr. 30, 2002).....................33

*Svezzese* v. *Duratek, Inc.*,
67 F. App'x 169 (4th Cir. 2003) .........................................................................17

*Teachers' Retirement Sys. of LA* v. *Hunter*,
477 F.3d 162 (4th Cir. 2007) ................................................................... *passim*

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................ *passim*

*Thesling* v. *Bioenvision, Inc.*,
  374 F. App'x 141 (2d Cir. 2010) ...............................................................................26

*Trahan* v. *Interactive Intelligence Grp., Inc.*,
  308 F. Supp. 3d 977 (S.D. Ind. 2018) .......................................................................22

*TransEnterix Inv'r Grp.* v. *TransEnterix, Inc.*,
  272 F. Supp. 3d 740 (E.D.N.C. 2017)........................................................................22

*TSC Indus., Inc.* v. *Northway, Inc.*,
  426 U.S. 438 (1976)...................................................................................................34

*Virginia Bankshares, Inc.* v. *Sandberg*,
  501 U.S. 1083 (1991).................................................................................................19

*Yates* v. *Municipal Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) .........................................................................4, 18, 36

*Zak* v. *Chelsea Therapeutics Intern., Ltd.*,
  780 F.3d 597 (4th Cir. 2015) .....................................................................................36

**Statutes**

Securities Exchange Act of 1934 Sections 10(b) and 14(a), 15 U.S.C. §§ 78j & n ............. *passim*

Private Securities Litigation Reform Act, 15 U.S.C. §§ 78u-4 & 5 ..................................... *passim*

**Other Authorities**

17 C.F.R. § 229.303(a)(3)(ii) ...............................................................................................31

17 C.F.R. § 240.10b5-1(c) .....................................................................................................4

Fed. R. Civ. P. 9(b) .......................................................................................1, 18, 19, 44

Fed. R. Civ. P. 12(b)(1)...........................................................................................................1

Fed. R. Civ. P. 12(b)(6)...........................................................................................................1

H.R. Conf. Rep. No. 104-369 (1995).......................................................................................1

M. Howard Morse, *Mergers and Acquisitions: Antitrust Limitations on Conduct Before Closing*,
  57 Bus. Law. 1463 (2002)..........................................................................................42

Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss with prejudice the Amended Complaint (or "AC") (Dkt. No. 35) pursuant to Rules 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The Private Securities Litigation Reform Act, 15 U.S.C. §§ 78u-4 & 5 (the "PSLRA"), "was enacted by Congress '[a]s a check against abusive litigation by private parties,' lest every rosy corporate prognostication generate potential liability." *Maguire Fin'l, L.P.* v. *PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017) (quoting *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  By heightening the pleading standards to "curtail the filing of meritless lawsuits," H.R. Conf. Rep. No. 104-369, at 41 (1995), the PSLRA requires plaintiffs to base their allegations of securities fraud on more than adverse business developments or bad news about the defendant.  This is just the type of suit Congress sought to deter.  Plaintiffs attempt to state securities fraud claims premised entirely on defendants' prognostications about the success of the August 2017 acquisition (the "Merger") of inVentiv Health, Inc. ("inVentiv") by INC Research Holdings, Inc. ("INCR").  However, plaintiffs' claims are based entirely on speculation and hindsight mischaracterizations, and they fail to allege specific facts in support of their claims, as required by the PSLRA and Federal Rule of Civil Procedure 9(b).

This action is a classic example of unwarranted and meritless securities fraud allegations lodged against a company that experiences a downturn in its stock price after a string of successes.  Tellingly, plaintiffs do not challenge the accuracy of even one INCR financial statement or dispute the accuracy of anything INCR said about its *own* business.  Rather,

---

[1]	Defendants here are Syneos Health, Inc. ("Syneos"), Alistair Macdonald, Gregory S. Rush, Michael A. Bell, Robert Breckon, David F. Burgstahler, Linda S. Harty, Richard N. Kender, William E. Klitgaard, Kenneth F. Meyers, Matthew E. Monaghan, David Y. Norton, and Eric P. Pâques.  (AC ¶¶ 18-22; 214-224.)

plaintiffs contend INCR management made overly optimistic statements about the business prospects of one division of an entirely different company, inVentiv, with which it was engaged in an arms'-length transaction. Virtually all of the challenged statements were made *prior to the closing of the Merger*, and the remaining statements occurred in two conference calls just five weeks after INCR completed its $4.6 billion acquisition of inVentiv on August 1, 2017. In its very first earnings announcement following the Merger, INCR (later renamed Syneos) disclosed that inVentiv's commercial business, which helps pharmaceutical clients market new drugs after they receive regulatory approval, was expected to underperform compared to previous *inVentiv* projections, among other adverse news that led INCR to reduce its 2018 earnings guidance. INCR's stock price plummeted, and these lawsuits predictably followed. These events do not give rise to any claim under the securities laws.

*First*, in their 284-paragraph Amended Complaint—comprised primarily of the truncated regurgitation of selected public statements by INCR over a six-month period—plaintiffs go to great lengths to obscure what is, at bottom, a simple and legally defective assertion. The crux of plaintiffs' claims is that the company's May and June 2017 earnings forecasts for the post-merger combined company were too rosy, and that the truth was revealed when the projections were later revised downward on November 9, 2017. (AC ¶¶ 5-10.) But not only do plaintiffs mischaracterize the statements at issue, the Fourth Circuit has long held that "projections of future performance not worded as guarantees are not generally actionable under the federal securities laws . . . because they will almost always prove to be wrong in hindsight." *Raab* v. *Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993). Likewise, the PSLRA rules out securities claims challenging such "forward-looking" information where, as here, those statements are "accompanied by meaningful cautionary statements" or were immaterial. 15 U.S.C. § 78u-5(c)(1)(A). This alone requires dismissal of this action.

-2-

Plaintiffs may not seek to resurrect their defective claim by attempting to repackage it as an omission claim. Plaintiffs allege that INCR failed to disclose that inVentiv's projected business success depended upon winning a handful of large new business contracts, but that no such contracts had been secured when earnings guidance for the hypothetical combined company was issued in May and June 2017. Whether viewed as a misstatement or omission, this theory falls flat. The assumptions underlying financial forecasts are not actionable under the PSLRA. Moreover, INCR disclosed repeatedly (i) that inVentiv's business was highly concentrated with "chunky" contracts among a handful of the largest pharmaceutical company clients, (ii) that its commercial division's revenues were "highly volatile," "lumpy" and significantly weighted to the latter part of the calendar year, (iii) that the loss of a single commercial contract late in 2016 materially impacted inVentiv's overall financial results, and (iv) that inVentiv's projections depended upon its more risky sales pipeline. In short, the supposedly omitted facts were disclosed, and plaintiffs plead no facts establishing that inVentiv's financial projections and prognostications were inconsistent with current data *when issued*.

*Second*, plaintiffs' claims all fail for the separate reason that the Amended Complaint pleads no particularized facts establishing a strong inference of scienter under the PSLRA, which the Supreme Court held must include facts demonstrating a "cogent" and "compelling" inference of fraud. *Tellabs*, 551 U.S. at 323-24. Here, because plaintiffs challenge only forward-looking statements and statements of opinion, they bear the insurmountable burden of establishing that each statement was made with "actual knowledge that [it was] false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). Plaintiffs identify no internal document, confidential witness, or evidence of any kind demonstrating any defendant's knowledge of facts contradicting his or her public statements at the time of any challenged statement. Nothing. Plaintiffs seek to avoid entirely their heavy burden to plead scienter by reference to stock sales by just two of the eleven

-3-

defendants, but plaintiffs plead no facts establishing that those sales were unusual.  They also fail to mention that both individual's INCR stock holdings increased during the Class Period, and that *every* stock sale relied upon was made pursuant to non-discretionary disposition plans adopted pursuant to Securities and Exchange Commission ("SEC") Rule 10b5-1,[2] and, therefore, "weaken[] any inference of fraudulent purpose."  *Yates* v. *Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014).

Far from demonstrating the requisite strong inference of scienter, the more plausible inference on these facts is that defendants diligently updated investors as additional information became available and their understanding of inVentiv's business evolved post-Merger.  INCR stated repeatedly through the summer and early fall of 2017 that it could not provide 2018 guidance for inVentiv or the combined company because it lacked visibility into the as-of-then independent inVentiv business.  Promptly after the Merger closed in August 2017 and INCR gained more visibility into all aspects of the combined business and a few months of sales data, it responsibly provided some updated color regarding its 2018 outlook in its *very first* post-Merger quarterly financial results.  Fraud is not remotely the more compelling inference on this record.

*Finally*, the Amended Complaint is also deficient as a matter of law because plaintiffs fail to plead that any challenged misstatement or omission caused their purported losses.  The Amended Complaint nowhere "allege[s] that the market reacted to new facts disclosed in

---

[2]       SEC Rule 10b5-1 provides, in pertinent part, that "a person's purchase or sale is not 'on the basis of' material nonpublic information if the person making the purchase or sale demonstrates that:  (A) Before becoming aware of the information, the person had . . . [a]dopted a written plan for trading securities; (B) The contract, instruction, or plan . . . [d]id not permit the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales . . . ; and (C) The purchase or sale that occurred was pursuant to the contract, instruction, or plan."  17 C.F.R. § 240.10b5-1(c).

-4-

[November 2017] that revealed [INCR's] previous representations to have been fraudulent."

*Teachers' Retirement Sys. of LA* v. *Hunter*, 477 F.3d 162, 187 (4th Cir. 2007).

## ALLEGATIONS OF THE AMENDED COMPLAINT[3]

### A.    The Parties

INCR.  INCR is a Raleigh-based public company that was founded as an academic organization pursuing central nervous system research and, over time, developed into a leading clinical research organization ("Clinical" or "CRO").  (Ex. 1 (2016 10-K) at 2.)  Specifically, INCR provided primarily Phase I to Phase IV clinical trial services to assist its pharmaceutical clients—mostly small to mid-sized pharmaceutical companies—in new drug approval processes, including full-service global studies, clinical monitoring, patient recruiting, data management, and other consulting services.  (*Id.* at 2-3; Ex. 2 (5/10/17 Tr.) at 3.)  Alistair Macdonald is the Chief Executive Officer and Gregory S. Rush was the Chief Financial Officer of INCR during the putative Class Period.  (AC ¶ 19.)  The remaining individual defendants are current or former members of INCR's board of directors.

inVentiv.  Prior to the Merger, inVentiv was a privately held company that operated two distinct business units:  (i) a CRO and (ii) a contract commercial organization ("Commercial" or "CCO") that helped pharmaceutical clients market new products *after* they had been approved by regulators, each of which accounted for approximately half of the company's revenue.  (Ex. 3, Ex. 99.2 (5/10/2017 Press Release) at 4; Ex. 3, Ex. 99.3 (5/10/2017 Presentation) at 39.)

---

[3]        In deciding this motion, the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322; *Cozzarelli* v. *Inspire Pharmaceuticals Inc.,* 549 F.3d 618, 625 (4th Cir. 2008). Further, the PSLRA provides that "the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e).  Citations to "Ex. __" are to SEC filings and other public documents referenced or relied upon in the Amended Complaint and included herewith as Exhibits.

inVentiv's CRO business provided similar services to INCR's CRO business, but INCR did not have a Commercial segment and the two companies had limited client overlap (Ex. 3, Ex. 99.3 (5/10/2017 Presentation) at 4); inVentiv's revenues derived from "key relationships with large biopharma"—including 43% of net revenues from just five clients (Ex. 4 (5/10/2017 Supp. Presentation) at 5)—as opposed to INCR's small to mid-sized clients. (Ex. 2 (5/10/17 Tr.) at 3.) Michael Bell was the Chairman and Chief Executive Officer of inVentiv and is now the Executive Chairman of the Syneos Board. (AC ¶ 21.) Following the Merger, the institutional investors that owned inVentiv, who presumably are not members of the putative class, owned 47% of INCR.

Plaintiffs. Lead plaintiffs San Antonio Fire & Police Pension Fund and El Paso Firemen & Policemen's Pension Fund ("El Paso")[4] allegedly purchased, respectively, 7,550 and 8,820 shares of INCR common stock during the proposed Class Period—less than 0.02% of INCR's stock (AC ¶ 188)—and claim to have suffered unspecified "economic losses." (AC ¶ 17.) Plaintiffs seek to represent a putative class of "all persons or entities that purchased or otherwise acquired shares of INCR common stock between May 10, 2017 and November 8, 2017" and "all persons or entities that held shares of INCR common stock as of June 29, 2017." (AC ¶ 13.)

## B.    May 10, 2017 Announcement of the Merger

On May 10, 2017, INCR announced that it had agreed to acquire inVentiv in a stock-for-stock merger. (Ex. 3, Ex. 99.2 (5/10/2017 Press Release).) As stated in the companies' joint press release, the Merger would form a top-three Clinical business and the top Commercial

---

[4]    El Paso's claims should be dismissed for lack of subject-matter jurisdiction. As another federal court held, El Paso is a Texas governmental entity created under Article 6243b of Vernon's Texas Civil Statutes, which does not permit the fund to sue. *In re Stone Energy Corp. Sec. Litig.*, No. 05-2088, 2009 WL 528415, at *2 (W.D. La. Feb. 27, 2009).

business, with over 22,000 employees in 60 countries worldwide. (*Id.* at 1.) The Merger provided other business opportunities, including:

- increasing the *scale* of the Clinical business, as scale was "increasingly becoming a key consideration for CRO customers and the combined company will be well-positioned to capitalize on this dynamic";

- creating a "*complementary and diversified customer base* and leadership across large, mid-sized and small biopharma";

- *saving* the two companies approximately $100 million in costs; and

- "*cross-selling opportunities*" arising from the fact that "INC Research's small to mid-sized biopharmaceutical clients will now be able to access inVentiv's comprehensive commercialization services, including selling solutions, communications, consulting and medication adherence."

(*Id.* at 2-3 (emphasis added); AC ¶¶ 30-37.) The Merger was well received by the market. INCR's stock rose from $43.65 to $52.80. (AC ¶ 101.)[5]

INCR also provided preliminary earnings guidance for the combined company. The company stated that the Merger would have "substantial growth *potential*," and that management expected that the transaction would be "accretive to INC Research's adjusted earnings per share per share in the first 12 months following [the third quarter 2017] close, mid to high single-digit accretive in 2018 and accretive by more than 20 percent in 2019 and beyond." (Ex. 3, Ex. 99.2 (5/10/2017 Press Release) at 1, 3 (emphasis added).)[6] Instead of

---

[5]    Syneos' current stock price as of September 18, 2018 is $47.85. https://finance.yahoo.com/quote/SYNH/history?p=SYNH&.tsrc=fin-srch (accessed Sept. 19, 2018 at 10:30 a.m.). Thus, in the 16 months since the announcement of the Merger, the stock has increased by approximately 10%, and plaintiffs nowhere allege that Syneos' actual 2018 financial performance in fact deviated materially from the forecasts provided in May 2017.

[6]    Mr. Rush stated similarly that the "transaction is expected to be accretive to [INCR's] adjusted EPS in *2018 at mid- to high single digits* and to be accretive by more than 20% in *2019 and beyond.*" (AC ¶ 99 (emphasis added).) Plaintiffs blatantly embellish Mr. Rush's statements through the convenient addition of bracketed words to suit their concocted theory. (AC ¶ 5 ("we're confident in that double-digit [revenue growth] number [*in 2018*]").) In looking at defendants' *actual* statements, however, neither Mr. Rush nor any other defendant stated that the Commercial business would have double-digit growth in 2018. (*See, e.g.*, Ex. 3, (continued . . .)

-7-

focusing on any future given year, the Company focused on the long-term growth story; INCR expected that the Merger, if completed, would improve its earnings modestly in 2018 and increasing thereafter relative to what it would have been absent the Merger. INCR did not specify what its own earnings might be in 2018 or any particular future year, and thus it did not forecast any specific earnings result for the combined company. INCR also did not guarantee that its forecasts would come to fruition; to the contrary, INCR expressly stated that its "expectations and anticipated results of operations" were "forward-looking statements," that they were "not guarantees of future results," and were subject to the risk of "potential business uncertainty, including changes to existing business relations, during the pendency of the merger that could affect INC[R]'s or inVentiv's financial performance." (*Id.* at 5, Ex. 99.3 (5/10/2017 Presentation) at 1.)[7]

On a public conference call with analysts the same day, Mr. Macdonald further discussed the strategic rationale for the Merger, including that it would create a "highly diversified and complementary customer base" by combining "INC's strength in small and midsized biopharma with inVentiv's key relationships with large biopharma." (Ex. 2 at 3.) The participants on the call (Messrs. Macdonald, Rush, and Bell) discussed future business prospects for the combined business (*id.* at 3-4, 7), but INCR noted at the very outset of the call that its statements about

Ex. 99.3 (5/10/2017 Presentation) at 6 ("Mid-to high single digit accretion in 2018. 20% plus accretion in 2019 and beyond. 2017-2020 Combined Outlook: High-single digits Net Revenue growth"), 18 (projecting CCO market development of approximately 8%), 24 (showing projections for 2017-2020 with 2017 estimates based on INCR's guidance and not actual results).) In fact, plaintiffs do not allege that any prior projected EPS for 2018 and beyond was revised downward in November 2017. (AC ¶¶ 133-139.)

[7]    Mr. Macdonald reiterated at a June 7, 2017 conference that the Merger could possibly yield "high-single-digit accretion in 2018." (Ex. 5 at 3.) Audience members were given the same caution that, among other things, "these and other forward-looking statements are not guarantees of future results." (Ex. 6 (6/7/2017 Presentation) at 1.)

"future expectations, plans and prospects" were "forward-looking statements," and referred investors to the additional risk disclosures in an accompanying presentation and in INCR's SEC filings.  (*Id.* at 2-3.)  These statements were also expressly stated to "represent *our views as of today* and should not be relied upon as representing our views as of any subsequent date."  (*Id.* at 3 (emphasis added).)  The INCR press release and the presentation accompanying the analyst call warned that one, among several, specific risks that might "cause actual results to differ materially from those [figures] expressed" was "the possibility that other anticipated benefits of the proposed transaction will not be realized, including, without limitation, anticipated revenues, expenses, earnings and other financial results, and growth and expansion of the new combined company's operations."  (Ex. 3, Ex. 99.2 (5/10/2017 Press Release) at 5, Ex. 99.3 (5/10/2017 Presentation) at 1.)

Although the Commercial business presented a "real opportunity" for the combined company, Messrs. Rush and Macdonald disclosed that the company was experiencing "challenges" in 2017, due to (i) a "massive cancellation on the commercial side . . . that's keeping their commercial business down a little bit this year," and (ii) the fact that "2016 was a near record low in new drug approvals."  (Ex. 2 (5/10/2017 Call Tr.) at 8, 14.)  While the FDA had an uptick of approvals over the last decade, the timing of those approvals was "lumpy" and hard to predict.  (Ex. 3, Ex. 99.3 (5/10/2017 Presentation) at 32.)  Mr. Macdonald underscored, however, that growing the Commercial business with "larger pharma" clients would be a "longer road" than working with smaller companies.  (Ex. 2 (5/10/2017 Tr.) at 13.)

Plaintiffs falsely portray INCR's comments here and elsewhere as stating or implying that new drug approvals were "the best predictor of the Commercial business's future performance" or a "huge leading indicator" of Commercial revenues.  (AC ¶ 100.)  INCR said no such thing.  Mr. Rush noted that the number of new drug approvals was an indicator of "what

-9-

that *market* looks like." (Ex. 2 at 14 (emphasis added).)  Mr. Rush did not offer any "best predictor" of inVentiv's Commercial revenues at all, but simply noted that inVentiv's Commercial revenues would depend necessarily on several factors, including the sales pipeline; where the market was going, *i.e.*, the size of the market opportunity (*i.e.*, new drugs); and the company's position in the market, *i.e.*, inVentiv's ability to convert those opportunities into sales.  Mr. Rush stated that, like a software company, inVentiv "has 0 backlog when they start the year, and they build their forecast and their analysts figure out what the revenue's going to be based on 2 things: where's the market going; and two, where's that particular company's spot in the market." (*Id.* at 14.)[8]

### C.    July 27, 2017 INCR Second Quarter 2017 Earnings Announcement

On July 27, 2017, INCR reported its second quarter 2017 results.  Mr. Macdonald stated that he was "*cautiously optimistic* that *we are on the path* to returning the company to double-digit organic revenue growth in 2018." (Ex. 7 (7/27/2017 Tr.) at 3 (emphasis added).)  As Mr. Rush clarified—and the Amended Complaint distorts—Mr. Macdonald's statement referred to the INCR business *alone*. (*Compare id.* at 4, *with* AC ¶ 51.)  Instead, INCR expressly *declined* to provide 2017 or 2018 guidance for the combined company because it believed it was "too early to provide combined guidance at this point, and we will be in a better position to forecast inVentiv's results after the merger closes." (Ex. 7 (7/27/2017 Tr.) at 5.)  Mr. Rush emphasized that several factors affect the ability "to give . . . an accurate guidance forecast," including

---

[8]    Mr. Rush explained that projecting revenues for the Commercial business was more challenging than the Clinical business.  Clinical is a "backlog-driven business." (Ex. 2 (5/10/2017 Tr.) at 14.)  As explained in INCR's annual report, although not "necessarily predictive of future performance," its Clinical "backlog"—the value of contracts for future services expected to commence in the next 12 months—was a "useful indicator of our potential future revenue growth" and "commonly used" in the CRO industry. (Ex. 1 (INCR 2016 10-K) at 6, 46.)  There was no analogously precise indicator for the Commercial business, and Mr. Rush explained that one "ha[s] to sort of think of it differently." (Ex. 2 (5/10/2017 Tr.) at 14.)

"what's your win rate [and] what's your pipeline."[9]  (*Id*. at 8.)  In fact, when questioned about providing 2018 figures, Mr. Rush declined to provide guidance due in part to the need to close new business wins in the second half of 2017, stating "[w]e got to close that business in the second half of this year in the commercial business for sure. . . ."  (*Id*. at 7.)

With respect to inVentiv, Mr. Macdonald explained that "[t]hey have a different customer set[] [a]nd they're in bigger longer-term relationships."  (*Id.* at 7.)  Mr. Rush reiterated that inVentiv has "larger customers than ours and so they tend to get larger studies and so that can cause a bit more volatility."  (*Id.*)  He explained that "inVentiv is a little bit more lumpy than" INCR, such that inVentiv "can have[] a big windfall one quarter and then next quarter [it] won't have any award there."  (*Id.*)  Although Mr. Rush noted that new drug approvals were "pretty strong so far this year, which is a precursor to the commercial," he warned, as he did previously, that this market opportunity would translate into revenues *only if inVentiv converted the opportunity into sales*:  "We got to go close that business in the second half of this year in the commercial business for sure."  (*Id.* at 7.)

**D.    The July 31, 2017 Stockholder Vote and the Proxy Materials**

On July 31, 2017, INCR stockholders held a special meeting to vote on the merger proposal.  Prior to the meeting on June 30, INCR disseminated a 408-page Definitive Proxy Statement (the "Proxy") that described in detail the terms of the transaction; the background giving rise to the agreement (AC ¶¶ 225-28); and, among many other things, merger-related executive compensation, including compensation payable to Messrs. Macdonald and Rush that is described erroneously in the Amended Complaint.  (Ex. 10 at 66-97, 129-31.)

---

[9]    Indeed, Mr. Rush explained that he was only able to comment on the INCR backlog by stating, "Again that backlog is INC only, we don't have inVentiv's yet."  (*Id.* at 7.)

The Proxy also contained (in just *one* of the roughly 260 pages of information provided to investors) financial forecasts for INCR and inVentiv, which included six years of revenue and earnings projections for inVentiv's business as a whole between the years ended 2017-2022.  (*Id.* at 88.)  The Proxy explained that "inVentiv has supplied, and INC Research has not independently verified, all of the information relating to inVentiv contained in this proxy statement."  (*Id.* at 200.)  INCR reiterated that the "inVentiv forecasts [are] not included in this document to influence your decision whether to vote for or against the proposal to adopt the merger agreement," and "this information should not be regarded as an indication that the Board, INC Research's advisors or other representatives or any other person considered, or now considers, such financial forecasts to be material or to be necessarily predictive of actual future results, and these financial forecasts should not be relied upon as such."  (*Id.* at 87.)  Over a page and a half of single-spaced text, INCR emphasized that these "forward-looking statements" (a) "are subjective in many respects," (b) "should not be relied on as necessarily predictive of actual future events," (c) are "not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement are cautioned not to place undue reliance" on them.  (*Id.* at 86-88.)

The Proxy included a litany of "**RISK FACTORS**" that INCR "stockholders should read and consider," which warned investors that INCR's optimism about the combined company's future business results may not materialize.  (*Id.* at 25, 87 (emphasis in original).)  Among other warnings that defeat, as a matter of law, plaintiffs' claims here, the Proxy cautioned investors that: (a) "*[f]inancial forecasts regarding INC Research and inVentiv may not be realized*"; (b) "[*t*]*he merger may not be accretive and may cause dilution to the combined company's earnings per share*"; (c) "*[t]he combined company may fail to realize the anticipated benefits of the merger*"; (d) "*[t]he operating results and share price of the combined company may be*

*volatile*"; and (e) the "***combined company may not successfully run a successful contract commercial organization***" "because INC Research has not historically had a commercial business segment" and INCR lacks experience with "commercial segment contracts [that] tend to have shorter durations and it can be difficult to predict whether these contracts will be renewed." (*Id.* at 28, 29, 33, 35 (emphasis in original).)   INCR also warned investors about the "[s]easonality" of inVentiv's business, by which "inVentiv has historically experienced an increase in net revenues in the fourth quarter as a result of clients' increased spending at the end of the calendar year," coupled with "decreased cost of net revenues and SG&A expenses in the fourth quarter and, to a lesser extent, the third quarter." (*Id.* at 156.)

Despite these extensive warnings, shareholders overwhelmingly approved the Merger with nearly 99% of voting shares in favor. (AC ¶ 244.) On August 1, 2017, INCR and inVentiv announced the successful completion of the Merger. (Ex. 17 (2017 10-K) at 3.)

**E.      September 6 and 7, 2017 Healthcare Conferences Following the Merger**

Plaintiffs challenge statements from just two conference calls subsequent to INCR's acquisition of inVentiv. At a September 6 healthcare conference—a mere 35 days after the Merger—Messrs. Rush and Bell reiterated the underlying strategic rationales for the transaction, including providing clients a full-service Clinical offering and obtaining a "good balance" of customers after combining inVentiv's large-pharma customer base with INCR's mid- to small-pharma customer base. (Ex. 11 at 1.) Like his prior characterizations of the Commercial business (including on July 27) as more "lumpy" and "volatil[e]" and thus harder to predict (*see supra* pp. 10-11), Mr. Rush described the Commercial business on September 6 as a "wildcard." (Ex. 11 at 3.) Specifically, he explained that the Commercial business was "[m]ore lumpy, more risky in the short run" as compared to the Clinical business, and that the "biggest challenge" was "convincing the customer to outsource in the first place" instead of promoting approved drugs

with in-house resources.  (*Id.* at 2.)  Nevertheless, "*we believe, over time,*" that commercial will be a "high single-digit – double-digit growth *industry*."  (*Id.* (emphasis added).)

Plaintiffs make much of Mr. Rush's reference to the Commercial business as a "wildcard," but Mr. Rush simply reiterated his oft-repeated mantra that the Commercial division, **which INCR had then owned for just five weeks**, could succeed only by converting opportunities into sales, which was necessary over the ensuing four months to meet expectations:

> [O]n the CRO side, we feel really confident at the high single digits of growth because of that backlog building. On commercial, that's the wildcard and that's the piece of the business that **we have to make sure that we continue to sell on**. **If that business were to grow** at a high single, low double-digit growth, that makes the single digits – high single digits growth a layup.  If it were to be flat again to down, then that's something laid on our ability to hit that.  And *we've got four months left to close the year, so we'll see*.

(*Id.* at 3-4 (emphasis added).)  Mr. Rush again declined to update forecasts.  (*Id.* at 6 ("I'm not updating that.").)

At a separate industry conference the next day, Mr. Rush again cautioned that he could *not* provide specific guidance on the prospects of the Commercial segment in 2018 or thereafter. (Ex. 13 at 4.)  He reiterated that, "unlike the CRO business, which is 80%" of revenues in backlog, on the Commercial side "more like about 15%-ish of your next year's revenue is in backlog.  So your visibility in the short run is not as high."  (*Id.* at 3.)  Mr. Rush stated that he was unable "to stand there in September and give you a guidance *after one month of merger for 2018*, there's a *lot more variability* in that business in the short run, and *I have lower visibility*." (*Id.* (emphasis added).)  Importantly, Mr. Rush cautioned investors that the Commercial business was inherently cyclical and weighted toward the second half of the calendar year, so it was too early for INCR to offer its own view of the Commercial business just acquired from inVentiv:

> Plus that business, *the bulk of the sales for the year*—and when I say the bulk, it's not linear.  It's not—7/12ths—at July 31, you don't have 7/12ths of your sales in for that business.  *Disproportionately more sales come in the last five months*.  So

I'm articulating that we need those 4 to 5 months to mature and see the sales pipeline to be able to be in a better position to give a degree of confidence in those numbers. That is just part of that business. Long-term, great market, but *a little early to call 2018*.

(*Id.* (emphasis added).)  Mr. Rush explained that he was "not going to give guidance as a company for 2018" until February 2018, in part because "[e]nd-year sales drive this business."[10] (*Id.* at 4-5.)

### F.    November 9, 2017 Third Quarter 2017 Results Announcement

Plaintiffs contend that the "truth" was revealed on November 9, 2017 when INCR "shocked the market with a surprisingly dismal outlook for 2018" when announcing INCR's third quarter (ended September 30, 2017) financial results, its first quarter following the Merger. (AC ¶ 10.)  The Commercial business' performance was "lower than expected."  (Ex. 15, Ex. 99.1 (11/9/2017 Press Release) at 1.)  The Company attributed the decline in Commercial revenues compared to 2016 (down $62 million) primarily to "(i) the impact of cancellations at the end of 2016, (ii) further cancellations *in the third quarter of 2017*, and (iii) lower new drug approval activity during 2016."  (*Id.* at 2.)  However, the Company also stated that it expected this business "to improve" over time, albeit "with potentially more quarterly variability than our CRO [Clinical] business."  (*Id.* at 1-2.)

During an earnings call that day, Mr. Rush stated that INCR was "not providing 2018 guidance until our fourth quarter call," but did "want to give *some color* for 2018."  (Ex. 16 (11/9/2017 Tr.) at 6 (emphasis added).)  He emphasized that "these views are preliminary," but the company was "cautiously optimistic that our consolidated net service revenue may grow in

---

[10]    Plaintiffs contend inaccurately that Mr. Rush at this time "reaffirmed" INCR's "2018" projections.  (AC ¶ 70.) Yet, the statement that plaintiffs truncate misleadingly referred only to "the numbers in the proxy for 2017."  (Ex. 13 at 9.)  These words were actually true. (*See infra* n.16.)

the mid-single digits." (*Id.*)  With respect to Commercial, INCR stated that while "we don't have the same levels of visibility as our Clinical segment, we are cautiously optimistic that our revenue will be roughly flat with our 2017 revenue levels with a potential path to low single-digit growth."  (*Id.*)

In response to analyst questions, INCR further addressed some of the challenges it faced in attempting to predict the performance of the Commercial business.  Mr. Macdonald explained that the company was "still grappling" with developing projection models for that "very different," newly-acquired business, and INCR was looking at "metrics" that would provide an indicator of its future performance.  (*Id.* at 8.)  Mr. Rush explained that "one of the things we're going to try to do" with respect to the Commercial business, although unable "to make a commitment that we'll be able to do it," is to try to "get[] a handle on . . . what are the best leading indicators of revenue growth."  (*Id.* at 12.)  The Clinical business, Mr. Rush observed, had established industry metrics to evaluate "what revenue growth could be," while investors are "somewhat flying blind on the commercial."  (*Id.*)

Mr. Rush further explained in this call that while the pipeline of new drug approvals had increased favorably in 2017, the approvals were of "smaller compounds and not producing some of the big sales teams that we saw even in '16." (Ex. 16 (11/9/2017 Tr.) at 12.)  Mr. Rush observed that, he "may have that wrong," and what he is "about to say [i]s directional," but one way to look directionally at the drop-off in Commercial revenues was to look at the number of potential blockbuster new drugs approved by the FDA that might present potential new Commercial business for inVentiv on a large scale, *i.e.*, large ("100-plus") sales teams.  (*Id.*)  In all of 2016, there were "4 or 5" such opportunities available to inVentiv, and it won two of them.  In the first three quarters of 2017, only two large approvals "have even gone out to bid."  (*Id.*)  Although INCR attempted to win that business, its competitors won "based on price.  We

weren't willing to match the price and our competitors were willing to do that." (*Id.*)  This was "one of the reasons" Rush cited for "temper[ing] our expectation for '18." (*Id.*)

### G.      This Action

On December 1, 2017, a complaint was filed in the Southern District of New York. *See Bermudez* v. *INC Research Holdings, Inc.*, No. 1:17-CV-09457-PGG.  On January 25, 2018, plaintiff Eglė Vaitkuvienė filed this action.  Although the New York action was filed nearly two months earlier, plaintiffs dismissed it in favor of this action.  On May 29, this Court appointed San Antonio Fire & Police Pension Fund and El Paso Firemen & Policemen's Pension Fund lead plaintiffs, and they filed the Amended Complaint on July 30.

The Amended Complaint alleges four claims.  Count One alleges a violation of Section 10(b) and Rule 10b-5 against INCR and Messrs. Bell, Macdonald, and Rush based upon supposed misstatements or omissions in certain INCR SEC filings, but primarily upon oral comments made in five conference calls and conferences.  Count Three alleges a claim under Exchange Act Section 14(a) against all 13 defendants based upon supposed misstatements or omissions solely in the Merger Proxy and the documents incorporated therein.  Counts Two and Four allege derivative "control person" claims under Section 20(a) of the Exchange Act contending (a) Messrs. Bell, Macdonald and Rush are liable for INCR's supposed Section 10(b) violation, and (b) all of the individual defendants (other than Mr. Bell) are liable for INCR's alleged Section 14(a) violation.[11]  Plaintiffs allege in these claims that every public statement by defendants concerning the future prospects of inVentiv's Commercial business was false or misleading because each supposedly omitted to state that (a) the business allegedly "depended"

---

[11]      Since plaintiffs' "claim for controlling person liability under section 20(a) must be based upon a primary violation of the securities laws," which plaintiffs have failed to plead, plaintiffs' Section 20(a) claims fail as a matter of law and are not further addressed here. *Svezzese* v. *Duratek, Inc.*, 67 F. App'x 169, 174 (4th Cir. 2003).

on "100 plus" contracts, (b) inVentiv would be unable to meet its forecasts or return to historical growth levels, or (c) the level of new drug approvals supposedly was not a viable metric to gauge the prospects of the Commercial business.  (*See, e.g.*, AC ¶¶ 100, 105, 108, 115, 131.)

## ARGUMENT

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation (or omission); (2) scienter, *i.e*., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e*., a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005) (internal citations omitted).  With respect to their Section 14(a) claim, plaintiff must plead facts that show "(1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction."  *Hayes* v. *Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003).  The PSLRA "requir[es] a plaintiff *to plead facts* to state a claim and . . . [to] state[] *all* of the facts upon which he bases his allegation of a misrepresentation or omission." *Hunter*, 477 F.3d at 172.  Thus, the Court should disregard "legal conclusions, deductions or opinions couched as factual allegations."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (internal quotation marks omitted).

## I.    PLAINTIFFS PLEAD NO ACTIONABLE MISSTATEMENT OR OMISSION WITH THE PARTICULARITY REQUIRED BY THE PSLRA.

### A.    The Heightened Pleading Requirements of the PSLRA and Rule 9(b).

The PSLRA imposes "a heightened pleading standard" with respect to the "fraud allegations in private securities complaints."  *Yates*, 744 F.3d at 885.  A plaintiff pleading a

-18-

violation of the Exchange Act must "specify each statement alleged to have been misleading, the reason or reasons the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Rule 9(b) likewise requires plaintiffs to state with "particularity . . . the 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Advanced Internet Techs., Inc.* v. *Dell, Inc.*, No. 5:07-CV-426, 2009 WL 10688048, at *2 (E.D.N.C. Sept. 25, 2009) (Howard, J.). Congress made these heightened pleading requirements "demanding," *Cozzarelli*, 549 F.3d at 623, because it recognized that "some Exchange Act suits seek only valuable settlements and fees rather than success on the merits." *Id.* at 623.

The PSLRA applies equally to all of plaintiffs' Exchange Act claims.[12] *Hayes*, 78 F. App'x at 861-62 ("we must apply the pleading requirements of the PSLRA" to Section 14(a) claims). "Failure to meet these 'heightened pleading requirements' results in dismissal of the case." *Carlson* v. *Triangle Capital Corp.*, No. 5:18-CV-332-FL, 2018 WL 3546232, at *4 (E.D.N.C. July 23, 2018).

---

[12] Only material misstatements in the Proxy can give rise to Section 14(a) liability. *See Virginia Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1086 (1991) ("§ 14(a) as implemented by SEC Rule 14a–9 . . . prohibits the solicitation of proxies by means of materially false or misleading statements."). Thus, the Section 14(a) claim is confined to statements in the Proxy itself, and the May 10, 2017 Merger announcement and investor presentation that were incorporated by reference therein. (Ex. 10 (Proxy) at 198.) Contrary to the Amended Complaint (AC ¶¶ 231, 240), the Preliminary Proxy cannot form the basis of a Section 14(a) claim. *Ferro* v. *Blankenship*, No. EP-95-CA-004-DB, 1995 WL 18236650, at *3 (W.D. Tex. Mar. 17, 1995). And the oral conference call commentary that comprise the bulk of the alleged misstatements are not part of the "Proxy Materials" (AC ¶ 234) and are thus not actionable under Section 14. *Smallwood* v. *Pearl Brewing Co.*, 489 F.2d 579, 601 (5th Cir. 1974).

**B.      The Amended Complaint Challenges Only Inactionable Forecasts.**

The gravamen of the Amended Complaint is that INCR's various *projections* for the combined company's 2018 performance (and beyond), including projections of earnings and expected growth rates for the combined company and the Commercial business, were somehow "materially false."  (AC ¶¶ 96-145.)  This theory fails as a matter of law.

*1.      INCR's Projections Are Not Actionable Factual Statements.*

To allege a false statement or omission of material fact, a plaintiff "must point to a *factual* statement or omission—that is, one that is demonstrable as being true or false." *Longman* v. *Food Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999) (emphasis in original).  Under settled law, a projection of future results does not qualify as a factual statement in this Circuit unless supported by "specific statements of fact or . . . worded as guarantees."  *Raab*, 4 F.3d at 290.  As the Court of Appeals has emphasized, projections "will almost always prove to be wrong in hindsight."  *Id.*  Projections are "simply the company's best guess as to how the future will play out," and "[i]mposing liability would put companies in a whipsaw, . . . deter companies from discussing their prospects, and . . . deprive[] [markets] of the information those predictions offer."  *Id.*  "[M]isguided optimism is not a cause of action."  *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).

Courts in this Circuit reject routinely fraud claims based on projections.  In *Hillson Partners Ltd. P'ship* v. *Adage, Inc.*, the Fourth Circuit ruled that statements that project was "on schedule" and company was "on track" for increased earnings were immaterial projections.  42 F.3d 204, 213-15 (4th Cir. 1994).  And, in *Raab*, the Fourth Circuit found non-actionable a company's predictions that "[r]egulatory changes . . . have created a marketplace for the DOE Services Group with an expected annual growth rate of 10% to 30% over the next several years," and that "Group is poised to carry the growth and success of 1991 well into the future."  4 F.3d at

-20-

288-90.  As here, the Fourth Circuit ruled that this "whole discussion of growth is plainly by way of loose prediction" and "hardly constitute[s] a guarantee" of the sort that might qualify as an actionable statement of fact.  *Id*.  Likewise, in *Marsh Grp*. v. *Prime Retail, Inc*., the Fourth Circuit ruled that "various permutations of management's expression of 'commitment' to paying the quarterly dividend" in the future "are not guarantees and lack the factual specificity necessary to make them actionable in this circuit."  46 Fed. App'x 140, 146-47 (4th Cir. 2002).  More recently, this Court held in *Ash* v. *PowerSecure Int'l, Inc.* that the defendants' estimate that the company "could realize $25 to $35 million in annual revenues from a new UI customer" was "accurately couched as estimates that had yet to 'firm up'" and thus "w[as] not materially misleading."  No. 4:14-CV-92-D, 2015 WL 5444741, at *9 (E.D.N.C. Sept. 15, 2015).

Similarly, none of the projections here were worded as "guarantees" or "specific statements of fact."  Quite the opposite.  In every instance, INCR warned "that these and other forward-looking statements are not guarantees of future results and are subject to risks, uncertainties and assumptions that could cause actual results to differ materially."  (*See e.g.*, Ex. 3, Ex. 99.3 (5/10/2017 Presentation) at 1; Ex. 6 (6/7/2017 Presentation) at 1.)  The Proxy itself stated that the projections contained therein were "*not fact*"—they were "*subjective*," prepared by *inVentiv*, and "*should not be relied upon*"—and the Merger very well "*may not be accretive*."  (Ex. 10 (Proxy) at 29, 33, 86-88, 200 (emphasis added).)  INCR reminded investors repeatedly of the various "factors that could cause actual results to differ materially," and referred investors to the risk disclosures in the Proxy, among others.  (*See e.g.*, Ex. 9 (7/27/2017 Presentation) at 2.)  The "inability to foresee the future"—which defendants readily and

-21-

repeatedly conceded, especially with respect to the Commercial business (*see supra* pp. 6-16; *see also* Appendix A)[13]—"does not constitute fraud." *Hillson*, 42 F.3d at 213.

### 2. The Challenged Statements Are Forward-Looking and Protected by the PSLRA's Safe Harbor.

Plaintiffs' claims also lack merit because they challenge *only* statements protected by the PSLRA's "safe harbor" for forward-looking statements, a codification of the common law bespeaks caution doctrine that also applies here. *See In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS), 2005 WL 2277476, at *11 (E.D.N.Y. Sept. 19, 2005) (safe harbor codifies but does not supplant bespeaks caution doctrine). This "safe harbor" was enacted "to allow public companies to disclose their projections and plans without the threat of abusive litigation." *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 844 (N.D. Tex. 2005). "[U]nder the [PSLRA], when statements are 'forward-looking,' they are not actionable at all, even if material, when they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ." *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 884 (W.D.N.C. 2001); *see also TransEnterix Inv'r Grp.* v. *TransEnterix, Inc.*, 272 F. Supp. 3d 740, 757 (E.D.N.C. 2017). The PSLRA safe-harbor governs all of plaintiffs' claims, including the Section 14(a) claims. *See, e.g.*, *Trahan* v. *Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 987-88 (S.D. Ind. 2018).

Forward-looking statements include, among other things, (i) financial projections, (ii) "a statement of the plans and objectives of management for future operations," and (iii) "a statement of future economic performance." 15 U.S.C. § 78u-5(i). The projections at issue here thus fall squarely in the "heartland" of the types of lawsuits the PSLRA was trying to curb. *Ash*,

---

[13]     For the Court's convenience, annexed hereto as Appendix A is a summary of selected cautionary warnings provided in connection with the challenged statements.

2015 WL 5444741, at *8 (company's estimate that in 2014/15 "it could be asked to double its work volumes and could realize $25–$35 million of revenue annually" non-actionable also because it "falls into the heartland of a forward-looking statement"); *Police Retirement Sys. of St. Louis* v. *Intuitive Surgical, Inc*., 759 F.3d 1051, 1058 (9th Cir. 2014) ("The alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face."). Statements indicating expected future performance, such as that the company "expects total sales . . . to double" or "expects that these . . . products will positively impact its long-term growth prospects," are all forward-looking. *Plymouth Cty. Ret. Ass'n* v. *Primo Water Corp.*, 966 F. Supp. 2d 525, 550-51 (M.D.N.C. 2013). And plaintiffs may not transform non-actionable forward-looking statements into actionable statements of fact by "characteriz[ing them] as statements of present belief regarding future events." *Marsh Grp*., 46 Fed. App'x at 146-47.

The PSLRA safe harbor also extends to INCR's disclosure of "the assumptions underlying or relating to" its projections, 15 U.S.C. § 78u-5(i)(1)(D), which sinks the remainder of plaintiffs' misstatement theories. Plaintiffs may not challenge indirectly the reasons given (or not given) for INCR's growth predictions, such as (a) its supposed description of new drug approvals as its "leading indicator" for "modeling the commercial business going forward" (AC ¶ 100(f)), *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 682 (E.D. Va. 2015) (stated expectation that contract would renew is protected assumption), (b) inVentiv's historical growth rates (AC ¶ 100(d)), (c) "confidence" in meeting projections (AC ¶ 110), *Hess* v. *American Physicans Capital, Inc*., No. 5:04-CV-31, 2005 WL 459638, at *6 (W.D. Mich. Jan. 11, 2005), or (d) the absence of reasons to change the projections (AC ¶ 124), *Intuitive Surgical*, 759 F.3d at 1059 (statement that "'At the present time, we don't have any indicators that tell us that [client

expenditures were decreasing]. But we're early into this' . . . is properly classified as an assumption").

Every single one of the challenged forecasts and their underlying assumptions were (i) identified as forward-looking and (ii) accompanied by extensive warnings that they "should not be relied upon" as predictive of actual results.[14] As detailed in Appendix A, INCR's public filings repeatedly warned investors, among other things, that "[a]ctual results may differ materially" from projections and that there is a risk that "anticipated benefits" of the Merger such as "anticipated revenues" and "earnings" "will not be realized." (*See* App. A at 1-4; Ex. 10 (Proxy) at 16.) Plaintiffs were told that forecasts relating to inVentiv were "prepared by inVentiv's management," were not intended for "public disclosure," were not "independently verified" by INCR, and that all of defendants' forecasts "were based on numerous variables and assumptions that are inherently uncertain" and "beyond INC[R]'s control." (Ex. 10 (Proxy) at 87, 200.) Furthermore, Mr. Rush specifically warned that inVentiv's business is (1) more "volatil[e]" because inVentiv relies on "larger customers," and also (2) "lumpy" such that one quarter could produce "a big windfall" and the next quarter nothing. (Ex. 7 (7/27/2017 Tr.) at 7.) INCR even reminded investors that it "has not historically had a commercial business segment," and that as a result, the combined company "may not be as successful in cross-selling its clinical and commercial services as projected prior" to the Merger. (Ex. 10 (Proxy) at 33.)[15]

---

[14]     *See* Ex. 2 (5/10/2017 Tr.) at 2-3; Ex. 3, Ex. 99.2 (5/10/2017 Press Release) at 1, Ex. 99.3 (5/10/2017 Presentation) at 1; Ex. 6 (6/7/2017 Presentation) at 1-2; Ex. 10 (Proxy) at 16-17, 25-59, 86-88 (extensive warnings regarding forward-looking statements generally, specific risk factors, and the financial projections contained therein); Ex. 7 (7/27/2017 Tr.) at 2; Ex. 8, Ex. 99.1 (7/27/2017 Press Release) at 3; Ex. 9 (7/27/2017 Presentation) at 2; Ex. 12 (9/6/2017 Presentation) at 2; Ex. 14 (9/7/2017 Presentation) at 2.

[15]     In addition to its own cautionary language, each of INCR's forward-looking statements also incorporated by reference the extensive cautionary language contained in the Proxy, among other INCR public filings. (Ex. 3, Ex. 99.3 (5/10/2017 Presentation) at 1 (urging

(continued . . .)

-24-

Courts in this Circuit have held indistinguishable cautionary language to be sufficiently meaningful. *See, e.g.*, *Neustar*, 83 F. Supp. 3d at 682 (dismissing case due to warnings that "the Company cannot assure you that its expectations will be achieved or that any deviations will not be material," and that certain contracts "represent in the aggregate a substantial portion of our revenue, are not exclusive, and could be terminated or modified in ways unfavorable to us"); *Plymouth Cty.*, 966 F. Supp. 2d at 550 (dismissing case due to warnings that "actual results could differ materially from those stated here," including due to "lower than anticipated consumer and retailer acceptance"); *Lab. Corp.*, 2006 WL 1367428, at *4 (dismissing case due to warnings that "[a]ctual results could differ" due to "increased competition . . . failure to obtain and retain new customers . . . [and] ability to attract and retain experienced and qualified personnel"). The PSLRA safe-harbor thus requires dismissal here.

### C.     INCR Had No Duty to Disclose Any Additional, Supposedly Omitted Facts.

Recognizing that their claims based on defendants' financial projections are clearly barred under controlling Fourth Circuit precedent and the plain language of the PSLRA, plaintiffs try to salvage their case by contending that, simply because INCR provided those inactionable projections, it was under a duty to disclose reams of other supposed "facts" about inVentiv's business. (AC ¶ 90.) This is not only wrong as a matter of law, but the supposedly omitted "facts" are nothing more than patent mischaracterizations embellished by ellipses and the misleading addition of bracketed words and dates. (*See, e.g.*, nn. 6 & 10, *supra*.)

---

stockholders to "read the proxy statement"); Ex. 6 (6/7/2017 Presentation) at 1 (same); Ex. 7 (7/27/2017 Tr.) at 2 ("These factors are discussed in the Risk Factors section of . . . our definitive proxy materials."); Ex. 12 (9/6/2017 Presentation) at 2 (incorporating "risk factors set forth in . . . our definitive proxy materials"); Ex. 14 (9/7/2017 Presentation) at 2 (same).) *See, e.g.*, *In re Lab. Corp. of Am. Holdings Sec. Litig.*, No. 1:03-CV-591, 2006 WL 1367428, at *6 (M.D.N.C. May 18, 2006) ("cautionary language may be incorporated by reference.").

-25-

The federal securities laws "do not create an affirmative duty to disclose any and all material information." *Singer* v. *Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011)); *see also Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). "For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." *Thesling* v. *Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010). "Silence, absent a duty to disclose, is not misleading." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988); *see also Singer*, 883 F.3d at 440 (same). INCR's projections are not actionable on their own, and may not be used to bootstrap some claim that INCR was obligated to update or caveat those projections. "The statements at issue here were predictions, neither material under the federal securities laws nor pled with sufficient particularity to allege a claim for fraud. There is no duty to update such statements on the basis of subsequent events." *Hillson*, 42 F.3d at 219.

### 1.      *INCR Omitted No Material Facts.*

Even if plaintiffs could assert some omission theory—and they cannot—the "facts" supposedly omitted (as opposed to plaintiffs' contortion of them) were disclosed and the disclosures were not misleading. Plainly, there can be no omission claim without an omission, *see Ash*, 2015 WL 5444741, at *8 ("lack of adequate disclosure" claim dismissed because company "disclosed the negative effect of operational inefficiencies"), and a "true statement does not fall within the ambit of" the securities laws, *Kas* v. *First Union Corp.*, 857 F. Supp. 481, 488 (E.D. Va. 1994); *see also Hillson*, 42 F.3d at 216 (no liability where statements were "totally accurate"). Likewise, the disclosure of historical facts, truthful when published, gives rise to no obligation to qualify or update those statements. *Raab*, 4 F.3d at 289 ("accurate reporting of its past results did not then require the company to speculate on the effect that a

contract slowdown . . . would have on its future earnings"); *see In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997) ("disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future").

### a.     New Drug Approvals

Plaintiffs falsely contend that INCR stated that the number of new FDA drug approvals was a "leading indicator" or, worse, "the best metric" (AC ¶ 127) for gauging future Commercial revenues, when, according to plaintiffs, it was not "a reasonable predictor of Commercial growth."  (AC ¶¶ 100(f), 131(f); *see also id.* ¶¶ 100(c), 105(c), 109(c), 115(c), 115(f).)  INCR said no such thing.

INCR never stated that increased FDA approvals would necessarily lead to greater Commercial revenues for inVentiv.  On their face, the statements stated only that new drug approvals is an indicator "as to what that [commercial] market looks like."  (Ex. 2 (5/10/2017 Tr.) at 14; *see* Ex. 7 (7/27/2017 Tr.) at 11 ("a lot of people are predicting 40 to 50 approvals this year which if we go back to that level that *should, in theory*, give us an *opportunity* to return to strong growth in commercial in 2018" (emphasis added).)  The Amended Complaint nowhere takes issue with INCR's observation that the number of new drugs is a viable measure of the *potential* market for inVentiv's Commercial services.  INCR made clear that, to convert that opportunity into revenues, inVentiv would still have to "close that business."  (Ex. 7 (7/27/2017 Tr.) at 7.)  INCR omitted no facts.  *Lerner* v. *Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 587 (D. Md. 2017) ("Ultimately, the inquiry is whether, *read as a whole*, the statements or omissions would have misled a reasonable investor about the nature of the securities." (emphasis added)).

Far from suggesting that "drug approvals a[re] the best metric for growth" during the September 7, 2017 conference call (AC ¶ 127), Mr. Rush observed that "new drug approvals is a metric that *has some correlation*" with revenues, but he expressly cautioned investors that "it's

*too simple of a metric*." (Ex. 13 (9/7/2017 Tr.) at 7 (emphasis added); AC ¶ 126.)  Although approvals historically have shown a "pretty strong *correlation*" with growth for inVentiv, Mr. Rush explained that "you can break that correlation pretty quickly as you go down [a] list" of other factors, such as whether the drug is for a "bigger market" or a "very small market"; whether the customer has a "propensity to outsource"; and whether INCR must "pry [the customer] away" from a competitor.  (Ex. 13 (9/7/2017 Tr.) at 7; AC ¶ 126.)

b.     *"100-Plus" Sales Contracts*

Plaintiffs contend that every statement INCR made about inVentiv's Commercial business was misleading because it failed to state that "business critically depended upon the number of 100-plus sales team contracts it was able to win."  (AC ¶¶ 7-8, 10-11, 100(a), 105(a), 109(a), 115(a), 131(a).)  The sole support for this assertion is an after-the-fact statement by Mr. Rush in November 2017 that inVentiv's revenues were impacted negatively by the fact that new drug approvals in the first three quarters of 2017 were primarily for "smaller compounds" and thus did "not produc[e] some of the big sales teams" inVentiv had experienced in the past. (Ex. 16 (11/9/2017 Tr.) at 12.)  Mr. Rush gave as a "directional" example that there had been only two commercial proposals in the market involving "100-plus sales teams" in the first three quarters, and inVentiv had not won either bid.  (*Id*.)  Even though plaintiffs nowhere contend that inVentiv, INCR or any other Commercial organization has before (or since) used this "100-plus sales team" metric as a measure of revenue growth, plaintiffs rest much of their case on the notion that it was fraudulent for INCR to have not mentioned this metric previously.  This is nonsense.

*First*, Mr. Rush stated previously that any correlation between new drug approvals and revenue potential would "break . . . pretty quickly" depending upon whether the drug was for a "bigger market" or a "very small market," as inVentiv's Commercial services were geared

-28-

toward large market drugs. (Ex. 13 (9/7/2017 Tr.) at 7.) 100-plus sales contracts are but one example of "bigger market" drugs. INCR had no obligation to disclose any particular metric. *Hayes*, 78 Fed. App'x at 862 (because proxy disclosed margins were improving, there was no duty to disclose data or another "methodology . . . for the determination of margins").

*Second*, INCR disclosed repeatedly that inVentiv's business was focused on larger customers and larger assignments. inVentiv "ha[s] larger customers than ours and so they tend to get larger studies and so that can cause a little bit more volatility." (Ex. 7 (7/27/2017 Tr.) at 7.) Regardless of whether those "larger studies" involved 100-person sales teams or 90-person sales teams, INCR disclosed that inVentiv's Commercial business tended toward large studies, the absence of which obviously diminishes inVentiv's revenue opportunities. *See Lab. Corp.*, 2006 WL 1367428, at *5 (company's failure to disclose that it was "in danger of losing several large contracts," which plaintiffs alleged was the "actual cause" of projections miss, not actionable because defendants "warned" of the risk of "fail[ing] to obtain and retain new customers"); *see also In re Cryomedical Sciences, Inc. Sec. Litig.*, 884 F.Supp. 1001, 1012 (D. Md. 1995) ("there is no duty to disclose information of common knowledge, Murphy's Law or Peter Principle or obvious results").

*Third*, plaintiffs nowhere plead any facts to suggest that the absence of any 100-plus sales team contracts undermined inVentiv's projected business results at any point prior to the Third Quarter 2017, when INCR disclosed its lack of such contracts. Only "4 or 5" such deals existed in all of 2016; the fact that there were two in the first half of 2017 says nothing, particularly where "[e]nd-year sales drive this business." (Ex. 13 (9/7/2017 Tr.) at 5.) *See Hunter*, 477 F.3d at 176 ("Far from impeaching the truth of Cree's public disclosures, the facts alleged in the complaint are consistent with the performance of the . . . contract.").

### c.    Timing of inVentiv Revenues

Plaintiffs relatedly speculate that the absence of 100-plus contracts on the date of each challenged statement rendered any comment about the Commercial business misleading because inVentiv would not meet its projections.  (AC ¶¶ 100(a), 105(a), 109(a), 115(a), 131(a).)  This conjecture is supported by nothing.  INCR disclosed repeatedly that the Commercial business revenues were "lumpy," "volatil[e]," and can lead to "a big windfall one quarter and then next quarter you won't have any awards there," and that those Commercial revenues were weighted toward the last few months of the calendar year.  (Ex. 7 (7/27/2017 Tr.) at 7; Ex. 13 (9/7/2017 Tr.) at 3.)  Plaintiffs cite no facts suggesting that inVentiv was not performing according to its plans in the first two quarters of 2017, or that its forecasts were unachievable prior to the third quarter of 2017, when INCR disclosed that they would not be met.  And Mr. Rush's description of the Commercial business as a "wildcard" is entirely consistent with such previous disclosures.  (Ex. 11 (9/6/2017 Tr.) at 3.)  INCR was under no obligation "to disclose financial information about the third quarter before that quarter had concluded." *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2010).

### 2.    Regulation S-K Did Not Require Any Disclosure.

Plaintiffs contend that INCR was under a duty to disclose the supposedly omitted information under Item 303 of SEC Regulation S-K.  (AC ¶¶ 90-95.)  Not so.  "Item 303 does not create a private right of action" and Item 303 cannot form the basis of a claim under the Exchange Act. *Ash*, 2015 WL 5444741, at *10-11 ("Item 303 is not a magic black box in which inadequate allegations under Rule 10b–5 are transformed, by means of broader and different SEC regulations, into adequate allegations."); *Shah* v. *GenVec, Inc.,* No. 8:12-cv-341-DKC, 2013 WL 5348133, at *15 n.16 (D. Md. Sept. 20, 2013) ("Where plaintiffs have failed to plead any actionable misrepresentation or omission under [Section 10(b)], SK-303 cannot provide a

basis for liability."); *see also Oran* v. *Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (Alito, J.) (Item 303 is not a basis for Section 10(b) liability: "a duty to disclose must be separately shown.").

In any event, Item 303 could not possibly apply here. Item 303 requires issuers to "[d]escribe" in "Management's discussion and analysis of financial condition" certain "known trends or uncertainties that . . . the registrant reasonably expects will have a material favorable or unfavorable impact on" revenues. 17 C.F.R. § 229.303(a)(3)(ii). INCR did not own inVentiv's Commercial business until the third quarter of 2017; it could not have an obligation to disclose trends in an as-of-yet acquired business. And a supposed revenue shortfall in inVentiv's "lumpy" and "volatile" Commercial business over a few months does not make a trend. *Kapps* v. *Torch Offshore, Inc.*, 379 F.3d 207, 218 (5th Cir. 2004) (five-month "decline in natural gas prices [did] not yet constitut[e] a trend"). Finally, plaintiffs contend that reliance on 100-plus contracts was an inherent part of inVentiv's business. (AC ¶ 7.) A trait that is "inherent in [defendants'] business since before the Class Period" is not a disclosable trend. *Plymouth*, 966 F. Supp. 2d at 558-59.

### D. Defendants' Optimism About the Merger Was Not Fraud.

Many of the alleged misstatements here are inactionable "puffery" as a matter of law. Puffery statements are "[i]ndefinite statements of corporate optimism" and "are generally non-actionable as they do not demonstrate falsity." *Carlucci* v. *Han*, 886 F. Supp. 2d 497, 522 (E.D. Va. 2012). "'Soft,' 'puffing' statements" also "generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." *Hillson*, 42 F.3d at 211. The Fourth Circuit has squarely held that "[n]*o reasonable investor would rely on these statements*, and they are certainly not specific enough to perpetrate a fraud on the market." *Id.* (emphasis added).

-31-

Accordingly, defendants' various expressions of "optimis[m]"; (AC ¶¶ 110-11) predictions of "strong" growth (AC ¶ 112); "excite[ment] about [the] long-term aspects of the commercial business" and "significant new business opportunit[ies]" (AC ¶¶ 97, 114, 125); and "gut" views that inVentiv was "roughly on track" to meet 2017 expectations (AC ¶ 124)[16] all "amount[] to puffery and [are] immaterial as a matter of law." *Ash*, 2015 WL 5444741, at *10 (statement that "expanding utility relationships, strong backlog, and the high quality of our sales pipeline" indicates "another very good year in 2014 for our utility infrastructure business" was puffery); *see also Hillson*, 42 F.3d at 212 (prediction of "significant sales gains . . . as the year progresses" too vague to be material); *In re Maximus, Inc. Sec. Litig.*, No. 17-CV-0884 (AJT/IDD), 2018 WL 4076359, at *13 (E.D. Va. Aug. 27, 2018) ("Statement 4 was not material, since Montoni's 'early days' and 'on track' language reflected a subjective, less than certain assessment.").

**E.     Plaintiffs Fail to Plead Each Defendant's Liability for the Challenged Statements.**

In *Janus Capital Grp., Inc.* v. *First Derivative Traders*, the Supreme Court held that Exchange Act liability does not extend to "persons or entities without control over the content of a statement." 564 U.S. 135, 142-43 (2011). Plaintiffs plead Section 10(b) claims against three individuals, but fail to plead any basis to hold any individual liable for the statements of others. Worse still, plaintiffs' Section 14(a) claim against 12 individuals is bereft of any allegation of any individual's involvement in *any one* of the challenged statements. The Section 14(a) claim challenges primarily inVentiv statements that are incorporated by reference into the Proxy. That

---

[16]     Mr. Rush actually stated that he believed inVentiv was "roughly on track" to meet its 2017 expectations "within a few percentage points, that's $100 million, $150 million of the original number." (Ex. 13 (9/7/2017 Tr.) at 9.) Plaintiffs do not even contend that inVentiv's third quarter 2017 results disclosed in November fell outside this range. (AC ¶¶ 133-139.)

-32-

does not make each individual liable for its content, because the "publishe[r] [of] a statement on behalf of another is not its maker." *Id.* at 142. For the same reason, INCR is not liable for the accuracy or completeness of inVentiv financial information in various documents or statements that INCR represented to have been "prepared by" and "the responsibility of inVentiv Health's management," and that INCR has "not independently verified." (Ex. 3, Ex. 99.3 (5/10/2017 Presentation) at 2; Ex. 10 (Proxy) at 200.) *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 380 (D. Md. 2004) ("stockholders do not have standing to sue" for "material misstatement of another company").

## II. THE AMENDED COMPLAINT ALLEGES NO FACTS ESTABLISHING A COGENT AND COMPELLING INFERENCE OF SCIENTER.

Under the PSLRA, a plaintiff alleging a claim under the Exchange Act must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The [pleading] burden placed upon plaintiff[s] is great." *Svezzese* v. *Duratek, Inc.*, No. MJG-01-CV-1830, 2002 WL 1012967, at *4 (D. Md. Apr. 30, 2002), *aff'd*, 67 F. App'x 169 (4th Cir. 2003). A "strong" inference is one that is "more than merely plausible or reasonable—it [is] cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309; *see also Cozzarelli*, 549 F.3d at 624 (noting *Tellabs* gave the "strong inference" standard "teeth, using adjectives like 'cogent,' 'compelling,' 'persuasive,' 'effective,' and 'powerful'"). Dismissal is required unless the Court "find[s] the inference that [the defendants] acted with scienter 'at least as compelling' as the inference that defendants lacked the required mental state." *Pub. Empls.' Ret. Ass'n of Colo.* v. *Deloitte & Touche LLP*, 551 F.3d 305, 312 (4th Cir. 2009).

-33-

At a minimum, the requisite state of mind that plaintiffs must establish with particularity to plead their Section 10(b) claims is intentional misconduct or severe recklessness—"a mental state embracing intent to deceive, manipulate or defraud."[17]  *Tellabs*, 551 U.S at 319; *Ottmann* v. *Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003).  But the bar here is even higher.  *First*, "[f]or those few 'forward-looking' statements that are actionable at all"—and there are none—"the [PSLRA] specifies that the required state of mind is 'actual knowledge . . . that the statement was false or misleading.'"  *First Union*, 128 F. Supp. 2d at 885 (quoting 15 U.S.C. § 78u-5(c)).  *Second*, to the extent not forward-looking, the remaining alleged statements commenting on or characterizing inVentiv's business prospects (or failing to do so) reflect only "opinions" or "beliefs" that are actionable only when plaintiffs show that defendants "did not actually believe the statement they were making."  *Knurr* v. *Orbital ATK Inc.*, 276 F. Supp. 3d 527, 537 (E.D. Va. 2017) (actual knowledge required to challenge opinions even under Section 14(a)).  Plaintiffs must, in each instance, demonstrate scienter on the part of the speaker, *Hunter*, 477 F.3d at 172, and they must do so separately for each defendant, *First Union*, 128 F. Supp. 2d at 884.  Nothing of this sort is alleged in the Amended Complaint under any scienter standard.

---

[17]     Plaintiffs attempt to ground their Section 14(a) claims in mere negligence. (AC ¶ 270.)  "[B]oth the Supreme Court and the Fourth Circuit have expressly declined to determine the state of mind of a defendant required to establish § 14(a) liability."  *Knurr* v. *Orbital ATK Inc.*, 276 F. Supp. 3d 527, 535 (E.D. Va. 2017); *see also TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 444 n.7 (1976); *Hayes*, 78 F. App'x at 864 n.1.  Although the circuits are split, the better view—espoused by the Sixth Circuit—is that "an action under [Section] 14(a) requires proof of scienter" in light of the Exchange Act's structure and legislative history.  *Adams* v. *Standard Knitting Mills, Inc.*, 623 F.2d 422, 431 (6th Cir. 1980).  In any event, because this case challenges exclusively opinion and forward-looking statements, plaintiffs must plead a knowing fraud for all their claims.  (*See infra* pp. 33-34.)  Moreover, the Amended Complaint fails even to plead a strong inference of negligence under the PSLRA.  Plaintiffs have not shown that INCR was negligent in not knowing the correct metric for forecasting the Commercial segment of inVentiv, a competitor engaged in an arms-length transaction.  Instead, as explained in the next earnings call after the Merger, INCR was "kind of still grappling with it all, because it is a very different business."  (Ex. 16 (11/9/2017 Tr.) at 8.)

### A.    Plaintiffs Allege No Legally Cognizable Motive for Defendants to Commit Fraud.

"[A]llegations of motive and opportunity are relevant, though not necessarily sufficient, to establishing a strong inference of scienter." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 634 (E.D. Va. 2000). "[W]hile particular facts demonstrating a motive and opportunity to commit fraud (or lack of such facts) may be relevant to the scienter inquiry, the weight accorded to those facts should depend on the circumstances of each case." *Ottmann*, 353 F.3d at 345-46. Here, plaintiffs' motive allegations undermine rather than support scienter.

### 1.    *Motive Cannot Be Inferred from Pre-Arranged Stock Sales.*

Plaintiffs allege that two of the 11 individual defendants—Messrs. Macdonald and Rush—were motivated to artificially inflate INCR's stock price in order to sell a portion of their INCR stockholdings between June 2017 and September 2017. (AC ¶¶ 74-78.) "But insider trading can imply scienter only if the timing and amount of a defendant's trading were 'unusual or suspicious.'" *Hunter*, 477 F.3d at 184. "Merely because executives sold shares during the proposed class period and netted substantial sums does not necessarily imply scienter." *Pipefitters Local No. 636 Defined Ben. Plan* v. *Tekelec*, No. 5:11-CV-4-D, 2013 WL 1192004, at *14 (E.D.N.C. Mar. 22, 2013) (citations omitted). Plaintiffs seek to infer scienter from Messrs. Rush's and Macdonald's stock sales only by contorting and omitting the facts.

Courts in this Circuit and elsewhere reject outright attempts to predicate some motive to commit fraud on non-discretionary stock sales undertaken pursuant to a pre-arranged plan.[18]

---

[18]    *See, e.g.*, *Elam* v. *Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) ("Stock sales pursuant to Rule 10b-5 trading plans 'can raise an inference that the sales were prescheduled and not suspicious.'"); *Cent. Laborers' Pension Fund* v. *Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 n.4 (5th Cir. 2007) (same); *Fishbaum* v. *Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. 1999) ("[T]he amounts of the trades were not suspicious, as [the individual defendant's] stock sales appeared to be part of a periodic divestment plan."); *In re Bausch &*
(continued . . .)

Here, every one of Messrs. Macdonald's and Rush's stock sales were made pursuant to prearranged 10b5-1 plans instituted in 2016, well before the start of the Class Period.[19]  "Under Rule 10b5-1, corporate insiders can set up trading plans to sell company shares at predetermined times and amounts," which the Fourth Circuit held "mitigate[s] any inference of improper motive surrounding [the defendant's] sales."  *Yates*, 744 F.3d at 891.  "Plaintiffs['] allegations regarding stock sales pursuant to pre-existing Rule 10b5-1 plans . . . do not add to the scienter analysis in any meaningful way."  *In re Lab. Corp.*, 2006 WL 1367428, at *11 n.10; *see In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (granting dismissal where sales were "made pursuant to a non-discretionary Rule 10b-5-1 trading plan, which undermines any allegation that the timing or amounts of the trades was unusual or suspicious").  Rather than support scienter, stock "[s]ales according to pre-determined plans may 'rebut an inference of scienter.'"  *Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008).

---

*Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 344 (W.D.N.Y. 2008) (stock sales "as part of preset trading plans under Rule 10b5-1 . . . do not appear to be 'unusual' in either their amount or their timing").

[19]    The SEC Forms 4 detailing Messrs. Macdonald's and Rush's stock transactions are included as Exhibits 19 to 32.  For the Court's convenience, a summary of those Forms 4 is annexed hereto as Appendix B.  Although a defendant may not seek to rebut an otherwise strong inference of scienter at the pleading stage by volunteering its own trading records as evidence of innocence, *Zak* v. *Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 606-08 (4th Cir. 2015), where, as here, plaintiffs seek to rely on stock sales to establish scienter, this Court may consider the entirety of the publicly filed Forms 4 plaintiffs rely upon, *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 n.10 (4th Cir. 2005); *KBC Asset Mgmt. NV* v. *3D Sys. Corp.*, No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *10 (D.S.C. July 25, 2016).

### 2.  The Volume and Timing of the Stock Sales During the Class Were Not "Unusual" or "Suspicious."

Plaintiffs allege that just two INCR executives sold stock during the Class Period for "gross proceeds" of "more than $9 million."[20]  (AC ¶¶ 74-77.)  Yet, "the complaint does not provide defendants' trading patterns outside the class period to permit comparison with their trades within the class period."  *Hunter*, 477 F.3d at 185.  On this record, plaintiffs' have not, and cannot, plead any inference of unusual trading.  *Id.*

Moreover, plaintiffs' attempt to portray these stock sales as substantial percentages of Messrs. Rush's and Macdonald's stock holdings is, at best, misleading.  Each of Mr. Rush and Mr. Macdonald actually ***increased*** his overall INCR stock holdings during the Class Period, including the exercise by Mr. Rush of 10,000 options that he thereafter held.  *See* Appendix B; *First Union*, 128 F. Supp. 2d at 899 (fact that "net holdings" increased "wholly inconsistent" with scienter theory).  As plaintiffs elsewhere tout (AC ¶ 72), certain unvested INCR options owned by Messrs. Rush and Macdonald vested upon closing of the Merger.  The stock sold by Messrs. Rush and Macdonald reflected only a portion of the equity that vested incident to the closing of the Merger.  For example, 126,093 of the 140,829 shares sold by Mr. Rush reflected the exercise and sale of options that vested on August 1, 2017 upon closing of the Merger.  *See* Appendix B.  There is nothing unusual or suspicious about an executive exercising options and

---

[20]  Plaintiffs' allegations of "gross proceeds" tell this Court nothing about the amount of profit that the individuals earned, making irrelevant and unreliable any implication that these amounts are "unusual."  *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006).  For example, 130,159 of the 140,829 shares sold by Mr. Rush during the Class Period were the result of an exercise of his options, for which his cost basis ranged from $10.06 to $40.23 per share.  And 18,295 of the 25,924 shares sold by Mr. Macdonald during the Class Period were the result of an exercise of his options, for which his cost basis ranged from $10.57 to $16.06 per share.  Further, 4,193 and 967 of the shares "sold" by Messrs. Macdonald and Rush, respectively, were surrendered to cover tax obligations.  *See* Appendix B.  Thus, any actual profits on these transactions were a fraction of what plaintiffs allege.

selling stock upon vesting. *First Union*, 128 F. Supp. 2d at 899 ("trading was not suspicious considering that Plaintiffs . . . ignore that many sales followed exercise of stock options"); *City of Brockton Ret. Sys.* v. *Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (rejecting scienter where executive "sold stock in the window for executive sales that opened after the issuance of the [annual] financial statements").

On the other hand, not one of the other 10 individual defendants is alleged to have engaged in any trading during the Class Period. "This fact alone is fatal to Plaintiffs' effort to establish scienter through stock sales." *First Union*, 128 F. Supp. 2d at 899. "The absence of sales from these individuals, then, suggests that the [allegedly improper] trading by [certain] defendants does not give rise to a strong inference of scienter." *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96 CIV. 8252 (HB), 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998), *aff'd sub nom. Kwalbrun* v. *Glenayre Techs., Inc.*, 201 F.3d 431 (2d Cir. 1999); *see Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'" (citations omitted)).

Indeed, Messrs. Macdonald and Rush sold stock on a variety of dates, none of which correspond to events that plaintiffs allege are of significance, and in both instances include sales after plaintiffs contend that "Defendants began to reveal that the Commercial prospects might not be as rosy" in September 2017. (AC ¶ 9.) Plaintiffs thus fail to allege with particularity any "unusual or suspicious" circumstances such that the Court could infer the necessary strong inference of scienter. *Hunter*, 477 F.3d at 184.

### 3. Defendants' Merger-Related Compensation Gives Rise to No Inference of Scienter.

Plaintiffs' allegation that Messrs. Rush and Macdonald received special compensation packages upon consummation of the merger (AC ¶¶ 71-73) pleads no motive to defraud.

*First*, this assertion is entirely redundant. The compensation benefits incident to the Merger were comprised primarily of accelerated vesting of options (Ex. 10 (Proxy) at 129-30); the same options that Messrs. Rush and Macdonald exercised and sold in part and which form the basis of plaintiffs' defective "insider trading" allegations.

*Second*, the assertion that defendants were "motivated to present the Merger and Commercial business in the best possible light" to facilitate this compensation (AC ¶¶ 71-72) is precisely the "type[] of generalized motives" that "courts have repeatedly rejected . . . as insufficient to plead scienter under the PSLRA." *Ottmann*, 353 F.3d at 352. Indeed, plaintiffs admit that defendants' Merger compensation arose from *pre-existing* employment arrangements, was disclosed in the Proxy, and was approved by stockholders.[21] (AC ¶ 72.) "In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. The motive to complete a corporate transaction is generic and can be imputed to any for-profit company and its officers. Such allegations alone do not give rise to a strong inference of fraudulent intent." *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 428 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007); *see also Cozzarelli*, 549 F.3d at 627 ("the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud.").

---

[21] Plaintiffs greatly overstate the value of this Merger compensation. *All of the potential cash benefits* (about $5 million) and a majority of the equity benefits (about $9.5 million) to which plaintiffs refer would be payable *only* upon "a qualifying termination of each named executive officer's employment immediately after the closing of the merger" (Ex. 10 (Proxy) at 129), *which did not occur*.

**B.      Plaintiffs Fail to Plead Strong Circumstantial Evidence of Fraud.**

"Where motive is not apparent, . . . [plaintiffs must] plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted); *see In re e.spire Comm., Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 744-45 (D. Md. 2001) (same).  This is so because, as the Fourth Circuit has observed, "scienter and knowledge with respect to misrepresentation are distinct components of the requisite analytical framework." *Maguire Finl.*, 876 F.3d at 548.  Plaintiffs must establish *both* knowledge of the misstatement *and* "an intent to mislead." *Id.*  To do so, "[a] plaintiff may not stack inference upon inference to satisfy the PSLRA's pleading standard." *Id.*

"Plaintiffs may not simply rely on the discrepancy between a company's optimistic outlook and subsequent disappointing results to support a claim of fraud." *In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 662 (D. Md. 2000).  "The PSLRA reflects Congress's determination that liability for securities fraud should not be predicated solely on an overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road." *Maguire Finl.*, 876 F.3d at 548.  Here, plaintiffs point to literally nothing—no documents, no confidential witness, and no public information—that supposedly alerted defendants to problems in inVentiv's Commercial business at the time of each supposed misstatement.  Plaintiffs plead no scienter.  *See Tekelec*, 2013 WL 1192004, at *15 ("plaintiffs have not alleged the existence of any internal documents from [Tekelec] or other direct statements contradicting the inference that defendants acted with a lawful intent"); *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

Plaintiffs cannot establish scienter from the mere fact that defendants conducted pre-Merger due diligence on inVentiv.  Plaintiffs speculate that defendants were provided "detailed information about inVentiv's CCO business and 'relationships with key customers'" at a series of meetings held between May 2016 and April 2017 and "in the course of due diligence" prior to agreeing to the Merger.[22]  (AC ¶ 64.)  Far from pleading actual fraud with particularity, this threadbare allegation is so conclusory it is meaningless.

To plead any inference of scienter, plaintiffs must allege "specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and *the particular document or other source of information from which the defendant came to know that the statement was false*."  *Iron Workers Local 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006) (emphasis added); *see also Marcus* v. *Frome*, 275 F. Supp. 2d 496, 502 (S.D.N.Y. 2003) (dismissing complaint that "does not mention any particular document or information that the defendants had access to, and does not allege that the information contained in those documents, whatever they were, was inconsistent or contradicted the information that formed the basis of the defendants' public statements.").  Put differently, "to withstand a motion to dismiss," for each

---

[22]  Grasping at straws, plaintiffs offer a single-sentence claim that the resignations of Messrs. Bell (who remains Chairman of the Board), Rush, and non-defendant Christopher Gaenzle from INCR were "highly suspicious and further support . . . scienter."  (AC ¶ 89.) Plaintiffs do not explain how one can infer from these supposed departures some intent to defraud.  "In reality, there are any number of reasons that an executive might resign, most of which are not related to fraud."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446–447 (S.D.N.Y. 2005).  "Subsequent resignations by executives are insufficient to support a strong inference of scienter."  *Iron Workers Local 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 593 (E.D. Va. 2006); *see also In re PXRE Grp. Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009) ("Without additional factual allegations linking [the executive's] resignation . . . to the alleged fraud, the Court finds these allegations insufficient to raise a strong inference of scienter.").  That Mr. Rush did not sign INCR's 2017 Form 10-K (which is not at issue here) in February 2018 after his resignation is of no moment as another CFO had taken Mr. Rush's place and thus appropriately signed the Form 10-K.  (AC ¶ 88; Ex. 17 (2017 10-K) at 24.)

-41-

supposed misrepresentation "a plaintiff must detail specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question." *Ressler* v. *Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998).  Plaintiffs' vacuous assertions that meetings were held or due diligence conducted reveals nothing about what any defendant learned, from where, or when, or how that supposed information contradicted a challenged, contemporaneous statement.  *Shields*, 25 F.3d at 1129 ("such allegations are so broad and conclusory as to be meaningless"); *Maguire Fin.*, 876 F.3d at 547 (assertion that defendant "was privy to confidential and proprietary information" that revealed the fraud deficient).  This tactic pleads no scienter because "Plaintiffs do not allege that financial data or forecasts discussed at these meetings did not match what [defendants] w[ere] reporting publicly."  *Tekelec*, 2013 WL 1192004, at *11.  "[C]ase law could not be clearer that allegations such as these are not enough to meet the pleading requirements for scienter in securities fraud cases."  *Phillips* v. *Triad Guar. Inc.*, No. 1:09-CV-71, 2015 WL 1457980, at *7 (M.D.N.C. Mar. 30, 2015).

Moreover, contrary to plaintiffs' conclusory allegation that "defendants had unbridled access to all of" inVentiv's financial information, the Proxy expressly warned that inVentiv financial information and projections were prepared by inVentiv and that "INC Research has not independently verified" that information.  (Ex. 10 (Proxy) at 200.)  Indeed, beyond the legally meaningless speculation of "unbridled access" to unspecified information,[23] *Lerner*, 273 F. Supp. 3d at 593 ("Courts have routinely held that corporate executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA."), plaintiffs nowhere

---

[23]  INCR's capacity to obtain customer and financial information from inVentiv was far from "unbridled."  The antitrust laws limit sharing competitively sensitive information among parties to a putative merger between competitors before closing.  M. Howard Morse, *Mergers and Acquisitions: Antitrust Limitations on Conduct Before Closing*, 57 Bus. Law. 1463, 1486 (2002); *see* Ex. 7 (7/27/2017 Tr.) at 8 ("Most companies don't give you what their pipeline is because that could be a competitive issue with others to let people know what their pipeline is.").

even contend that INCR received any inVentiv information after April 2017.  (AC ¶ 63.)  INCR did not previously have any Commercial business, and plaintiffs plead no facts explaining why, *prior to signing the Merger*, INCR did or must have known about any shortcomings in inVentiv's projections, adverse developments in its business, or some supposedly essential metric for measuring future inVentiv business success in the form of 100-plus assignments.  To the contrary, in its very first earnings call following the Merger, INCR explained that its management was "still kind of grappling with it all, because it is a very different business." (Ex. 16 (11/9/2017 Tr.) at 8.)

C.    **The Competing Inferences Give Rise to No Strong Inference of Scienter.**

Any inference of scienter that might arise from plaintiffs' speculation is overwhelmed by the far more plausible inference that, as the chronology suggests, INCR revised its outlook after the closing of the Merger on August 1, 2017 in light of the information learned once it owned the asset, the passage of time, and further developments in the Commercial business.  In other words, the more plausible inference is that Defendants timely provided facts to shareholders as they became known, and management's understanding of inVentiv's and the combined company's prospects continued to evolve.  As the Fourth Circuit ruled in *Ottmann*, a claim that the defendant misstated affairs with respect to a newly acquired business "militates against a finding that [the defendant] acted with a culpable state of mind."  353 F.3d at 348.  Plaintiffs here plead no fraud that "was so obvious that [defendants] must have been aware of it, especially in the midst of a complex nationwide integration of the two businesses." *Id.* at 351.

Moreover, plaintiffs may not plead fraud-based claims against 13 defendants without pleading scienter as to each defendant.  *Matrix Capital*, 576 F.3d at 190.  The Amended Complaint is legally defective because it nowhere pleads scienter separately as to each defendant. *Pipefitters Local No. 636 Defined Ben. Plan* v. *Tekelec*, No. 5:11-CV-4-D, 2012 WL

1029256, at *4 (E.D.N.C. Mar. 26, 2012) (dismissing complaint that "failed to specify when and on what basis *each* defendant knew or was reckless in not knowing that *his* statement was false or misleading") (emphasis in original).

### III.   THE AMENDED COMPLAINT FAILS TO ALLEGE LOSS CAUSATION.

Under the PSLRA, plaintiffs bear the burden of adequately pleading "loss causation," that is, that the alleged "material misrepresentation or omission caused the loss for which the plaintiff seeks to recover damages."  *Katyle* v. *Penn Nat. Gaming, Inc.*, 637 F.3d 462, 465 (4th Cir. 2011).  Loss causation is a necessary element of both Section 10(b) and 14(a) claims.  *See Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (Section 10(b) context); *Hayes*, 78 F. App'x at 861 (Section 14(a) context).  To meet this burden, plaintiffs must plead "a sufficiently direct relationship" between the plaintiffs' loss and the alleged fraudulent conduct.  *Katyle*, 637 F.3d at 472.  This "direct relationship" must be pled with "sufficient specificity," a standard consistent with Fed. R. Civ. P. 9(b)'s requirement that fraud allegations be pled with particularity.  *Id.* at 471.  "The degree of specificity demanded is that which will 'enable the court to evaluate whether the necessary causal link exists.'"  *Id.*

"To allege loss causation in this case, plaintiffs would have to allege that the market reacted to new facts disclosed in [November 2017] that revealed [INCR's] previous representations to have been fraudulent."  *Hunter*, 477 F.3d at 187.  The Amended Complaint alleges affirmatively that plaintiffs' supposed loss—the "massive decline" in INCR's stock price on November 9, 2017—resulted from INCR's announcement of "a surprisingly dismal outlook for 2018" (AC ¶¶ 10-11), *i.e.*, the reduction in INCR's forecasts.  This allegation defeats any loss causation theory.  Plaintiffs do not allege "that the price dropped to the 'correct' price after the truth came out" about allegedly undisclosed information:  that inVentiv's projected business success depended upon winning allegedly non-existent 100-plus sales contracts, or the inefficacy

-44-

of new drug approvals to predict future Commercial revenues. *Maximus*, 2018 WL 4076359, at *16. Nor do plaintiffs allege that the "earnings accretion" statements they challenge were corrected by the November disclosures, which said nothing about projected earnings in 2018 or thereafter. Although the information in the November 2017 "earnings calls indicates that the Individual Defendants' earlier statements may have been overly optimistic," the disclosure did not reveal any prior INCR statement to have been false at the time it was made. *Id* at *17.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Amended Complaint in its entirety, with prejudice.

This the 20th day of September, 2018.

WYRICK ROBBINS YATES & PONTON LLP

By:  /s/ Lee M. Whitman

Lee M. Whitman
N.C. Bar No. 20193
4101 Lake Boone Trail, Suite 300
Raleigh, North Carolina 27607
Telephone: (919) 781-4000
Facsimile: (919) 781-4865
lwhitman@wyrick.com
*COUNSEL FOR DEFENDANTS*

SULLIVAN & CROMWELL LLP
Brian T. Frawley
Thomas C. White
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
frawleyb@sullcrom.com
whitet@sullcrom.com
*COUNSEL FOR DEFENDANTS SYNEOS HEALTH, INC., MICHAEL A. BELL, ROBERT BRECKON, DAVID F. BURGSTAHLER, LINDA S. HARTY, RICHARD N. KENDER, WILLIAM E. KLITGAARD, ALISTAIR MACDONALD, KENNETH F. MEYERS, MATTHEW E. MONAGHAN, DAVID Y. NORTON, and ERIC P. PÂQUES.*

DECHERT LLP
David H. Kistenbroker
Joni S. Jacobsen
35 West Wacker Drive, Suite 3400
Chicago, Illinois 60601
Telephone: 312-646-5800
david.kistenbroker@dechert.com
Joni.jacobsen@dechert.com
*COUNSEL FOR DEFENDANT GREGORY S. RUSH*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on this day a copy of the foregoing document was filed with the Court's CM/ECF system which served the same on all parties of record.

This the 20th day of September, 2018.

/s/ Lee M. Whitman

Lee M. Whitman

-46-